UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

_____ )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
            vs.                  )        CASE NO. 7:20-CR-167-M-5
                                 )
                                 )
JOSEPH MAURINO,                  )
                                 )
            Defendant.           )
_____ )


WEDNESDAY, AUGUST 18, 2021
*DE NOVO* DETENTION HEARING
HELD IN WILMINGTON, NORTH CAROLINA
BEFORE THE HONORABLE RICHARD E. MEYERS II
CHIEF UNITED STATES DISTRICT JUDGE


APPEARANCES:

On Behalf of the Government:
**BARBARA D. KOCHER, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina  27601**

On Behalf of the Defendant:
**DAMON CHETSON, Esquire**
**The Chetson Firm, PLLC**
**19 West Hargett Street, Suite 508**
**Raleigh, North Carolina  27601**


USPO:
**ABBY WASER**


**MICHELLE A. McGIRR, RPR, CRR, CRC, RMR**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**

1                          I N D E X

2     **WITNESS:**

3
                   NCIS Special Agent Chris Little
4

5     **EXAMINATION:**                                    **PAGE**

6
                   Direct Examination by Ms. Kocher          8
7                   Cross-Examination by Mr. Chetson          59
                   Redirect Examination by Ms. Kocher        60
8

9

10

11

12

13

14

15

16

17

18

19                          *    *    *

20

21

22

23

24

25

```
 1                    (Wednesday, August 18, 2021)

 2                    P R O C E E D I N G S

 3

 4      (The defendant, Joseph Maurino, escorted into the courtroom at

 5                           3:23 p.m.)

 6   (Chambers conference held off the record commencing at 3:34 p.m.)

 7    (Chambers conference off the record concluding at 3:37 p.m.)

 8                    (Open Court at 3:38 p.m.)

 9               THE COURT:  I guess the appropriate order to manage this,

10   we'll have the clerk call the case.  We have a superseding

11   indictment, which has changed the nature of the underlying charge

12   for which this defendant has not had an initial appearance, but he

13   has had an initial appearance where he's been formally advised of

14   all his rights.

15               So there's a question of what additional information is

16   necessary, whether or not we can waive that portion.

17               So let's call the case and address that first.

18               THE CLERK:  USA v. Joseph Maurino.

19               THE COURT:  Counsel, please state your appearance for the

20   record.

21               MR. CHETSON:  Damon Chetson for the defendant, your

22   Honor.

23               MS. KOCHER:  And Barbara Kocher, your Honor, for the

24   Government.

25               THE COURT:  Mr. Chetson, does your client wish to have a
```

```
 1    formal initial appearance on the superseding indictment?  He's been
 2    fully informed of his rights.  You're here on the detention matter.
 3    I believe we can proceed on detention now.
 4               Do we need to read him the new charge so that it's
 5    formally there or do you want to waive that?
 6               MR. CHETSON:  We can waive that, your Honor.  And I'm
 7    going to provide my client a copy of the superseding indictment
 8    today here in court.
 9               THE COURT:  Okay.  Do you need a few moments to go over
10    that with him?
11               MR. CHETSON:  Your Honor, I did talk with him about it.
12    He hasn't had a chance to read the whole indictment at this stage,
13    but he has a copy and is going to read it here in court, but he's
14    been advised --
15               THE COURT:  I'll give you however long you need for that
16    and you can inform the Court when you're prepared to proceed.
17               MR. CHETSON:  Thank you.
18      (Attorney Chetson conferring with the defendant at counsel table
19                         briefly off the record)
20               MR. CHETSON:  Thank you, your Honor.  I've reviewed it
21    with my client.
22               THE COURT:  Okay.  Shari, do we have a waiver for that?
23               THE CLERK:  Yes, sir.
24               MR. CHETSON:  May I approach?
25               THE COURT:  Please do.
```

1          (Attorney Chetson retrieving documents from the clerk)

2                    MR. CHETSON:  I'm wearing a mask, your Honor, because I

3     was in the Sampson County jail yesterday so -- I'm vaccinated but...

4          (Attorney Chetson returning the document to the clerk)

5                    THE CLERK:  Thank you.

6                     (The clerk providing documents to the Court)

7                    THE COURT:  All right.  We're here on the *de novo* hearing

8     on detention based on Mr. Maurino's appeal of the magistrate judge's

9     detention order in this case.

10                    I've read and considered Mr. Chetson's filing in this

11    case and under the statute, the *de novo* hearing is appropriate.

12                    The United States has filed a third superseding

13    indictment, which now lists the defendant in a second count of the

14    indictment, which is Count Five; is that correct?

15                    MS. KOCHER:  It is, your Honor.

16                    THE COURT:  In particular, Count Five re-alleges

17    paragraphs 1 through 20, which were previously stated, and states

18    that:  Beginning in or about June 2019, and continuing to the

19    present, in the Eastern District of North Carolina and elsewhere,

20    the defendants, Liam Montgomery Collins, also known as "Disciple,"

21    James -- Paul James Kryscuk, also known as "Deacon," Jordan Duncan,

22    also known as "Soldier," and Joseph Maurino, also known as "Bishop,"

23    willfully and knowingly conspired and agreed to willfully and

24    knowingly damage and attempt to damage the property of an energy

25    facility of the United States involved in the transmission and

distribution of electricity, in an amount exceeding or which would have exceeded $100,000, in violation of Title 18, United States Code, Section 1366(a).

Specific to this defendant, it states:  Liam Montgomery Collins, also known as "Disciple," Paul James Kryscuk, also known as "Deacon," Jordan Duncan, also known as "Soldier," and Joseph Maurino, also known as "Bishop," researched, discussed and critically reviewed at length a previous attack on the power grid by an unknown group.  That group used assault-style rifles in an attempt to explode a power substation.  That's paragraph H.

In paragraph J, it states:  Liam Montgomery Collins, also known as "Disciple," Paul James Kryscuk, also known as "Deacon," Jordan Duncan, also known as "Soldier," and Joseph Maurino, also known as "Bishop," discussed using homemade thermite to burn through and destroy power transformers.  Thermite is a combination of metal powder and metal oxide which burns at temperatures over 4,000 degrees Fahrenheit.

This allegation is a violation of Title 18, United States Code, Section 1366(a).

Counsel, do the parties agree that this changes this to a presumption case from what was previously not a presumption of detention; is that correct?

MS. KOCHER:  That is the Government's position, your Honor.

MR. CHETSON:  Yes, your Honor.

1          THE COURT:  Okay.  It's a presumption case.

2    Nevertheless, the Government has the burden of establishing -- I

3    think the defendant has set forth sufficient materials in his

4    filings to place at least the question in issue for this Court is to

5    decide whether or not there are any conditions of release which

6    would adequately ensure the appearance of the defendant or protect

7    the public from future dangerous acts of this defendant.

8          So I will allow you to put on your evidence, Ms. Kocher.

9          MS. KOCHER:  All right, sir.

10         In previous experience with the Court, the Court had

11   noted review of the materials that had previously been submitted.

12         THE COURT:  I've read all the materials that have been

13   submitted.  I have -- we've been trying to do this on an expedited

14   basis so I have not had an opportunity.  I've read the filings, I've

15   seen all the exhibits.  I've not had an opportunity to listen to the

16   full two-and-a-half-hour transcript of the prior hearing.

17         MS. KOCHER:  Thank you, sir.  That is helpful to me.  And

18   the video exhibits, did you have the opportunity to --

19         THE COURT:  I did review the video exhibits.

20         MS. KOCHER:  All right.  Thank you, sir.

21         The Government would call NCIS Special Agent Chris

22   Little.

23         THE COURT:  The witness will step forward and be sworn.

24         THE CLERK:  Raise your right hand, left hand on the

25   Bible.  Please state your name for the record.

1          THE WITNESS:  John C. Little.

2              **NCIS SPECIAL AGENT CHRIS LITTLE**

3          having been duly sworn, testified as follows:

4          THE WITNESS:  Yes, ma'am, I do.

5          THE CLERK:  Thank you.  You may have a seat.

6          THE WITNESS:  Afternoon, your Honor.

7          THE COURT:  Good afternoon.

8          Your witness, Ms. Kocher.

9              <u>**DIRECT EXAMINATION**</u>

10    BY MS. KOCHER:

11         Q.    Agent Little, just for this Court's information, you have

12    been investigating this group from the origin of the investigation

13    itself; is that correct?

14         A.    Yes, ma'am.

15         Q.    And you previously testified last week regarding this

16    defendant, Mr. Maurino, having been involved with the group from

17    2017; is that correct?

18         A.    Yes, ma'am.

19         Q.    I want to turn your attention -- given the Court's

20    familiarity with the information that was provided last week, I want

21    to turn your attention to the new charge, and that is the conspiracy

22    to destroy an energy facility, and just briefly discuss that as it

23    may impact the Court's determination of detention.

24         First, did there come a point in your investigation that

25    you came to realize the group's interest in the power grid?

1      A.    First became specifically aware to me when we started

2    doing reviews of returns from iCloud accounts, seeing images and

3    screen shots in some of the iCloud accounts returned that

4    specifically mentioned the power grid.

5      Q.    All right.  Now, whose iCloud returns were those?

6      A.    Initially it was Liam Collins, Paul Kryscuk, Jordan

7    Duncan and Justin Hermanson.

8      Q.    All right.  And specifically, Mr. Maurino does not have

9    an iCloud account to your knowledge; is that correct?

10     A.    Not to my knowledge, no.

11     Q.    Was Mr. Maurino at all mentioned or referenced in these

12   returns that you reviewed?

13     A.    Yes.

14     Q.    In what way?

15     A.    He was mentioned as Bishop, a screen name for the most

16   part, within the Wire group.  I would see him active in the

17   encrypted communications of the group as Bishop.

18     Q.    All right.  And you were able to identify him as Bishop

19   how?

20     A.    Multiple -- just from the way they would reference him or

21   things about him or a specific communication with Mr. Kryscuk where

22   he gives his name and address to Mr. Kryscuk and it says Bishop --

23   you know, as Bishop at the top on the application.

24     Q.    And historically, what kind of things did you run into in

25   those texts and chats that indicated to you their interest in the

1    power grid?

2        A.   Historically, the first that comes to mind is an image

3    that was circulated within Wire depicting an individual standing in

4    front of a power substation with a skull mask consistent with what

5    the group wore in their live-fire training in Boise, Idaho.  So it's

6    the same mask and the individual appears to have similar equipment

7    and weapon as to what the group is seen training with in Boise.

8            It appears to be nighttime, individuals standing in front

9    of a power station, and then the caption under it, it says, do not

10   do this, do not be the type of person -- that's not a direct quote

11   from the image, but it says -- it's communicating, do not be the

12   type of person that becomes good at blowing up power substations and

13   getting away with it.

14           It's one of the first ones -- it's -- that struck me

15   first as far as significant due to the dress and appearance of the

16   individual, them standing in front of a power station and then just

17   the actual -- the text.

18       Q.   Now, if I understand you correctly, the text is saying,

19   don't do it?

20       A.   Right.  It's -- but it's obviously an attempt to veil the

21   meaning of what they're saying and it's something that's done

22   frequently.

23       Q.   Did other evidence regarding the power grid come to your

24   attention?

25       A.   Yes.  There were other pictures and memes in that fashion

1    that were communicated and then there's other direct mention of it.

2            For instance, through a combination of interviews of

3    individuals that were in the group, they discussed the -- they

4    informed me of their discussions within Wire of the power grid and

5    then those -- the information from what was told to me was

6    corroborated by other electronic evidence I saw.

7        Q.   Can you give an example of something someone told you

8    that was later corroborated by evidence you saw?

9        A.   Yes.

10           MR. CHETSON:  I'm going to object to the, someone told

11   you, as opposed to who was saying what.

12           THE COURT:  I think at this point, I'm sort of taking it

13   for what it's worth.  Where the --

14           MR. CHETSON:  Okay.  No, I mean, I understand the last

15   rules.

16           THE COURT:  -- I think at this point the objections --

17   we're in a detention hearing, the Rules of Evidence are

18   significantly relaxed.  We'll allow Ms. Kocher to put on evidence.

19   You can engage in cross-examination --

20           MR. CHETSON:  Thank you, your Honor.

21           THE COURT:  -- and I think we'll --

22           MR. CHETSON:  I apologize.

23           THE COURT:  No, it's quite all right.  I think figuring

24   out what our appropriate ground rules are as we recognize the Rules

25   of Evidence don't apply for this and we're trying to make sure the

1    Government's placed its evidence --

2             MR. CHETSON:  Yes, sir.

3             THE COURT:  -- in its most comprehensible manner and then

4    you can point out the holes as appropriate on cross-examination.

5             MR. CHETSON:  Okay.  Sorry, your Honor.

6        A.   So, for instance, Mr. Zacharek, in our --

7             MR. CHETSON:  Sorry, Mr.?

8        A.   Mr. Zacharek.  In our interaction with him, he described

9    the group specifically discussing a successful attack on the power

10   grid where group used rifles to shoot a transformer.  They used

11   flashlights to communicate; and he described the group as critiquing

12   that operation and talking about ways that that could have been

13   accomplished better.

14            And also I saw communications electronically that

15   highlight that the group was able to get away with it and that how

16   it appeared to be -- how encouraging that was that a group could get

17   away with something like that.

18            This is corroborated by other statements later made by

19   Mr. Womack stating that Mr. Hermanson showed him a video of a -- the

20   description given in the video is an identical attack to what was

21   described by Mr. Zacharek and he described a reenactment of the

22   attack.

23            From the details given to me about the attack, I was able

24   to find the attack they were referencing; and the details of the

25   attack are consistent with the Metcalf Power Station attack and

where the power substation was disabled and it caused a significant amount of damage in an outage.

THE COURT: And it may be helpful, Mr. Little, or Agent Little, I have not reviewed the audio from the prior hearing so I'm coming to this with no knowledge of who Zacharek is and no knowledge of who Womack is, what their relationship is. I'm assuming that they are cooperating informants or witnesses of some description who are familiar with these --

THE WITNESS: They are --

THE COURT: -- but they're not named or charged in the indictment and don't appear anywhere as individuals from what I've been able to read so far.

So I'm trying to -- let you understand the basis of the Court's ignorance as to where we're starting. I didn't have time to listen to the testimony that took place before Judge Jones so this is *de novo* with my review of all of the exhibits that were filed and the pleadings that were filed.

MS. KOCHER: Yes, your Honor.

THE WITNESS: I understand, your Honor.

Q. (By Ms. Kocher) All right. So starting back then with Mr. Zacharek you mentioned. Who is he?

A. He was a member of the group that I believe he also joined on or about the fall of 2017.

Q. Tell us more about Mr. Zacharek's involvement in the group. Did he stay involved in the group?

1      A.    He did.  He was involved in the group throughout the

2 duration.

3      Q.    And how did it come to pass that he was speaking with

4 you?

5      A.    He's been interviewed by the FBI.  I've been able to

6 speak with him and he was at Grand Jury.

7      Q.    And what was his last occupation, to your knowledge?

8      A.    He was a police officer.

9      Q.    And is he still a police officer?

10      A.    He is not.

11      Q.    What happened?

12      A.    He was publicly outed for his participation in the Iron

13 March forum we previously referenced in this investigation and

14 association with neo-Nazi ideology and he was fired from his

15 position in the police department.

16      Q.    When did that happen?

17            MR. CHETSON:  Can I get a spelling of his name?

18            MS. KOCHER:  Do you know how to spell Zacharek?

19      A.    It's Z-A-C-H-A-R-E-K to the best of my --

20            MR. CHETSON:  Z-A-H-A-R-E-K?

21            THE WITNESS:  I believe it's Z-A-C-H-A-R --

22            MR. CHETSON:  Thank you.

23      Q.    (By Ms. Kocher)  Did he have a screen name?

24      A.    Yes.

25      Q.    What was it?

1      A.    I believe he was Dealer.

2      Q.    I'm sorry?

3      A.    Dealer.

4      Q.    Dealer?  When was he -- I don't recall if you used the

5 word outed or what, but when was his relationship to a neo-Nazi

6 group revealed such that he lost his job as a police --

7      A.    In October of 2020, shortly before arrests were made in

8 this investigation.

9      Q.    Did he have communications with any group member after

10 his release from the police?

11     A.    Yes.

12     Q.    And tell us about those.

13     A.    Specifically I recall communications with Jordan Duncan.

14     Q.    All right.  What communication do you specifically

15 recall?

16     A.    They were text messages, I believe iMessages between

17 Jordan Duncan and Mr. Zacharek.  It was regarding how he was going

18 to handle this.  This had happened within the group previously to

19 Mr. Collins.  Mr. Duncan appeared to be encouraging him to get to

20 Boise and that's what Mr. Duncan understood the plan to be.  And

21 it -- from being able to communicate with Mr. Zacharek, that

22 stressed him out.  He became scared and concerned at that point of

23 being -- because of being publicly outed and what that meant within

24 the group.

25     Q.    What did that mean?  Did he tell you?

```
 1        A.    He was afraid that the group would think he had talked or
 2   given information to law enforcement and he feared retribution.
 3        Q.    So did he choose to go to Boise?
 4        A.    No.
 5        Q.    Where was he when law enforcement first encountered him
 6   then?
 7        A.    I believe they found him -- law enforcement found him at
 8   his parents' home in the State of New York.
 9        Q.    And that was on or about the day of the arrests of Mr.
10   Collins, Mr. Kryscuk and Mr. Duncan in Boise, Idaho?
11        A.    Yeah.  It was very close in proximity, but I don't
12   remember the exact date.
13        Q.    And Mr. Zacharek has been cooperating since that time?
14        A.    Yes, ma'am.
15        Q.    Let me turn your attention to Womack.  You mentioned that
16   Mr. Womack said that co-defendant Hermanson showed him a video
17   reenactment, if you would, of this Metcalf Power Station attack or
18   what you determined to be the Metcalf Power Station attack.  Who is
19   Womack?
20        A.    Maxwell Womack was a Marine in the same unit as Mr.
21   Collins and Mr. Hermanson.  He was recruited into the group by Mr.
22   Collins and Mr. Hermanson.
23        Q.    And how did you have the opportunity to speak with Mr.
24   Womack?
25        A.    I spoke with him directly here and he was also
```

1  interviewed by NCIS and the FBI in October of 2020.

2      Q.    And did he provide general information on the group as

3  well as that specific statement that you've testified to?

4      A.    Yes, ma'am.

5      Q.    Are there other persons that you've spoken with that are

6  not charged in the indictment that gave you information and enhanced

7  your understanding of the way the group operated?

8      A.    Mr. Hermanson.

9      Q.    That's co-defendant Hermanson?

10     A.    Yes, ma'am.

11     Q.    Returning then -- so Mr. Zacharek and Mr. Womack both

12 discussed the discussions by the defendants of this successful

13 attack on a power station.  Do you recall -- let me first have you

14 describe the manner in which the digital evidence that you were

15 looking at would indicate whether or not this defendant, Mr.

16 Maurino, was involved or knew of that communication?

17     A.    The screen names that are visible in that particular

18 screen shot and then additionally, we have digital evidence that Mr.

19 Maurino was an administrator for the group's chat and I've seen

20 other Wire conversations where Mr. Maurino, as Bishop, indicates his

21 involvement in the chat.

22     Q.    All right.  So specifically as relates to that described

23 attack on the Metcalf power station, do you have any specific

24 recollection as to Mr. Maurino's involvement in the discussions?

25     A.    It would be that he was present for the discussions as

described by Mr. Zacharek.  Mr. Zacharek described it as it was --
described and critiqued as a group specific to that -- specific to
what I've determined as the discussion of the Metcalf attack.

Q.    Was the animated example of that power station attack
found on any of the digital media that you reviewed, do you know?

A.    Not that I recall at this time.  I recall seeing
something similar, but I would need to review it again as far as
that.  I have found a reenactment that appears identical to what was
described by Mr. Womack and been able to view it.

Q.    Let me turn your attention then to other types of
evidence in regard to interest in the power grid.  Were there some
of these texts or chat screen shots specifically related to the
power grid?

A.    Yes.

Q.    What do you recall in that regard?

A.    I recall specifically a conversation regarding replacing
BLM fliers in a given area of Boise that Mr. Kryscuk communicated
that he had torn down and wanted to replace with their own
propaganda.  There were suggestions of what to -- what to replace it
with; and Mr. Maurino, as Bishop, suggested replacing it with the
slogan, the lights go out and so do you.

       This is significant to me because of statements made by
Mr. Hermanson regarding how the group discussed the use of power
outages in their -- what he described as operations.  This would be
creating an outage that diverts the police, causes chaos from the

outage itself, causes damage to the equipment, takes a long time to replace and causes an outage of significant length; and then using that to create a favorable operating environment to conduct an assassination or murder of a specific person.  So the phrase, the lights go out and so do you, is significant.

It's -- additionally, the actual area is significant. Putting that in Boise due to -- what I'm sure we'll discuss later, but due to the handwritten list Mr. Kryscuk had of intersections that we've discussed.

Q.   Ultimately did you find a theme among any photographic or videographic evidence that you came across in reviewing their digital media?

A.   I did.

Q.   And what is that?

A.   In addition to the initial -- what I -- meme I described, there's other images circulated within the group of, for example, three unknown individuals doing the Heil Hitler salute beneath large power lines just situated in the distance directly beneath large power lines that are above them.

Additionally, the group took a series of photos and video while in Boise in the summer of -- in July of 2020.  One image I recall the -- I'm -- I don't know the exact term because I'm not a photographer, but the group appears to be superimposed over a panoramic view with a large power tower situated directly in between them.  So it would be two on the left, two on the right with this

1    large power line directly in between them.

2         Q.    And were you able to identify any of the four people in

3    that photo?

4         A.    Yes.

5         Q.    And who were they?

6         A.    They were Mr. Kryscuk, Mr. Duncan, Mr. Maurino and then

7    TC.

8         Q.    All right.  And TC is the juvenile brother of defendant

9    Liam Collins?

10        A.    Yes, ma'am.

11        Q.    Were there other photographs and videos taken of that

12   live-fire training?

13        A.    Yes.

14        Q.    And were there others that presented the pose, if you

15   would, in front of the tower, the transmission lines, as the one

16   you've described?

17        A.    Yes.  There were others, but the one -- the one I

18   described stands out to me so much because it appeared superimposed

19   and very purposeful.  And then there was also other pictures and

20   videos of the actual training itself.

21        Q.    And that training, you mean the live-fire training?

22        A.    Correct.  And that brings me back to why I also felt some

23   of the other statements were significant because that type of

24   training displayed -- appeared offensive in nature and it would be

25   the type of -- the type of act that would be conducted within the

1    outage is what it appeared to be.

2         Q.    Did you find evidence, Agent Little, that the group

3    practiced operational security?

4         A.    Yes.

5         Q.    Can you tell us about that.

6         A.    Operational security, or op-sec, was something that was

7    discussed on multiple occasions, specifically it's from screen shots

8    I've seen and then additional interviews and testimony from group

9    members regarding operational security and what measures were taken.

10         There were -- there was operational security sent around

11    the actual current communications and then operational security

12    around being able to conduct operations and get away with it in the

13    form of fake identity documents with fictitious names.

14         There was the practice of using burner phones within the

15    group -- prepaid phones you can pay cash for, put time on and aren't

16    associated with an individual.

17         There was the practice of not discussing direct plans on

18    electronic devices, as far as the very specific details.  For

19    instance, Mr. Hermanson was advised to only write things down that

20    were -- to write them if they were specific planning, not to put

21    them on electronic media and --

22         Q.    So would they exchange letters then?

23         A.    Exchange letters between each other?

24         Q.    Right.  Is that how they did it, they would write the

25    specific plans down and exchange letters?

```
 1        A.    No, not to my knowledge.  It was also if you needed to
 2   discuss something important, it would need to be face-to-face.  Like
 3   a face-to-face conversation would be preferable.
 4              There was also other understood rules about -- the term
 5   used was snitches get ditches -- and it was presented as group
 6   rules.
 7        Q.    And is this in the Wire chat that you mentioned?
 8        A.    Yes, ma'am.
 9        Q.    How long was that live-fire training there in Idaho?
10        A.    It was multiple days.  I don't remember exactly how many
11   days it was, but it was a matter of days.  Not weeks, but it was a
12   matter of days.
13        Q.    And was Mr. Maurino there the entirety of that training?
14        A.    Yes.  To my knowledge he was there for -- for the entire
15   time.
16        Q.    I want to turn your attention to the idea of explosives.
17   Did defendant Duncan in particular amass, what the indictment
18   alleges, was a library of materials?
19        A.    Yes, ma'am.
20        Q.    And tell us about that.
21        A.    It was a large quantity of documents stored on an
22   external hard drive that was seized from his apartment in Boise,
23   Idaho.  There was information taken from the military on that hard
24   drive in addition to a large amount of explosives manuals that
25   covered topics, to include explosives made from ammonium nitrate and
```

covered incendiary devices utilizing thermite.  It was an extensive collection of those types of manuals.

In addition to how to make home-made silencers, how to make firearms.  There was documents regarding chemical weapons, ricin.

Q.    Was there any indication that he had shared that material with any other member of the group?

A.    Yes.

Q.    Tell us about that.

A.    I've seen a specific manual regarding how to build silencers, that an identical manual was also -- the manual was on Mr. Maurino's phone, an identical manual on Mr. Duncan's external hard drive.

This extends to also other schematics and manuals that were found on Mr. Kryscuk's iCloud and his device itself in addition to TC.  These were explosives manuals that pertained to detonators and car bombs.

THE COURT:  Were those found on this defendant's devices?

THE WITNESS:  No, your Honor.

MS. KOCHER:  I didn't hear the question, sir.  I'm sorry.

THE COURT:  Were those found on this defendant's devices, the device related -- the material found on this defendant's device was a how to build silencers manual; is that correct?

THE WITNESS:  Yes, your Honor.

Q.    (By Ms. Kocher)  You mentioned there was information

about how to make thermite on Duncan's drive.  Do I recall that
correctly?

    A.    Yes, ma'am.

    Q.    Was that information also located on any other device?

    A.    There was information how to make thermite on Mr.
Kryscuk's device -- or on his iCloud account.  And at this time I'm
not sure if it was on his device when it was seized because I
haven't been able to fully review that device, but it was on his
iCloud.

    Q.    To that end, have you fully reviewed Mr. Maurino's device
at this time?

    A.    Not completely.

    Q.    What is thermite?

    A.    Thermite is a mixture of aluminum powder and oxidized
metal that is incendiary.  It burns extremely hot, I believe over
4,000 degrees, and can melt steel.  It's utilized by military to
penetrate armor.  It's extremely hot.

    Q.    So it does have a military use?

    A.    Yes.

    Q.    Did any of the persons you spoke with tell you why they
would consider using thermite in regard to the power grid?

    A.    Yes.  Mr. Hermanson indicated the thermite was discussed
as an option to use to burn through a transformer because it would
ensure the complete and total destruction of the transformer and
ensure -- or give them the best chance for the longest outage and

the most damage.

Q. And turning to this defendant, do you recall any specific presence of Bishop in any of the writings or conversations that happened in regard to thermite?

A. He would have been present for the discussion described by Mr. Hermanson, but I'm not referencing a -- in that statement, I'm not referencing a screen shot that I was able to read. I'm referencing what was described by Mr. Hermanson as a group conversation.

THE COURT: Can you describe for the Court where that conversation took place, who was present and to the extent you know, when it changed from could to would or should? That is, we could do this. When does it change to, we will do this, plan to do this, should do this. As opposed to, this is how we might, to, this is what we want to do.

THE WITNESS: I guess -- as far as the use of thermite, sir?

THE COURT: Yeah. And the power grid -- I'm trying to figure out when we've crossed from planning from some future perspective -- I understand from the prior hearing we've had in this case regarding the future need to defend Idaho as a homeland at some operational point in the future. That seems to the Court -- some of the discussion in this case has been prospective. That is, some day the U.S. will fall. We may need to defend Idaho. We need to be prepared. We are the ones who are going to do it. We're going to

build a post fall-proof world out of science fiction.  And then
there's the, we have a present, current plan to attack a particular
target.  I'm trying to figure out where on the spectrum of possible
worlds the evidence takes us.

THE WITNESS:  Yes, sir.  I don't believe it's a future
of, it's going to fall and we're going to use this to defend
something --

THE COURT:  Right.

THE WITNESS:  -- I believe it's a, we're going to use
this to accelerate the fall and make it happen.

THE COURT:  And that's what I'm trying to get to.  Where
and how you see the plans taking place?

THE WITNESS:  I see that as just from the consistent
ideology within the group as far as accelerating and creating that,
by using these types of operations to create that kind of chaos, but
I do not know a specific date that was set to do it.

THE COURT:  All right.  I'm not necessarily suggesting
you have an imminent, on Thursday we will do this, but next fall?
You know, if something else happens then, what do you -- you have
what appears two insiders who are participating in these
conversations at some point before things come apart.  And I know
this is a detention hearing, we don't want to get into too much
detail.  I'm trying to figure out where are we on the fantasy
reality, imminent plan, aspiration spectrum of trying to figure out
what we're trying to do.

 1              And I'll leave that to you, Ms. Kocher --

 2              MS. KOCHER:  If I might ask a question.

 3              THE COURT:  Your witness.  I'm just trying to figure out

 4    where we are.

 5              MS. KOCHER:  Yes, sir.

 6         Q.    (By Ms. Kocher)  Do you have reason to believe, Agent

 7    Little, that locations were actually chosen?

 8         A.    Yes.

 9         Q.    And what is that?

10         A.    Mr. Kryscuk maintained a handwritten list of multiple

11    intersections and a -- multiple intersections and a specific fuel

12    depot as described by his wife that he kept in his wallet.

13         Q.    And that handwritten list was two-sided; is that correct?

14         A.    Yes, ma'am.

15         Q.    And if you would take a moment to describe the other side

16    of that list.

17         A.    The other side contained 12 to 14 names of specific

18    individuals that were handwritten on the other side -- it's actually

19    an envelope and it was -- one side had the handwritten intersections

20    and the other side had the handwritten names.

21         Q.    All right.  And what information do you have about the

22    list of names?

23         A.    The list of names contained individuals like the governor

24    of Oregon, the national leadership of BLM and other individuals.

25    Many of them were -- I guess I would describe them as local-level

1   politicians --

2        Q.    And did --

3        A.    -- or state level --

4        Q.    Excuse me.

5        A.    Sorry.

6        Q.    That's okay.  You can finish your sentence.

7        A.    Or state-level politicians.

8        Q.    And did either of the individuals to whom you spoke

9   discuss with you the purpose of this list?

10       A.    Yes.

11       Q.    And what was it?

12       A.    I discussed it with Mr. Hermanson, who I did not -- I did

13  not inform him of the list, but he described a conversation in which

14  Mr. Kryscuk had made -- and others -- made comments that -- to

15  include Mr. Zacharek -- that for the group to accomplish their

16  goals, people would have to die.  That is something I recall.

17           And then Mr. Hermanson described a group conversation in

18  which the group is saying, okay, how would we get started and he

19  indicates that Mr. Kryscuk says that it's -- don't worry about it.

20  I have a list of 12 to 14 people that we will check off the list.

21  Or he said, we will check them off the list.

22           And at the time, Mr. Hermanson didn't know or have

23  knowledge of an actual handwritten list.  He didn't know that he was

24  referencing one, but that's the term used, I believe it was, check

25  them off the list.

1    Q.    And did Kryscuk and Hermanson, not this defendant,
2  discuss specifically how some of those people on the list would be
3  murdered or assassinated?
4    A.    Yes.
5    Q.    Can you give us an example of that?
6    A.    They discussed the use of car bombs.  The best way to
7  install a car bomb in a vehicle, the way to -- best way to initiate
8  a car bomb within that vehicle; and also, as described by Mr.
9  Hermanson, the group discussed a way to use a wedge to enter a
10  vehicle undetected.
11    Q.    For the purpose...
12    A.    For the purpose of placing a device inside of the vehicle
13  without -- and then being able to enter the vehicle and not
14  appear...
15    Q.    Was there evidence in regard to this list that anyone
16  within the group had actually attempted or had gained information
17  about the location of those individuals?
18    A.    Yes.
19    Q.    What is that?
20    A.    Mr. Kryscuk had screen shots of home addresses for
21  individuals.  I haven't seen it for all individuals on the list, but
22  I know it's more than one individual on the list he had screen shots
23  of their home address; and in one instance I can recall where he had
24  shared that screen shot with another group member.  I believe Mr.
25  Collins.

1      Q.    All right.  Let me turn your attention back then to the
2    other side of that envelope and a list of intersections you said.
3    What did those -- on investigation, what did those intersections
4    turn out to be?

5      A.    They turned out to be power substations in the Boise
6    area.  Portland, Seattle, San Francisco and other locations in
7    California.  And these locations were consistent with areas Mr.
8    Hermanson described as areas the group aspired to conduct
9    operations.

10     Q.    And was the power company contacted upon finding that
11   list of power substations and the other things you've described?

12     A.    Yes.  The power companies in those respective areas were
13   contacted by the FBI.

14     Q.    And what did they have to say about the significance of
15   those particular intersections and the facilities they had at those
16   intersections?

17     A.    They said they would cause a significant amount of
18   damage, some would cause more damage than others, some would cause
19   longer outages than others; but they would cost millions of dollars
20   to replace.

21           And the FBI specifically asked one of the experts
22   regarding the substations what specifically thermite would do and
23   they confirmed that thermite would specifically cost -- cause the
24   most damage because it gets inside of the transformer and it's -- it
25   doesn't become a matter of replacing parts at that point because it

1   burns and melts from the inside.

2        Q.   So you mean the entire transformer would have to be

3   replaced?

4        A.   It would -- correct.  It would have to just be removed

5   and replaced; and some of those take a very long time to manufacture

6   or replace.

7        Q.   Did you notice anything relative to the list of

8   intersections and proximity to any of those addresses of the names

9   of the people on the back?

10       A.   Yes.  A specific instance I recall is the screen shot of

11  the name and address I just mentioned that Mr. Kryscuk had screen

12  shotted and then also shared with Mr. Collins.  There are multiple

13  intersections on the handwritten list in close proximity to that

14  address in San Francisco.

15       Q.   And is that consistent with what you learned from your

16  conversation with Mr. Hermanson, that they would -- taking out the

17  power grid would have a dual purpose of both causing chaos as well

18  as providing cover for their operations?

19       A.   Yes, ma'am.

20       Q.   There came a time when Collins, Kryscuk and Duncan were

21  all three located in Boise; is that correct?

22       A.   Correct.

23       Q.   Do you have evidence that they talked face to face about

24  power grids?

25       A.   Yes.

1       Q.    What is that?

2       A.    Ms. Kryscuk, the wife of Paul Kryscuk, in an interview

3 with the FBI, stated that she overheard them discussing the power

4 grid while at their home in Boise, Idaho.

5       Q.    Did it specifically reference something against the power

6 grid?

7       A.    She referenced them discussing the grid going down, but

8 that they stopped -- as I understand it, she -- they referenced the

9 grid going down and she described as once they were aware of her

10 presence, they stopped discussing what they were discussing.

11      Q.    All right.  When is the last physical contact you are

12 aware that Mr. Collins had with Mr. Maurino where they could have

13 spoken face-to-face?

14      A.    It would have been shortly after Mr. Collins' discharge

15 from the Marine Corp in September of 2020.

16      Q.    And what was the occasion of their meeting?

17      A.    Mr. Collins went to his house.

18      Q.    Mr. --

19      A.    Mr. Collins went to Mr. Maurino's residence in New

20 Jersey.  He had loaded a rental vehicle up with belongings from the

21 Camp Lejeune area and went from Camp Lejeune to Mr. Maurino's

22 residence.

23      Q.    Do you have any insight through the digital media what

24 that visit may have been about?

25      A.    At this time I do not.

1      Q.   All right.  Had there been other visits, if you would, to

2   Mr. Maurino's house by or on behalf of Mr. Collins?

3      A.   Yes.

4      Q.   What was that?

5      A.   Mr. Collins was able to arrange for an individual from

6   his military unit to deliver stolen body armor to Mr. Maurino at his

7   residence.

8      Q.   And when was that, if you recall?

9      A.   It was prior to September 2020.  I don't recall the exact

10  date.

11     Q.   Do you recall if it was in 2020?

12     A.   It was.

13     Q.   I want to turn your attention, Agent Little, to

14  tannerite.  Are you familiar with that?

15     A.   Yes, ma'am.

16     Q.   What is it?

17     A.   Tannerite is a binary explosive that comes in two parts.

18  Once they're combined, they can be -- it can be ignited through a

19  high impact, like a round.  So you can shoot it and it can explode.

20     Q.   So by round you mean a bullet?

21     A.   A bullet, yes.

22     Q.   And what are the two components of Tannerite?

23     A.   Ammonium nitrate and aluminum powder.

24     Q.   And do I recall that aluminum powder is one of the

25  potential ingredients in thermite?

1     A.    Yes.

2     Q.    And the indictment alleged that Mr. Collins asked both

3   Hermanson and MW.  That would be Maxwell Womack?

4     A.    Yes.

5     Q.    To purchase 50 pounds of Tannerite for the group; is that

6   right?

7     A.    Correct.  50 pounds each.

8     Q.    Was there -- as we spoke briefly about operational

9   security, was there any operational security involved in their

10  description, that is Womack and Hermanson's description to you of

11  that interaction with Collins?

12     A.    Yes.  It was described to me that Mr. Womack was asked to

13  go on line and purchase it with a gift card so that a credit card

14  cannot be traced back to who purchased it.  So, like, a cash gift

15  card.

16     Q.    All right.  Of the plans regarding the power grid, do I

17  understand the Government's evidence to be that Mr. Maurino was

18  involved in the discussions but -- and shared perhaps some of the

19  memes and the videos that have been described but did not, to your

20  knowledge, pursue purchase of any of the components of any explosive

21  device?

22     A.    Not to my knowledge.

23     Q.    Did the group overall share the information about what's

24  needed to make thermite, if you know?

25     A.    I don't recall group -- the group sharing information

1    regarding thermite, but I recall the group discussing information

2    regarding ANFO.

3        Q.    And what is ANFO?

4        A.    ANFO is made from ammonium nitrate and it's the explosive

5    used by -- most famously by Timothy McVeigh in the Oklahoma City

6    bombing.

7        Q.    And that ammonium nitrate is the other portion of

8    tannerite?

9        A.    Correct.  The other half, if you will, contains ammonium

10   nitrate.  Of the two halves of tannerite.

11       Q.    I see.  And do you recall if Mr. Maurino was in that chat

12   or in that conversation in regard to ANFO?

13       A.    I don't recall as far as seeing him in the screen shot,

14   but I do recall that it was in their group conversation.

15       Q.    I want to turn your attention away from that charge in

16   the indictment now and just ask you generally, was there a plan,

17   discussion, thought given to any type of operation -- I think you've

18   used the word -- that was -- that does demonstrate Mr. Maurino's

19   involvement with the group?

20       A.    Yes.

21       Q.    And what plan -- I don't want to put that word in your

22   mouth, but what operation was that?

23       A.    Mr. Hermanson described an operation to infiltrate a New

24   Jersey National Guard Armory to steal M240 machine guns.

25       Q.    And what is an M240?

1        A.    An M240 is a belt-fed, fully-automatic machine gun that

2    in the military it would take -- it's deemed like as a crew-served

3    weapon that generally more than one person will operate and feed the

4    weapon.

5        Q.    And what would be the purpose of possessing M240 machine

6    guns, if Mr. Hermanson told you.

7        A.    Correct.  When I -- when I discussed that with Mr.

8    Hermanson, he bluntly said it was the lethality of the weapon

9    system; and it's something that, with the majority of the members

10    being in the military and being -- not only in the military, in the

11    infantry, they would all be very familiar with that weapon system.

12        Q.    All right.  How about the idea that it would be at a

13    National Guard Armory.  Are M240s at all National Guard Armories?

14        A.    Not to my knowledge.

15        Q.    Is there familiarity by someone in the group with

16    National Guard Armories?

17        A.    Yes.  Mr. Maurino was in the New Jersey National Guard.

18            THE COURT:  Can you tell me what the relationship is to

19    Government's Exhibit 9, which appears to be photographs of squad

20    automatic weapons?

21            THE WITNESS:  Those -- yes, sir.  That was from Mr.

22    Maurino's phone.

23            THE COURT:  Okay.

24            THE WITNESS:  And it was taken with his -- from looking

25    at the forensic extraction, I can see that it was taken with his

phone.  It's not a screen shot of another image.

MS. KOCHER:  Taken from his phone.

THE COURT:  Okay.  And so Government's Exhibit 9, do you know what location is that?  Is that the New Jersey National Guard location?

THE WITNESS:  I do not know that is the specific location.  The location data for that image is not available.

THE COURT:  And he served previously overseas as well?

THE WITNESS:  Myself?

THE COURT:  No.  This defendant served overseas as well, correct?  He was deployed?

THE WITNESS:  Yes, your Honor.

Q.    (By Ms. Kocher)  Did this plan, in regard to entering a National Guard Armory and stealing the M240s, have any bones to it?  Was it just that broad or was there more information?

A.    There was specific information given to Mr. Hermanson in a face-to-face setting with -- person to person, face-to-face with Mr. Collins regarding that plan; and Mr. Collins expressed to Hermanson that there were two guards that they would need to kill to gain access.

Q.    Did they have a plan to access the facility overall?

A.    To get initial access they would use Mr. Maurino's National Guard affiliation.

Q.    Can you explain how that would work --

A.    He would have a uniform and an identification card that

1    would allow him to get -- I don't know specifically what their

2    protocols are like there but, generally, at these facilities, your

3    uniform and ID card would get you inside the actual fence line and

4    close to the building or even inside.

5        Q.   Are the guards typically then at the building as opposed

6    to at the fence line?

7        A.   I don't know how specifically it would work at a National

8    Guard Armory.

9        Q.   All right.  Just simply that Hermanson said that Mr.

10   Collins told him in a face-to-face -- was that at Camp Lejeune?

11       A.   Yes.  Or it was in our district.  It was in the -- at

12   Camp Lejeune or in the Jacksonville area if they were off base.

13       Q.   All right.

14       A.   That he made it clear that they had specifically

15   identified there was two guards on duty at a given time.

16       Q.   All right.  Looking back over the exhibits, Government

17   Exhibit 5, appears to be a series of text messages.  The middle one

18   bears the name Nelson Wivera [phonetic] and says, he one of your

19   boys?  Is that the exchange in regard to the delivery of the stolen

20   body armor that you described earlier?

21       A.   Yes, ma'am.

22       Q.   All right.  And Government's Exhibit 6 is a man in a

23   skull mask with a hat and holding a firearm.  Do you recall that

24   exhibit?

25       A.   Yes.

1     Q.    Do you know who's in that photo?

2     A.    Can I see it?  Would you hold it up?

3           MS. KOCHER:  Yes.  If I may approach, your Honor.

4           (The Court displaying Exhibit to the witness)

5     A.    That is Mr. Maurino.

6           MS. KOCHER:  Thank you.

7     Q.    (By Ms. Kocher)  Are you able to identify the weapon that

8  he's holding there?

9     A.    Yes.  It appears to be a short-barrel rifle and it

10  appears consistent with what was seized at his home in October.

11    Q.    All right.  Exhibit 7 is two individuals sitting on the

12  tailgate, it appears, of a vehicle.  Do you recall that exhibit?

13    A.    I do.

14    Q.    And do you know who was sitting on those?

15          (The Court displaying Exhibit to the witness)

16          MS. KOCHER:  Thank you, your Honor.

17    A.    That is Mr. Maurino and TC and those are the skull masks

18  I was describing earlier when -- the initial image I described

19  outside of a power station.

20    Q.    (By Ms. Kocher)  And Government's Exhibit 8 is a series

21  of text messages that begins:  I'll need list of ammo to get, and

22  then, I got seven Mack 11s.  And then my copy is illegible.  To the

23  right, it says, about eight, I think 38s, nine 9s.  And then it goes

24  on, the response is by Rick V, and it says, word.  Do you recognize

25  what that exhibit would be?

1          A.     Yes, I do.

2          Q.     What is that?

3          A.     That is the excerpt from a chat Mr. Maurino had with

4    another group of individuals outside from what's already been

5    described as the actions taking place in Boise.  That is a separate

6    chat group that appears to have been started on the Signal

7    application and that appears to be referencing weapons Mr. Maurino

8    says he has.

9          Q.     All right.  Based on the context of this particular

10   screen at the first page of Exhibit 8, was there other conversation

11   about getting together ammo for practice, if you would?

12         A.     Yes, ma'am.

13         Q.     I'm sorry?

14         A.     Yes, ma'am.

15         Q.     Do you recall discussions about exchanging money or

16   repaying one another for ammo and other items they had gathered?

17         A.     Yes, I do.

18         Q.     I notice on the second page of Exhibit 8 there is a text

19   or message which says, download Wire and add me on it.  It'll be

20   better to move there.  I'll make a group chat.

21                Do you recall who wrote that or whose account that was

22   written on?

23         A.     That's Mr. Maurino.

24         Q.     And, again, given the context of all of this, what can

25   you tell the Court about the move to Wire?  What would be the

1    purpose of that move?

2         A.    Operational security.  Wire was perceived as more as a

3    safer platform to utilize than Signal.

4         Q.    Did you find in the larger text strings admonitions by

5    this defendant to the others about not continuing to discuss

6    whatever the topic was on that?  And by that I mean --

7         A.    When the topic would turn to specific firearms and

8    firearms purchases, Mr. Maurino would either advise that he would

9    discuss it on Wire or he would discuss it in person.

10        Q.    All right.  The third page of Exhibit 8, Agent Little, an

11   individual says, I was forced to hang out with an annoying Jew

12   against my will.  Then the response is two separate texts.  The

13   first one says, eh, everything has a silver lining; and the second

14   one is, social interactions like that and learning to be likable by

15   people who you don't like and should hate you is an experience-only

16   ability.  Do you remember that?

17        A.    I do.

18        Q.    Tell us what -- about that.

19        A.    I remember reading the conversation.  And to me, it

20   highlights his awareness of the need to be able to hide in plain

21   sight within society or, for instance, within the National Guard

22   without alerting those that should be concerned with him without

23   alerting them of his true feelings or views --

24        Q.    I'm sorry.  Do you have actually an example of that from

25   the information and evidence you've reviewed; that is, Mr. Maurino

1    hiding in plain sight?

2        A.    What comes to mind is an article the Army Times did about

3    him and his brother deploying together as identical twins and that

4    they were both going to Qatar at the same time.  So the Army Times

5    does the article, but at the same time, even throughout his

6    deployment, Mr. Maurino's participating in this group and continuing

7    to keep in communication with Mr. Kryscuk and utilize the Wire

8    application.

9        Q.    And do you know, sir, if the ongoing participation in

10   such a group is itself violation of the Military Code of Justice?

11       A.    It is.

12       Q.    As a member of the National Guard, would he have been

13   subject to that?

14       A.    Yes.  He would have been subject to it while he was

15   activated and deployed to Qatar certainly.

16       Q.    All right.  And I had asked about if there were -- in the

17   larger context of Exhibit 8 -- if there were admonitions to the

18   parties.  I would just -- in that Signal chat, I would note that at

19   page 5 of Exhibit 8, in the center, Big Ben appears to say, I want a

20   good pew-pew.  Do you recall that text?

21       A.    I do.

22       Q.    Again, from the context, what did you discern Big Ben was

23   talking about?

24       A.    He was talking about a firearm.

25       Q.    And the response is, okay, dummy, we can talk in person.

1       A.    Correct.

2       Q.    Do you know who responded in that manner?

3       A.    Mr. Maurino.  I believe he also asked him, does he want a

4  specific brand or something more underground.

5       Q.    All right.  And that would be part of the Government's

6  evidence as to Count One?

7       A.    Correct.

8       Q.    Agent Little, are the persons you've described as

9  cooperators in custody or out?

10      A.    They are out.

11      Q.    And are the targets, for lack of a better word, the

12 persons on that list of names that you've described, are they, to

13 your knowledge, out and about with their regular lives?

14      A.    Yes.

15      Q.    The persons in that additional group, participating in

16 the message in Government's Exhibit 8, do you know if they are in

17 custody or out and about at this time?

18      A.    They are out.

19      Q.    Do you have concerns in regard to Mr. Maurino's access to

20 weapons?

21      A.    I do.

22      Q.    And what are those based upon?

23      A.    There are unaccounted for weapons.  We seized the -- one

24 unserialized lower receiver and short barrel upper, but they're --

25 for instance, the number of weapons he describes in the Signal group

1    were not recovered.  To my knowledge, like the folding stock lower
2    that he was seen retrieving from the backpack gun in that video and
3    firing at the group of targets, that that particular folding stock
4    lower was not recovered.

5             And then additionally, the later group that we described
6    from the Signal chats from our evidence we discussed regarding the
7    purchase of three unserialized lower receivers from Mr. Kryscuk, we
8    did not recover all of those.  We recovered one from Mr. Maurino,
9    but then that would indicate there's maybe others out that he would
10   have access to or be given access to.

11        Q.    That specifically referencing the conduct described in
12   Count One of the indictment; is that right?

13        A.    Yes, ma'am.

14        Q.    The overall conspiracy to manufacture and provide the
15   firearms.

16             You testified, I believe, Agent Little, that this
17   defendant was an administrator of this group chat; is that correct?

18        A.    That's correct.

19        Q.    Did he have other positions of leadership in this group?

20        A.    Yes.  He was part of vetting interviews of -- prior to
21   someone's acceptance into the group.

22        Q.    And can you give any specifics about that?

23        A.    These interviews were described to us by Mr. Hermanson
24   and Mr. Womack.  They would -- after a trial period within a
25   separate chat, they would make it to what sounds like a formal

interview that is done over Wire in an encrypted voice conversation,
not text, but encrypted voice conversation, and they were asked
specific questions about their skills, because the group was seeking
people with specific skills, skill sets within the military, and
then special skill sets of their own.  Like their own special niche
they would fill for the group.

They were asked questions like who their enemies are and
their world -- questions regarding their world view.

Q.    All right.  Specifically, did you have someone tell you
that Mr. Maurino was on their vetting committee?

A.    Yes.

Q.    And who was that?

A.    Mr. Hermanson.

MS. KOCHER:  No further questions, your Honor.

THE COURT:  I've got a follow-up question about the
Biggie Smalls' lyric.

MS. KOCHER:  About the what?  I'm sorry.

THE COURT:  About the Biggie Smalls' lyric.  I got seven
Mack 11s, about eight 38s, nine 9s.  That's a Biggie Smalls' lyric.
Are we looking for those firearms?

THE WITNESS:  I don't know.  I don't recognize that.

THE COURT:  This is in the Government's Exhibit 8 where
it says, I've got seven Mack 11s, about eight 38s, nine 9s.  That's
a rap lyric.

MS. KOCHER:  I'm --

1          THE COURT:  The Court's independently aware of that.

2          MS. KOCHER:  And it's a what?  I'm not understanding the

3    words, sir.  I apologize.

4          THE COURT:  So if you look on page 8 --

5          MS. KOCHER:  Yes.

6          THE COURT:  -- Government's Exhibit 8, page 1 --

7          MS. KOCHER:  Yes.

8          THE COURT:  -- where he says, I'll need a list of ammo to

9    get.  Then he says, I got seven Mack 11s, about eight 38s, nine 9s.

10   I understand the rest.  We're about to get 308 12 gauge pigeons.

11   That's a genuine shopping list, but that to me seems like he's just

12   tossing a Biggie Smalls' lyric into the chat.

13         THE WITNESS:  I don't recognize the lyrics is what I'm

14   saying, sir.

15         THE COURT:  Okay.  Yeah.  Well, that is a Biggie Smalls'

16   lyric.

17         MS. KOCHER:  I am still not understanding the word.  I

18   apologize.

19         THE COURT:  Biggie Smalls?  Biggie Smalls is a dead

20   rapper.

21         MS. KOCHER:  Oh.

22         THE COURT:  It's a lyric from a song by the dead rapper,

23   Biggie Smalls.

24         MS. KOCHER:  Got it.

25         THE COURT:  There's a lot of other stuff going on here,

```
 1    but that particular one is not compelling.  So I'll pass that on for
 2    what it's worth.
 3              All right.  Mr. Chetson, your witness.
 4              MR. CHETSON:  Yes, your Honor.  And we're nearing 5.  I
 5    don't know what you want to do.
 6              THE COURT:  I think the Court can -- we can -- I'm
 7    unavailable until 3:30 tomorrow.  I can look at personnel here and
 8    see -- I don't want to hold everybody longer, but if we -- I'm
 9    trying to get a sense of how long we think it will take to wrap this
10    up.
11     (Discussion between the Court and the deputy clerk off the record)
12              THE COURT:  We don't have a court reporter tomorrow.  I'm
13    not supposed to be in the building at all.  How soon I could get
14    back from -- I'm supposed to be out of town.
15              We can -- if we think we can do -- I'm willing to stay
16    until 5:30 if we think we can do this, if we have personnel to cover
17    that.
18              MR. CHETSON:  Your Honor, I'm happy to resolve this by
19    5:30, however, the Government has gone on for now an hour and
20    15 minutes or so.  I don't want to try this case -- I'm sorry for
21    sitting.  I don't want to try this case, but that's basically what
22    we've done.  And I don't really -- I'm not saying I need three hours
23    or something like that, or two hours, but I have some real -- and I
24    don't want to --
25              THE COURT:  Well, I've read the pleading.  I think there
```

1    is the discovery, try-the-case question, and there's the question,

2    which what I haven't heard and I'm concerned about is, I'll tell

3    you --

4            MR. CHETSON: Yeah, yeah.

5            THE COURT: -- this particular defendant was charged

6    criminally in New Jersey, has been out on bond since that time.

7            He's been aware -- he's been questioned by the Federal

8    Bureau of Investigation very early and I'd like to know when. He

9    has been aware that there's a federal investigation. He's been

10    aware that all the other members of this group with which he was a

11    participant -- there's a whole separate question about his trial.

12    That's not the case.

13            MR. CHETSON: Right.

14            THE COURT: The question is he knows that those folks

15    were federally arrested, he's been federally interviewed and he's

16    been at liberty; and all of the concerns we have that we say are

17    present concerns, were concerns starting back at the initial federal

18    interview. And if he was going to do something to those people in

19    the interim, it seems to the Court that that's likely to have

20    happened.

21            So I'm trying to get -- that's what makes this defendant

22    different from Kryscuk and some of the other defendants is, he looks

23    different to me; and I'm trying to get a sense where we are.

24            I'm happy to take that by proffer instead of by witness

25    if we think that's going to be more effective.

1          MR. CHETSON:  Sure.  Yes, your Honor.  The other issue,

2    I'll just say there's been a lot of statements made by this agent

3    and I can cross him on all the statements, but it's about

4    present-in-a-chat type stuff, right, as -- and I can go through and

5    we can go through each one and see whether this agent can say what

6    my client was saying.

7          Because there's a difference, your Honor -- and I don't

8    mean to just get into argument here -- but there's a difference

9    between existing in a chat -- and I'm very familiar with the

10   Internet and chat systems and so forth and I can draw that all out

11   from the agent; but being present in a chat or being involved in a

12   chat and what that means versus, yes, saying something, you know.

13         I'm logged on to chats right now, your Honor, with

14   lawyers that -- on Signal -- that they're saying things.  Now, I try

15   to limit what chats I get into, but if they're saying things in

16   there and I'm present, am I involved?  And so that's kind of where

17   we are.

18         And given -- and I don't want to spend three hours

19   cross-examining the witness, but the issue becomes what is he

20   saying.  And I get the difference between conspiracy and what they

21   can show in a conspiracy and overt acts and all that, and I

22   understand what the Government can do there; but this is quite a

23   different issue where we're talking about somebody's liberty status.

24         And so I'm happy to -- I don't mean to belabor the

25   question, but I can go through all those things.  So that's number

1    one.

2              Number --

3              THE COURT:  Go ahead.  I'll take number two.

4              MR. CHETSON:  Yeah.  So that -- I don't want to give up

5    my opportunity, but by the same token I don't want to belabor issues

6    that the Court is not -- some things are concerning about this

7    certainly.  Yes, your Honor.

8              THE COURT:  There's a question of whether or not he's had

9    short-barrel rifles, unregistered receivers.  All the firearm

10   counts.  There's the extent to which the conspiracy to do damage to

11   the power grid is immediately present, sometime out in the future.

12   There's that set of questions.

13             And there's the question that's pressing to me today,

14   which is this defendant's been at liberty for six months prior to

15   his arrest.

16             MR. CHETSON:  Right.

17             THE COURT:  What's the danger that we can develop --

18             And you would have gotten it on redirect anyway, Ms.

19   Kocher.

20             So I'm going to give both of you -- and I think we may be

21   better off proceeding by proffer rather than testimony of the

22   witness regarding the information between the time of his state

23   arrest and now, that suggests that he won't show up or that he is a

24   genuine clear and present danger.

25             MR. CHETSON:  And I'm happy to move expeditiously, your

1    Honor.  So what I'll do is -- can I go by proffer right now and

2    then --

3                    THE COURT:  Proffer right now.  To the extent you need to

4    ask specific questions of the witness --

5                    MR. CHETSON:  Thank you.  I didn't want to give up my

6    right to ask questions.

7                    THE COURT:  Okay.

8                    MR. CHETSON:  So what I will say -- and I'm going to

9    refer to essentially Bates numbers, your Honor, for some of this

10   stuff.  Because I've had an opportunity since last week to go

11   through a bunch of the discovery that was provided to me by the

12   Government.

13                   And if I could sit, your Honor, while I --

14                   THE COURT:  Please do.

15                   MR. CHETSON:  It is clear that my client is arrested on

16   or about -- and I think I said in my motion, maybe October 22nd, but

17   it may be -- there's two different dates that appear, but

18   October 20th essentially was within that two-day period, your Honor.

19                   The next day after his arrest on state charges for the

20   firearms, the state New Jersey firearms case, he's released from

21   custody, state custody that day and he speaks with the -- he speaks

22   with the Government, the FBI agents, in New Jersey at his home.

23                   That occurs on October 23rd with Special Agent Franheim

24   [phonetic], Manley [phonetic] and Task Force Officer Schmidt.

25                   He initiated a conversation.  I will say that at that

point, he had a state criminal defense attorney who had been
retained.  The Court may have seen the exhibit that I presented
about his conduct.

THE COURT:  I have.

MR. CHETSON:  But in any case, my client's mother, who's
present in court, reminds him through the Ring audio, you know, your
attorney said don't talk, but he continues to talk and say things,
which is fine.

I simply say that in terms of, to the extent he was
supposedly engaging in operational security, he's telling them
things and admitting conduct, including that he is Bishop, right.

Now he doesn't say what he said is Bishop, but the idea
that he is Bishop he admits to, your Honor.  And so maybe against
what his attorney might say, he does that.

The Government comes back -- they do a partial -- at
least a partial search of the home, your Honor, because they seize a
number of books and literature from him.  They return to the home in
November to return those items.  They don't notice anything amiss
about the home.

I'll just proffer to you that the home is a -- a middle
class home in Manalapan, New Jersey.  It is a suburban home tract --
sort of a suburban home.  You can imagine what it might look like.

They returned to the home in November.  Don't see
anything amiss.  Drop off the books.

In January he -- my client -- is scheduled to participate

1    in a mass vaccination site in New Jersey as part of the Army

2    National Guard duty.  At that time he is still in the Army National

3    Guard.

4            I will tell the Court that during this time, the FBI and

5    perhaps NCIS -- but at least the FBI -- apprises the Army National

6    Guard of my client's -- of the investigation and the existence of

7    the state charges, which -- and they follow up in January and then,

8    I believe, again in February, and then to ensure that he has

9    been term -- that he has been administratively discharged.

10           So he is at this point in our history, he has been

11   administratively discharged under general, but with honorable

12   conditions.

13           I say that, one, to sort of dispel the notion that he's

14   independently doing something as a bad soldier apart from this

15   conduct and say that he was administratively discharged.

16           In February -- or in March rather -- the Government

17   simultaneously is engaging in interviews with Mr. Hermanson.  They

18   have a conversation with Mr. Hermanson back in October and I think

19   he's in Okinawa.  During that -- they spell out for him, you know,

20   you know you can help yourself.

21           Mr. Hermanson begins talking to the Government.  The

22   Government -- Mr. Hermanson tells them things about my client, I'm

23   assuming.  I haven't seen the full interview.  I've gotten a summary

24   of it, but not the full interview.

25           Because in March, the Government then, on six different

occasions -- five or six different occasions -- and there are 302

reports about it -- drive by my client's home to ensure that there's

nothing amiss.

They take down the license plates of the cars there.

Nothing is apparently amiss because no other reports are done.

I'll note also that in September of 2020 before the

arrests are commenced, the Government is aware of my client.  It has

been aware since July of 2020 and the Government -- there are 302

reports regarding the use of a pole camera outside my client's home.

That is proposed by one of the Federal agents and I'm not

sure exactly where.  A technical -- I forget -- TTA, technical agent

is consulted about that.  There's some discussion about that.

Apparently the lighting conditions are not great in that area.  So

for whatever -- and I don't know whether there are other decisions

about resources and money.  We're in the middle of COVID; but in any

case, a pole camera is not installed.

I say that because the Government has, as you're well

aware, many different mechanisms to observe somebody and watch

somebody.  One is contemplated, but to the extent they think my

client is out there secreting weapons, burying weapons, stalking

protests or power stations, the Government has the ability to do

some of the things necessary to bring the evidence to court here and

doesn't do -- just doesn't do it.

So my client, I'll let you know, is arrested on -- his

mom is present during the October 20th arrest by State Police, who

1    are, of course, informed about the potential existence of a firearm

2    that may violate New Jersey state law.

3           On, I think it's June 26th, your Honor, of 2021, in

4    response to the Government's superseding indictment, which is

5    returned, I think, on June 6th or in early June, an arrest warrant

6    goes out and the FBI comes at about 8:45 in the morning.  The reason

7    why I know that, your Honor, is not only from -- I haven't gotten

8    all the reports yet, but there's a Ring video that my client's

9    family has -- and I can play it for the Court -- but essentially it

10    shows FBI coming to the door, my client coming out with his hands up

11    and walking backward.  So you've already heard in my filing about

12    the nature with which he surrenders.

13           And so what I would indicate to the Court is that this

14    pattern, this evidence, shows that the Government was surveilling

15    him at certain points.  Had the ability and clearly understood the

16    ability to fairly cheaply -- I don't want to say what a pole camera

17    costs -- but to put up a pole camera and watch the home.  None of

18    that was -- well, some of that was done; but nothing indicates at

19    all that he did anything wrong in the period after October 20th,

20    I'll just say that, and we'll contest the other at trial.

21           On January 9th my client is informed -- and there was

22    some intimation that he may have been at the initial detention

23    hearing in front of Judge Jones -- that my client was to go to

24    Washington D.C. potentially as part of the coverage of -- or

25    protection of the counting or inauguration or what have you.

1          In fact, my client is actually -- and had volunteered or
2   decided as part of his service, to go to the vaccination center and
3   assist in the vaccination of his fellow citizens.
4          That's actually terminated about two weeks into that
5   essentially deployment to the vaccination center because now the
6   Army National Guard has heard about this and they're beginning the
7   process of removing him from the military.
8          He contacts, on January 9th, the FBI agent -- and this is
9   on Bates Exhibit 11387.  He called them and talked to Agent Franheim
10  about this issue of, hey, why have I been separated from the
11  military?  What's going on?  I'm not sure exactly what was going
12  through his mind.  Maybe he thought the case was over and now he
13  doesn't know what's going on.
14         So he calls them and he says -- he just wanted some
15  answers about what's going on with his case.  And then he says -- he
16  asks for his phone back.  I think that's important for two points.
17  He's doing the appropriate thing of calling the FBI and trying to
18  get his property back, but, you know, it indicates that the
19  Government has had his phone since roughly October and he's told
20  that he could have the phone back when the processing was done.
21         The reason why that's important, your Honor, is because
22  we've been told a lot about what this agent has seen or heard from
23  people that might be on -- or that this agent has seen on phones and
24  yet I don't -- except for the seven or eight exhibits, there's
25  nothing in here that the officer or the agent has told us about him

1    plotting to go to a power facility, to bomb a power facility or --

2    it is -- well, I would prefer a client not say anything at all in

3    relation to firearms on chats or anywhere else, but this is what

4    they have at this stage.

5              So we have renditions from the agent about what is said

6    and the agent having had his phone since October, and at least

7    processing since January, hasn't provided us with the evidence here

8    in court.

9              But finally, Mr. Maurino asks Special Agent Franheim if

10   there are any questions he wanted to ask Mr. Maurino since he was on

11   the phone.  So he makes another effort, probably against his -- a

12   good attorney's advice, but he makes another effort to volunteer

13   information.  And I say that again because we've heard a bit about

14   this operational security issue and about how my client is

15   supposedly some kind of serious plotter against the Government and

16   how he's exercising these carefully-laid plans for operational

17   security and here he is volunteering and talking to the Government

18   and providing them with information that anybody who was caring

19   about operational security would not provide.

20             So that's kind of where we are in terms of the

21   Government -- the Government's evidence or about -- or evidence

22   about my client's conduct.

23             You've seen some of the evidence -- and I'll stand now

24   since I'm no longer looking at these documents.  You've seen some of

25   the evidence that we -- that we filed as exhibits regarding the

DD214 and the conduct overseas and the good behavior otherwise and
the medal that he received for the tactical training.

          And now I'm getting into argument, which I probably
should hold off on; but we are in the process where -- we're in the
position where the Government argues that evidence that it has is
evidence of my client's bad conduct.  Evidence that it does not have
it says is evidence of my client's supposed operational security.

          And supposedly there are all these weapons out there --
and I get the Biggie Smalls' lyric has been essentially acknowledged
by the Court for what it is -- but that -- that throws into doubt
the characterizations that the Government has made about what my
client's real intent was even before October 20th, 2020.  Because if
the Government can't distinguish -- and frankly, your Honor, I filed
that and it was the very top of the motion that I filed for a
detention hearing where I laid out where that lyric came from.

          If the Government can't distinguish those things and the
agent can't distinguish those things, then we're in a difficult --
I'm -- it's a moving target about what I'm fighting here, your
Honor.

          And I don't want to overextend my argument so --

          THE COURT:  I'll tell you -- all right.  Let's figure out
anything that you need to -- you think that you need to ask this
agent --

          MR. CHETSON:  Yes, sir.

          THE COURT:  -- let's -- I'll give you 5 minutes.  Ask him

```
1    anything you think you need to ask and we'll go to argument.
2              MR. CHETSON:  Thank you, your Honor.
3                         CROSS-EXAMINATION
4    BY MR. CHETSON:
5         Q.    Just -- Agent, you --
6              MR. CHETSON:  One second.  Let me check with my --
7      (Attorney Chetson conferring with the defendant at counsel table
8                       briefly off the record)
9         Q.    (By Mr. Chetson)  You're aware my client, after being
10   separated from the Army National Guard, turned in -- and his brother
11   assisted in turning in -- all of the equipment that he had been
12   assigned by the Army National Guard.  Are you aware of that?
13        A.    I'm not aware of that, but I know that's required when
14   you're separated.
15        Q.    You have no reason to doubt that he, in fact, was in the
16   process or had already turned in all of the equipment that he had
17   been assigned by the Army National Guard?
18        A.    At what point?
19        Q.    Soon -- within weeks after being discharged from the
20   military?
21        A.    I'm not aware -- I mean, I know that's common practice
22   when you're discharged is to -- and I'm not doubting that it
23   happened after his discharge.  I just don't -- I don't know.
24        Q.    When did you interview Mr. Womack?
25        A.    Mr. Womack was interviewed by NCIS on October 20th, but
```

1  it was not myself.

2      Q.   Okay.  And when was Mr. Zacharek interviewed?

3      A.   Again, I believe Mr. Zacharek was interviewed on -- on or

4  about October 20th initially and then also came here for Grand Jury.

5      Q.   When -- for which Grand Jury, the superseding or the

6  third superseding?

7      A.   It was not this most recent.  It was -- it would have

8  been -- I believe it was last November.

9      Q.   Okay.  The November...

10      MR. CHETSON:  Your Honor, honestly I have no more

11  questions.

12      THE COURT:  Ms. Kocher, redirect.

13                    **REDIRECT EXAMINATION**

14  BY MS. KOCHER:

15      Q.   Just to make clear, it's true, Agent Little, that Mr.

16  Womack, Mr. Zacharek and Mr. Hermanson were interviewed more than

17  once; is that correct?

18      A.   That's correct.

19      Q.   And you've just stated their first interview date?

20      A.   Yes.

21      Q.   Okay.

22      MR. CHETSON:  When was the last time they were

23  interviewed?

24      THE WITNESS:  I don't recall the exact dates of the last

25  interview.

```
 1              MR. CHETSON:  Do you know the month?
 2              THE WITNESS:  I mean, I was able to speak with Mr.
 3    Hermanson today.
 4              THE COURT:  He was here for the superseding indictment --
 5              THE WITNESS:  Yes.
 6              THE COURT:  -- the third superseding.
 7              MR. CHETSON:  Okay.  All right.  No further questions.
 8              THE COURT:  I have one question in that regard.  The
 9    United States became aware that this defendant was Bishop as far
10    back as October of last year?
11              THE WITNESS:  Yes.
12              THE COURT:  And he was aware that they knew he was Bishop
13    as far back as October of last year?
14              MR. CHETSON:  Yes.  He told them, your Honor.
15              MS. KOCHER:  I want to clarify, the Government knew Mr.
16    Maurino was Bishop long before October of 2020.
17              MR. CHETSON:  Okay.
18              MS. KOCHER:  If that was your question is, how early.
19              THE COURT:  Okay.  But the -- he was arrested.  At the
20    time he was arrested, he talked.  He told them he was Bishop.  And
21    I'm trying to figure out when the United States knows that he's
22    aware that the United States knows he's Bishop.  That's what I'm
23    trying to find out.
24              MS. KOCHER:  Yes.  That...
25              MR. CHETSON:  Yes.
```

1          THE COURT:  Would that be -- is there any reason to doubt
2     the proffer from the defense, that he told them he was -- or
3     admitted to being Bishop as far back as his first interview with the
4     FBI?
5          THE WITNESS:  I have no reason to dispute that that's
6     what he said --
7          THE COURT:  Okay.
8          THE WITNESS:  -- as far as being Bishop.  As far as the
9     other things he alleged in that initial interaction, I don't know
10     that all of that was accurate.
11          THE COURT:  Okay.  Fair enough.  I'm trying to get a
12     sense of how long he's been at liberty with the United States being
13     aware that -- being aware what the United States knows about this
14     group and he's at least been at liberty since the first indictment
15     was handed down and the other members of this group were arrested.
16     And with an awareness at that time that they knew -- the United
17     States knew he was Bishop; is that correct?
18          MR. CHETSON:  Yes, your Honor.  If you're asking, it's --
19     it's Bates number 8004245 is the exact page.  It is a 10/23/2020 FBI
20     302 and it's a three-page 302 and on the second page of the 302 and
21     that exact Bates number, it says, Maurino knew the names Liam
22     Collins and Paul Kryscuk.  Maurino was aware Collins and Kryscuk
23     used the Wire app.  Maurino also used the Wire app and identified
24     his user name as Bishop.  And he is informed during the same
25     interview and is aware then of the fact that the others had been at

1   that point arrested or detained.

2           And I will also proffer that none of these other -- the

3   AP reporter, the governors, were all given duty to warn

4   notifications by the FBI according to the 302s that I received after

5   they became aware of what Mr. Kryscuk had on his list; and they were

6   all aware -- and I have not -- I have no indication that any of them

7   had reported any threat of harassment at all by my client.

8           THE COURT:  All right.  Mr. Chetson, I read your filing.

9   I understand the position.

10          Ms. Kocher, I'm going to tell you, this Court is inclined

11  to release this defendant on a monitor.

12          I'm going to allow you to make an argument against that

13  right now.

14          MS. KOCHER:  I appreciate that, your Honor; and I would

15  also note that that would not be the first time in this hearing that

16  that signal has come toward the Government.

17          The Government's position is that the fact that the

18  defendant has not violated to date is not the end-all of the

19  considerations.  He is now facing a maximum of 25 years total.

20          That had -- I understand the relevance of the Court's

21  consideration that he knew he was -- that he admitted he was Bishop

22  and he understood as of October 23rd that he might be a target of

23  government investigation, but it did not come home to him.  I

24  suspect it did not come home to him until he began his transport to

25  North Carolina when he actually was in custody for some period of

1  time.

2          He is now facing a 25-year maximum on these sentences.

3  The Government continued, as was noted by defense, to monitor as

4  best it could by keeping some level of surveillance up, considering

5  other types of investigative possibilities, like a pole cam, which

6  technologically could not be undertaken at that point in time.  And

7  given that level of interest, indicted as soon as could happen with

8  the review of the phone.

9          It was the phone content that you've heard about, that

10 is, the exchange with the sale of Kryscuk's weapons to two other

11 people in New Jersey that solidify his role in that gun conspiracy.

12 Your Honor is well aware there is not a civil rights count in this

13 indictment as of yet, which from the beginning, Mr. Maurino clearly

14 would have fit in.  So we were, frankly, limited.  The indictment is

15 very limited.  And it was only upon that information coming from the

16 phone that allowed Mr. Maurino to be added as a defendant.

17         I can't speak to what Mr. Maurino was thinking, whether

18 he thought he was clear, whether he was going to lay low, whether he

19 was going to live his social interactions -- like learning to be

20 liked by people that should hate you -- whether it was just more

21 experiential learning for him in that regard.

22         His mom did testify that one of her best friends is a

23 Holocaust survivor, presumably Jewish, at the last hearing and said

24 Mr. Maurino has no problem with Jewish people; and that clearly the

25 words that Mr. Maurino used here certainly are not a member of any

1    -- not lyrics from a rap song where he describes the needed ability

2    to learn how to blend in.  And, as testified today, the very fact

3    that he blended in even while serving his country in Qatar,

4    continuing his relationship, continuing on the Wire chat and

5    continuing contact, particularly with Mr. Kryscuk, is all evidence

6    of that.

7            In the end, your Honor, the Government does believe that

8    there's a risk of danger generally to the community and yet a risk

9    of flight by this defendant despite his uncontested -- we have no

10   evidence to show and I've not put on evidence and am not arguing

11   that there was any violation of his release conditions; but, your

12   Honor, it's a New Jersey law.  It was a state law.  He had not even

13   had, to my understanding, an arraignment on that charge yet.  The

14   hearings -- so I may be wrong?

15           MR. CHETSON:  No, I'm -- sorry.

16           THE COURT:  It's her turn.

17           MS. KOCHER:  The pretrial release report fashioned would

18   indicate, in regard to his criminal history, that is nothing in --

19   compared to what he is now presented with.

20           And it is true that the Signal chat group, the two

21   members -- the two persons to whom he apparently sold these guns of

22   Kryscuk, at least exchanged moneys for them.  That, I think, was all

23   going down in August, September.  The Government does not have

24   evidence before you that the guns were actually shipped from Kryscuk

25   to the east.  So I don't know if those guns were manufactured and

1    handed on as was testified to today.  We don't have those lower

2    receivers.  We don't know where they are, but that's two people

3    that's out.

4            Then we have the members of the Signal chat that are part

5    of Exhibit 8 that are potentially out.  I can't speak to what's been

6    happening.  As your Honor may have gathered, our evidence -- we

7    don't have a confidential human source in.  We never did.  Our

8    evidence has come from the defendants' own words and their own chats

9    that they screen shot, despite the operational security which they

10   believed they were practicing.

11           And, your Honor, I would note that in regard to

12   operational security and his talking with the FBI, the Government's

13   position would be that's more of trying to be likable, to learn what

14   he can about what's happening with the investigation and to give

15   what information he may, not so much that he was wide open.

16           In fact, the agent's response was he would be more than

17   happy to talk with him, but he needed to meet in person.  And it was

18   that to which Mr. Maurino denied at that point.  He didn't want to

19   meet with the FBI.

20           In essence, your Honor, the Government argues what it did

21   argue before Judge Jones last week and that is there is, despite the

22   compliance with the state conditions, the current charges have

23   changed the landscape too much.  There are both victim targets out

24   as well as co-conspirators that are not in custody, to include TC;

25   and the risk of danger, particularly in a rebuttable presumption

```
 1   case, is not adequately countered by the presence of electronic
 2   monitoring.
 3              THE COURT:  Is TC charged?
 4              MS. KOCHER:  TC has not been charged, your Honor -- he
 5   has state proceedings in that district and I -- is it Maine?
 6              MR. CHETSON:  Rhode Island.
 7              MS. KOCHER:  I apologize.  It is Rhode Island.  He has
 8   state proceedings against him there.
 9              THE COURT:  Thank you, Ms. Kocher.
10              Mr. Chetson.
11              MR. CHETSON:  So I'll just limit my argument to a few --
12   couple of things.
13              THE COURT:  You're winning.
14              MR. CHETSON:  Okay.  The only issue I'll say, in state
15   court in North Carolina you're not arraigned until the moment you go
16   either plea in and take your plea and get sentenced -- we don't have
17   the three-month PSR process -- or until you stand before a jury
18   coming into the room.  So the status of the New Jersey case I
19   couldn't say, but he's appeared.
20              THE COURT:  All right.  All right.  This Court's going to
21   set conditions of release.
22              The basis for the difference between this defendant and
23   the other defendants is this defendant's been aware of the ongoing
24   Federal investigation for the entire time.  It is apparent to the
25   Court, pursuant to Title 18, United States Code, Section 3142 --
```

1          THE COURT:  You can return to your seat.  Sorry.

2                      (Witness Excused)

3          THE COURT:  We've had you trapped up here.

4          This Court can fashion conditions of release which will

5     ensure the appearance of the defendant and the safety of the

6     community.

7          The defendant's mother was proffered at the prior hearing

8     as an adequate third-party custodian.

9          This Court's going to order this defendant be released on

10    home detention -- I'm sorry, on home incarceration.  That's a

11    24-hour-a-day lockdown at your residence except for medical

12    necessities, other court appearances and other activities

13    specifically approved by the Court.

14         Now, you'll have the opportunity to make appropriate

15    motion to this Court for things like work, your voluntary

16    activities, anything else that you need to do.

17         The behavior that's been described in the charges in the

18    indictment is particularly troubling; and the issue is that there's

19    been no evidence since this defendant became aware of the federal

20    charges, of all the other participants in this activity, of his

21    behavior -- that the United States was aware of his behavior; that

22    the United States knew who Bishop was; that the United States knew

23    that he was a participant in the Wire; and that the United States

24    was investigating him.

25         The one significant change since that has been the new

charge that was handed down today, which does significantly alter the exposure from a five-year exposure to a 25-year exposure.

The Court also notes that no one is going to be more motivated than this defendant to think about the appropriate degree of cooperation and the extent to which he can prejudice his case by any behavior that violates the law.

I'm going to order -- it's ordered that the defendant's release is subject to the following conditions:

Defendant must not violate federal, state or local law while on release. Defendant must cooperate in the collection of a DNA sample as authorized by 34, United States Code, Section 4070(2).

Defendant must advise the Court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

The defendant must appear in court as required; and if convicted, must surrender as directed to serve the sentence the court may impose.

The defendant will be notified of his next appearance.

It is further ordered the defendant is placed in the custody of Cynthia Maurino, who agrees to supervise the defendant, use every effort to assure the defendant's appearance at all court proceedings and notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

The Court accepts all of those proffers that were made

1  before Judge Jones.

2          The defendant must submit to supervision by and report

3  for supervision to the New Jersey Pretrial Services.  Telephone

4  number 609-989-2056.

5          Surrender any passport to the United States Probation

6  Office; not obtain a passport or other international travel

7  document; not possess a firearm, destructive device or any other

8  weapon.

9          Participate in the following location restriction program

10 and comply with its requirements as directed:

11         Home incarceration.  Restricted to 24-hour-a-day lockdown

12 at your residence except for medical necessities and court

13 appearances or other activities specifically approved by the Court.

14         You must submit to the following location-monitoring

15 technology and comply with its requirement as directed.  That's a

16 radio frequency monitor.  And report as soon as possible to the

17 pretrial services or supervising officer every contact with law

18 enforcement personnel, including arrests, questioning or traffic

19 stops.

20         The Court's also going to add the condition that the

21 defendant not have unmonitored access to the Internet.

22         Ms. Maurino, do you have the capacity to monitor your

23 son's access to the Internet and any devices, such as Wire or other

24 chat devices?

25         MS. MAURINO:  Yes, your Honor.

1          THE COURT:  This Court's going to order he not access the

2     Internet for any reason and not have access to any such devices

3     unmonitored.

4          So I understand in the 21st Century you have to be able

5     to do some business to succeed and so with the permission of the

6     probation office, any appropriate Internet use can be constructed

7     such that in the 21st Century, that is monitored access.

8          Yes, ma'am.

9          MS. MAURINO:  May I speak, your Honor?

10          THE COURT:  You may.

11          MS. MAURINO:  If my son would like to attend college --

12     that's what he was doing up until June -- may he attend online

13     classes and go to school?

14          THE COURT:  Yes.  That will be a permitted activity --

15     continued access to an ongoing course of college is going to be a

16     permitted activity by the Court.  I'll add that as a permitted

17     activity and order the probation office that that be deemed a

18     permitted activity.

19          MR. CHETSON:  Your Honor, and to meet with counsel.

20     Because I will be able to do that by zoom and so forth.

21          THE COURT:  Any technology necessary to facilitate

22     participation in the conduct of his defense will be permissible.

23          The defendant is ordered not to contact any of his

24     co-defendants or any other people charged in this case except in the

25     presence of, and under the supervision of defense counsel.  I

1   understand there's a possibility such conversations may be

2   necessary.

3           Mr. Maurino, you're advised of the following penalties

4   and sanctions:

5           Violating any of the foregoing conditions of release may

6   result in the immediate issuance of a warrant for your arrest, a

7   revocation of your release, an order of detention, a forfeiture of

8   any bond and a prosecution for contempt of court can result in

9   imprisonment, a fine, or both.

10          While on release, if you commit a federal felony offense,

11  the punishment is an additional prison term of not more than ten

12  years; and for a federal misdemeanor offense, the punishment is an

13  additional prison term of not more than one year.  The sentence will

14  be consecutive, that is in addition to any other sentence you

15  receive.

16          It is a crime punishable by up to ten years in prison, a

17  $250,000 fine or both to obstruct a criminal investigation, tamper

18  with a witness, victim or informant, retaliate or attempt to

19  retaliate against a witness, victim or informant or intimidate or

20  attempt to intimidate a witness, victim, juror, informant or officer

21  of the court.

22          The penalties for tampering, retaliation or intimidation

23  are significantly more serious if they involve a killing or

24  attempted killing.

25          If after release, you knowingly fail to appear as the

conditions of release require, or to surrender to serve a sentence,
you may be prosecuted for failing to appear or surrender and
additional punishment may be imposed.

If you're convicted of an offense punishable by death,
life imprisonment or imprisonment for a term of 15 years or more,
you'll be fined not more than $250,000 or imprisoned for not more
than ten years or both.

An offense punishable by imprisonment for a term of five
years or more, but less than 15 years, you will be fined not more
than $250,000 or imprisoned for not more than five years or both.

Any other felony, you'll be fined not more than $250,000
or imprisoned for not more than two years or both.

A misdemeanor, you'll be fined not more than $100,000 or
imprisoned not more than one year or both.

A term of imprisonment imposed for failure to appear or
surrender will be consecutive to any other sentence you receive.

In addition, a failure to appear or surrender may result
in the forfeiture of any bond posted.

THE CLERK:  I'm going to print out a new one with the
additional --

PROBATION OFFICER WASER:  Your Honor, we would just ask
if the order could be saved for his return to New Jersey, for them
to install the equipment there.

THE COURT:  Okay.

PROBATION OFFICER WASER:  Thank you.

1              MS. KOCHER:  Your Honor, I'm wondering if you would

2      consider -- I heard no contact with co-defendants.  Could you

3      specifically include there, cooperating witnesses certainly --

4              THE COURT:  I think I did.  Any other potential

5      participants in the scheme --

6              MS. KOCHER:  I'm sorry.  I heard others charged.

7              THE COURT:  -- so I consider that any other cooperate --

8      and he can potentially talk with witnesses if they're being

9      interviewed in the presence of defense counsel and only under those

10     circumstances for the purposes of preparing his defense.

11             MS. KOCHER:  All right, sir.  And I presume, but did not

12     hear, no firearms.

13             THE COURT:  It was stated.

14             MS. KOCHER:  Thank you, sir.

15             THE CLERK:  Do you want to add --

16             MS. KOCHER:  I would note, your Honor, that Mrs. Maurino

17     was unaware that the defendant had the lower receiver that was

18     recovered from the home, and I do have concerns; but I leave it to

19     the Court as to whether there are currently any firearms that might

20     be secreted in the home.

21             THE COURT:  The Court's also going to order a probation

22     search of the premises before the defendant returns to that

23     premises.

24             MS. KOCHER:  Thank you, sir.

25             THE COURT:  Mr. Chetson.

1          MR. CHETSON:  I was going to approach to get a copy of

2     that.

3          THE COURT:  Please do.

4          THE CLERK:  We're trying to get an updated one.

5          THE COURT:  We'll get that signed.

6          Thank you everybody for indulging the late hour.

7          MS. KOCHER:  Thank you, sir.

8          MR. CHETSON:  Your Honor, with respect to the search of

9     the home, I want to let the Court know that my client's mother, Ms.

10    Maurino, located the ceramic plates over the weekend.

11         What I did was, I had her consult with an attorney of her

12    own to find out how those could be turned over to the FBI.  She was

13    in the process of that, but because a search is coming, I wanted to

14    ensure that that process went forward; but now that there's going to

15    be a search, I did not want the Court to think that I, in any way,

16    was trying to hide evidence.  I was making sure it was turned over

17    in a lawful manner to the Government.

18         Thank you.

19         THE COURT:  Okay.  I'll take that as understood.

20         MR. CHETSON:  Thank you.

21         THE COURT:  Mr. Maurino, this Court's taking a risk on

22    you in part because of your history of service to this country.  I

23    hope that my faith in you is going to be treated appropriately and

24    that you will meet all your obligations.

25         THE DEFENDANT:  I will, your Honor.

1           THE COURT:  All right.  Anything further from the

2   prosecution?

3           MS. KOCHER:  No, sir.

4           THE COURT:  Anything further from the defense?

5           MR. CHETSON:  No, your Honor.

6           THE COURT:  All right.  We'll be in recess.

7

8

9                   (Hearing concluding at 5:36 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF NORTH CAROLINA

 3

 4                 CERTIFICATE OF OFFICIAL REPORTER

 5

 6            I, Michelle A. McGirr, RPR, CRR, CRC, RMR, Federal

 7   Official Court Reporter, in and for the United States District Court

 8   for the Eastern District of North Carolina, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code, that the

10   foregoing is a true and accurate transcript of my stenographically

11   reported proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the regulations of the

13   Judicial Conference of the United States.

14

15   Dated this 12th day of October, 2021

16

17                                  /s/  Michelle A. McGirr
                                    MICHELLE A. McGIRR
18                                  RPR, CRR, CRC, RMR
                                    U.S. Official Court Reporter
19

20

21

22

23

24

25
```