1      **UNITED STATES DISTRICT COURT**

2      **EASTERN DISTRICT OF NORTH CAROLINA**

3                                        )
       UNITED STATES OF AMERICA,         )
4                                        )   **DOCKET NO. 7:20-CR-167-5M**
                           Plaintiff,    )
5                                        )
       vs.                               )
6                                        )
       JOSEPH MAURINO,                   )
7                                        )
                           Defendant.    )
8      _____

9              **TRANSCRIPT OF DETENTION HEARING**
             **BEFORE MAGISTRATE JUDGE ROBERT B. JONES, JR.**
10             **WEDNESDAY, AUGUST 11, 2021; 1:07 PM**
                 **WILMINGTON, NORTH CAROLINA**
11

12     **FOR THE GOVERNMENT:**
             United States Attorney's Office - EDNC
13           By:  Barbara D. Kocher, AUSA
             150 Fayetteville Street
14           Suite 2100
             Raleigh, NC 27601
15

16     **FOR THE DEFENDANT:**
             The Chetson Firm
17           By:  Damon Chetson, Esq.
             19 W. Hargett Street
18           Suite 400
             Raleigh, NC 27601
19
        Audio Operator:                 CLERK'S OFFICE PERSONNEL
20
                               eScribers, LLC
21                           7227 N. 16th Street
                                 Suite 207
22                           Phoenix, AZ 85020
                               800-257-0885
23                           www.escribers.net

24     Proceedings recorded by electronic sound recording; transcript
                    produced by transcription service.
25

1                        I N D E X

                                                               VOIR
2    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS  DIRE
     For the Government:
3    John Little              7     37     65,74      69

4    For the Defendant:
     Cynthia Maurino         77     88

5


6    EXHIBITS   DESCRIPTION                         ID.   EVID.


7    For the Government:
     G-1        Live fire training video                 20
8    G-2        Skit video                               20
     G-3        Inventory list                           20
9    G-4        Wire message screenshot                  20
     G-5        Conversation between Liam                 20
10              Collins and Nelson Guevera,
                and defendant and Nelson
11              Guevera
     G-6        Picture from Boise training               20
12              exercise
     G-8        Signal chats about firearms               20
13   G-9        Picture of machine guns                   20
                inside military armory
14
     For the Defendant:
15   D-1        Letter from Mitchell Ansell               95
     D-2        Picture of defendant's bedroom            95
16   D-3        Letter about rescued bird                 95
     D-4        News story about defendant                95
17              and his twin brother
     D-5        Manalapan High School                     95
18              diploma.
     D-6        National Guard orders                     95
19   D-7        Form DD214                                95
     D-8        Army achievement medal                    95
20


21   CLOSING ARGUMENTS:                              PAGE
     For the Government                              95
22


23   RULINGS:                                        PAGE  LINE
     Defendant to be detained pending trial          112   8
24


25

<u>P R O C E E D I N G S</u>

1

2       THE CLERK:  All rise.  This Honorable Court is back

3   in session.  Please be seated and come to order.

4       THE COURT:  All right.  Are the parties ready to get

5   started in this case?

6       MS. KOCHER:  The government is, Your Honor.

7       MR. CHETSON:  The defense is, Your Honor.

8       THE COURT:  All right.  I'll hear first from the

9   government.

10       MS. KOCHER:  Thank you, Your Honor.  The government

11   began with a proffer for background information from the

12   information in the indictment, which was issued June 16th of

13   2021.  Codefendant Liam Collins posted frequently on an online

14   message board platform used for communications and posts by

15   neo-Nazi and white supremacy extremist groups, known -- that

16   is, the platform was known as Iron March.  In 2017,

17   codefendant Collins entered the Marines and was stationed at

18   Camp Lejeune, North Carolina, throughout his time of service,

19   until his separation from the military in September of 2020.

20   Using the Iron March platform, Collins discussed recruitment

21   for a group he described as a modern-day SS.  In 2016, he

22   posted that he was organizing a legitimate paramilitary

23   defense force, describing that everyone in the group was going

24   to be required to have served in the nation's military.  "It's

25   a goal for the long term.  I'll be in the U.S. Marine Corps

1    for four years, while my comrades work on the group's physical

2    formation."

3           In early 2017, Collins and Kryscuk communicated on

4    Iron March.  And in February of 2017, codefendant Kryscuk set

5    forth, essentially, a manifesto, noting the steps he would

6    take to achieve change in the United States, in accord with

7    his ideology.

8           "The first order of business", according to Kryscuk,

9           was to knock down the system, mounting it and

10          smashing its face, until it has been beaten past the

11          point of death.

12          "Second order of business is the seizing of territory

13          and the Balkanization of North America", essentially

14          laying the framework for a guerrilla organization and

15          a takeover of local government and industry.  "As we

16          build", Kryscuk went on to say, "our forces and our

17          numbers, we will move into the urban areas and clear

18          them out.  This will be a ground war, very

19          reminiscent of Iraq, as we will essentially be facing

20          an insurgent force made up of criminals and gang

21          members."

22          Collins and Kryscuk, in their posts on Iron March,

23   encouraged the use of encrypted messaging applications.

24          In January of 2019, Kryscuk was paid for a tool.

25   That payment and that tool was for a 9-millimeter pistol,

1    manufactured by Kryscuk for this individual.  In May of 2019,

2    Kryscuk was paid to build a -- for a build, rather, and a

3    lower.  This money was for Kryscuk to construct an assault

4    rifle for the individual.  In June of 2019, Kryscuk received

5    payments from three individuals, to include codefendant

6    Duncan, for what was termed Legos, a tool, and a jig.

7    Thereafter, Kryscuk made purchases, in approximately the same

8    amount, from a company that sells jigs, which assist in the

9    manufacture of lower receivers into assault-type rifles.  By

10   November of 2019, Kryscuk reported that he had milled an 80

11   and that he obtained a jig to do an AR-10.

12           Duncan, Kryscuk, and this defendant, Mr. Maurino, met

13   in Boise, Idaho, in July of '20 for live fire weapons

14   training.  Maurino was then only known to the investigating

15   agents because of a transfer of money over an online payment

16   account to Kryscuk's account.  And that transfer occurred in

17   September of 2018.  The participants in that live fire

18   training made a compilation video of the live footage.  That

19   video depicts Kryscuk, Maurino, and another individual firing

20   short-barrel rifles and each of the participants firing

21   assault-style rifles.  The end of that video shows the four

22   participants outfitted in Atomwaffen-type masks, giving the

23   Heil Hitler sign beneath the image of a black sun.  The last

24   frame of the video displays the statement "Come home, white

25   man."

1             By August of 2020, Duncan and Kryscuk were praising

2     the efforts of Collins, who they claimed had sacrificed the

3     most for the cause, had gotten them tons of gear and training,

4     and had added three Marines to the group.  Specifically, at

5     numbered paragraph 17 of the indictment, a screenshot of a

6     message from Kryscuk in the Wire application, dated August 4th

7     of '20, was recovered from this defendant, Maurino's, phone.

8     The screenshot is a photo of a United States Parcel Service

9     receipt for two packages shipped from Boise, Idaho, to New

10    Jersey.

11            One package was intercepted and searched, pursuant to

12    a federal warrant issued by the District of New Jersey.  And

13    in this bag was gear -- I'm sorry -- in this package was gear

14    such as boots and a sleeping bag, as well as an upper receiver

15    to a short-barreled rifle.  The foregrip, handguards, and

16    optic on that receiver appear to be identical to the short-

17    barrel rifle used by Maurino in the training video mentioned

18    in the indictment.  Also recovered from Maurino's phone was a

19    text message from an individual, using the moniker Gentile,

20    about purchasing guns.  This defendant, Maurino, responds in

21    part, that for 600 dollars, he could provide an 80 percent,

22    and provide it in a week, and that it would be an untraceable

23    GLOCK.

24            Moreover, Kryscuk and Maurino have communicated, as

25    shown by screenshots.  In September of '20, there was an image

John Little - Direct

1    of a $449.98 receipt for the purchase of three 80 percent

2    lowers for assault-type rifles and a jig with which to

3    complete them.  585 dollars was transferred from Maurino to

4    Kryscuk the day previous.  Maurino, in turn, had received

5    payments of 185 and 225 dollars from two other individuals,

6    which he put with an additional 180 dollars to comprise the

7    funds he sent to Kryscuk.

8        And Your Honor, on that platform, the government

9    would call Special Agent Chris Little with the Naval Criminal

10   Investigative Service.

11       THE COURT:  Okay.

12       THE CLERK:  If you would, please place your left hand

13   on the Bible and raise your right hand.

14        GOVERNMENT'S WITNESS, JOHN LITTLE, SWORN

15       THE CLERK:  Thank you.  You can have a seat.

16                     DIRECT EXAMINATION

17   BY MS. KOCHER:

18   Q.   If you would, sir, state your full name for the record.

19   A.   John C. Little.

20   Q.   And how are you employed?

21   A.   I'm a special agent with the Naval Criminal Investigative

22   Service at Camp Lejeune.

23   Q.   And have you been an agent on the investigation of Mr.

24   Maurino and his named codefendants and others throughout its

25   entire history?

John Little - Direct

1    A.   Yes, ma'am, I have.

2    Q.   All right.  Could you, very briefly, just describe the

3    general categories of evidence that were reviewed and

4    developed as part of this investigation?

5    A.   In general, we've conducted controlled purchases,

6    reviewed multiple electronic devices and online cloud storage

7    accounts, in addition to direct interviews of individuals

8    involved with the group.

9    Q.   And specifically, did you have the opportunity to review

10   a cell phone of Mr. Maurino's?

11   A.   Yes, ma'am.

12   Q.   What evidence -- or rather, did you uncover evidence as

13   to the earliest time that Mr. Maurino interacted with this

14   charged group?

15   A.   I did.  From Mr. Kryscuk's phone, I found a screenshot

16   from the aforementioned Wire encrypted messaging application,

17   where he's communicating with Mr. Maurino.  Mr. Maurino is

18   utilizing the alias "Bishop"; Mr. Kryscuk utilizing the alias

19   "Deacon".  I believe that conversation took place in February

20   of 2018, and it appears Mr. Kryscuk is getting Mr. Maurino's

21   home address to send him an invitation.

22           THE COURT:  I'm sorry.  I didn't hear that.

23   "Invitation?"

24           THE WITNESS:  Which part?

25   BY MS. KOCHER:

John Little - Direct

1  Q.   It's difficult to hear out here.  You --

2  A.   Okay.

3  Q.   -- there's no microphone, no.  He just didn't hear the

4  last thing that you said.

5  A.   It appears the -- the content of the message was Mr.

6  Kryscuk utilizing their aliases, getting Mr. Maurino's home

7  address to send him an invitation.

8  Q.   Before we get into the specifics further, then, as to Mr.

9  Maurino, were there particular rules that the group, in the

10  larger part, functioned by?

11  A.   Yes.

12  Q.   What are they?

13  A.   Specifically, they had rules about only discussing

14  certain topics in -- within the encrypted application, and

15  then more serious planning or more serious discussions had to

16  take place face-to-face.  There's other communications

17  regarding group rules.  They -- they frequently used the terms

18  OPSEC, which would be operational security.

19       Some of those other rules to their OPSEC indicated things

20  that, like snitches would get ditches, like, indicating, you

21  know, they -- if you tell, you -- you'll be harmed.  Also you

22  know, wearing a mask is a "no face, no case".  That's some of

23  the other terms that were used.

24  Q.   All right.  In reviewing the evidence as pertains to Mr.

25  Maurino, did you find consistent historical activity or

John Little - Direct

1   ideology?

2   A.   Yes.

3   Q.   Tell us about that.

4   A.   Beginning in 2018, I found a separate -- this was not

5   from his phone, but from open source research -- an instance

6   where it appears Mr. Maurino attempted to join an Identity

7   Evropa chat group on a Discord server.

8   Q.   What is Identity Evropa?

9   A.   Identity Evropa is a group that would have similar

10  ideology to that described in -- in -- you just got done

11  describing in the indictment.  And they're most known for --

12  the implication of their planning for the Unite the Right

13  rally in Charlottesville.

14       THE COURT:  The what?  What did you say?

15  Q.   That was the judge.

16       THE WITNESS:  The Unite the Right rally in

17  Charlottesville.

18  Q.   That was Identity Evropa is involved in that, not Mr.

19  Maurino?

20  A.   Correct.

21  Q.   I am gathering you're having difficulty telling where

22  sound is coming from; is that correct?

23  A.   That's correct.

24       MS. KOCHER:  Okay.  Then I would note for the record

25  that the witness box has some type of Plexiglass on all three

John Little - Direct

1    sides.

2    Q.   All right.  So that's historical ideology.

3         Was there historical activity recovered from Mr.

4    Maurino's phone as well?

5    A.   Yes.  There was a -- a -- a video from 2018 of Mr.

6    Maurino firing what appears to be a short-barrel rifle at a

7    gun range.

8    Q.   All right.  And do you have any information,

9    historically, about Mr. Maurino's ability to obtain a gun

10   permit within the state of New Jersey?

11   A.   Yes.  And as I understand it, Mr. Maurino was denied an

12   application to purchase a firearm in the state of New Jersey,

13   on the basis of living with his identical twin brother,

14   Matthew Maurino.  It's stemming from an incident that occurred

15   while they were in high school.

16        In that incident, as I understand, they were part of a

17   chat group where the -- the chat became threatening towards

18   the school at some point.  And a member of that group decided

19   to turn over that chat or make authorities or officials at the

20   school aware of the chat.  And it -- the end result was

21   Matthew Maurino not being able to attend that school anymore.

22   So stemming from that incident, as I understand, Mr. Maurino

23   here was denied the request to get a firearms purchase permit

24   in New Jersey.

25   Q.   Why would his brother's activity have stopped that?  Do

John Little - Direct

1    you know?

2    A.   Because they live in the same home.

3    Q.   Now, his brother is currently a member of the National

4    Guard in New Jersey; is that right?

5    A.   Yes, ma'am.

6    Q.   All right.  So I do want to turn your attention, then,

7    specifically to Mr. Maurino and kind of go through the

8    chronology of Mr. Maurino's involvement with the

9    coconspirators.

10        MS. KOCHER:  Your Honor, may I approach?

11        THE COURT:  Go ahead.

12        MS. KOCHER:  For ease, I have handed to the Court

13   Government's Exhibits 1 through 9, and to the witness,

14   Government's Exhibits 3 through 9, numbers 1 and 2 being

15   videos on a compact disc.

16   BY MS. KOCHER:

17   Q.   Let me turn your attention first, then, to Government's

18   Exhibit 3.  Do you recognize that?

19   A.   I do.

20   Q.   What is that?

21   A.   This is a screenshot I found from the phone of Liam

22   Collins.  It has the alias used by Mr. Maurino at the top of

23   the screenshot as "Bishop".  And it is a inventory --

24   handwritten inventory list.

25   Q.   All right.  Can you call off just the general type of

John Little - Direct

1    items or what you see on the list?

2    A.    Approximately 296 bottles of water.  I know there's large

3    amounts of other supplies for -- 200 tablets of One A Day

4    vitamins, a large amount -- 290 capsules of Tylenol,

5    batteries, food.  I just -- what I would describe as

6    provisions.

7    Q.    You would describe as what?

8    A.    Like, provisions.

9    Q.    And do you know when this was saved to Liam Collins'

10   phone?

11   A.    I believe it was in March of 2020.

12   Q.    And is this type of list consistent with the charged

13   group's activities?

14   A.    Yes.  It's consistent with other behavior described by

15   group members, how the group discussed ways to set up what

16   they called bug out locations, or areas they could flee to if

17   they were -- after conducting what was described as an

18   operation, or if they were on the run.  Basically, they could

19   flee to these areas, have pre-staged items to allow them to

20   sustain in a different location.

21   Q.    All right.  Let me pull you forward in time a little bit.

22   If that was in March of '20, let's go to May of 2020.  Did

23   Black Lives Matter and the rallies that were happening over

24   that month and beyond have any part in the group?

25   A.    Yes, they did.

John Little - Direct

1  Q.   And what was that?

2  A.   Black Lives Matter was consistently discussed throughout

3  the group, on multiple occasions, and their -- their issue

4  or -- or hate of -- of the group.  Specifically, there were

5  instances where multiple group members surveilled Black Lives

6  Matter rallies.

7  Q.   Was there evidence specifically of Mr. Maurino

8  surveilling a Black Lives Matter rally?

9  A.   Yes.  There was two videos on Mr. Maurino's phone where

10  he appears to drive by a Black Lives Matter -- Black Lives

11  Matter rally, document it with a video, then circle back, and

12  drive back again and -- and make a second recording.

13  Q.   Now, when you say "he" there, is he visible in the video?

14  A.   I cannot see him, but I can tell that it was recorded

15  with his phone.  And from what is visible, it -- it -- it

16  appears to be him, but I do not see his face in the video.

17  Q.   All right.  And you mentioned that the surveillance was

18  undertaken by the group, I believe you said.  How do you know

19  that?

20  A.   The other group members had similar items on their

21  electronic devices.  For instance, a group member T.C. had

22  a -- I saw an image from -- from his device that was on -- on

23  multiple other devices, to include Mr. Maurino's phone, where

24  group member T.C. attended a Black Lives Matter rally.  He

25  took a picture in a position of what I would describe as,

www.escribers.net | 800-257-0885

John Little - Direct

1    like, a tactical advantage above the people at the rally, and

2    then superimposed a swastika on his -- on his hat, and put the

3    text at the bottom of the screenshot, "If they only knew."

4    Q.   All right.  Now, member T.C., you refer to him as such

5    because he is a juvenile; is that correct?

6    A.   That's correct.

7    Q.   All right.  Was there other BLM surveillance by members

8    of the group?

9    A.   That's correct.  Mr. Kryscuk was observed by law

10   enforcement surveilling BLM rallies in Boise, Idaho.  And he

11   also appears to have joined a social media platform to further

12   track where the -- the rallies would -- would take place.

13   Q.   And was there other reference to BLM, besides just these

14   findings of the surveillance of the rallies?

15   A.   There was multiple references from things we were told in

16   interviews and then also in electronic devices.  For instance,

17   one group member told when they were -- had to conduct a -- a

18   group interview to gain membership in the group, they're asked

19   who their enemies are, the -- you know, to describe the kind

20   of people they hate.  They were coached to -- to say people

21   like BLM to basically pass the -- the -- the vetting

22   interview.

23   Q.   All right.  And that was vetting interview?

24   A.   Yes.

25   Q.   All right.  Let me turn your attention to Government's

www.escribers.net | 800-257-0885

John Little - Direct

1   Exhibit 4.  What is that?

2   A.   This is a screenshot of a Wire conversation that was

3   taken from group member T.C.'s phone.

4   Q.   All right.  Now, I see "Bishop" at the top of that in

5   orange print; is that right?

6   A.   Yes.

7   Q.   And who would that refer to?

8   A.   Mr. Maurino.

9   Q.   And then I see "Deacon".  Who does that refer to?

10  A.   That would be Mr. Kryscuk.

11  Q.   And in purple is "Butcher".  Who is Butcher?

12  A.   That would be T.C.

13  Q.   All right.  And what is the relevance of Government's

14  Exhibit 4?

15       I'm sorry.  What's the context of Government's Exhibit 4?

16  A.   The context, this is stemming from a conversation I -- I

17  saw on Mr. Kryscuk's device with Liam Collins.  Mr. Kryscuk

18  took a picture of BLM fliers he ripped down from his

19  neighborhood and discussed the need to replace those fliers

20  with their own propaganda.  I believe this conversation here

21  is an extension of the discussion of what to replace that

22  with.

23  Q.   All right.  And what's relevant to Mr. Maurino?

24  A.   Mr. Maurino states, "The lights will turn off, and so

25  will you."

John Little - Direct

1    Q.   And in terms of the information that you saw, what is the

2    relevance of the statement that "The lights will turn off, and

3    so will you"?

4    A.   We -- again, from interviews and review of multiple

5    devices and accounts, we have information indicating the group

6    aspired to conduct operations that would disable the power

7    grid and cause long-term outages in targeted areas by -- for

8    instance, by attacking, like, a power transformer and a power

9    substation.

10        We also -- from interviews of group members, they stated

11   things like they could -- the power outage, in and of itself,

12   could be deadly because of the chaos that would -- that would

13   ensue.  But they could also conduct targeted assassinations or

14   murders within that outage and use that either distraction to

15   law enforcement to their advantage, or the actual outage and

16   ensuing chaos to their advantage to kill targeted individuals.

17   Q.   All right.  If I can turn your attention to Government's

18   Exhibit 5.  Can you tell us the context for this exhibit?

19   A.   Yes.  As you mentioned previously, Liam Collins was

20   praised by the group as a source of recruitment, but also a

21   source of stolen military equipment and gear the group could

22   utilize, as a -- as a unit, basically.  This is a

23   conversation -- the actual first page is a conversation taken

24   from Liam Collins' phone with Nelson Guevera (ph.), where Liam

25   Collins is -- is using Nelson Guevera as a delivery person to

John Little - Direct

1   deliver stolen military body armor to Mr. Maurino.  Mr.

2   Collins is providing the contact information for Mr. Maurino

3   to Nelson Guevera.

4   Q.   Okay.

5   A.   The second page is direct conversation with Mr. Maurino

6   and Mr. Guevera regarding the delivery of the stolen body

7   armor.

8   Q.   All right.  Now, these particular pages of Exhibit 5

9   don't mention body armor; is that right?

10  A.   That's correct.

11  Q.   How do you -- how are you aware that it was body armor

12  that was delivered that day?

13  A.   I had the opportunity to interview Mr. Guevera.

14  Q.   I see.  And so that's what he informed you he delivered?

15  A.   He knew it was body armor.  And we recovered multiple

16  other sets of stolen body armor at different locations

17  throughout the investigation.

18  Q.   All right.  What can you tell us about this body armor?

19  A.   This body armor is -- it's called a -- a SAPI plate or an

20  ESAPI plate.  There's ceramic, and they provide protection

21  against pistol and rifle caliber ammunition.  It's commonly

22  issued in the -- in the -- throughout the military.

23       From interviews with individuals within the group, they

24  discussed acquiring capabilities like this, like body armor

25  and other military equipment, to -- for what they saw as an

John Little - Direct

1    inevitable confrontation with federal law enforcement, with

2    federal tactical units.  And they wanted this level of

3    protection because of what those units would have.

4    Q.   Can the general public purchase these SAPI plates, if you

5    know?

6    A.   The general public cannot purchase these specific plates

7    because they're issued to military members.  They can purchase

8    similar plates.  I'm not, you know, certain on actual, you

9    know, level of protection they provide.  But they could not

10   provide these because these were actually issued to a military

11   member that stole them.

12   Q.   All right.  The indictment discusses scenes from a

13   compilation video that was taken at the Boise live fire

14   training.  Do you recall that?

15   A.   Yes.

16   Q.   Did you find videos or other evidence of Mr. Maurino's

17   presence at that live fire training on his phone?

18   A.   I did.

19   Q.   And have you, previous to this hearing, had the

20   opportunity to view what was marked as Government's Exhibits 1

21   and 2?

22   A.   Yes, I have.

23        MS. KOCHER:  All right.  Your Honor, if I can have

24   just a moment, I would like to play those videos for the

25   Court.

John Little - Direct

1        THE COURT:  Mr. Chetson, do you object to any of this

2   evidence?

3        MR. CHETSON:  No, Your Honor.  Not for the purposes

4   of today.

5        THE COURT:  All right.

6        (Pause)

7        MS. KOCHER:  If we can, at this time, watch

8   Government's Exhibit 1?

9        (Video recording played)

10  BY MS. KOCHER:

11  Q.   Let me stop here.  Who is that individual, if you know?

12  A.   That's Mr. Maurino.

13       (Video recording played)

14  Q.   And who is that individual?

15  A.   Mr. Duncan.

16       (Video recording played)

17  Q.   And who is that individual?

18  A.   Mr. Kryscuk.

19       (Video recording played)

20  Q.   And can you tell who that individual is?

21  A.   T.C.

22  Q.   T.C.

23       (Video recording played)

24  Q.   Did you recognize that individual?

25  A.   T.C.

John Little - Direct

1      (Video recording played)

2  Q.   Now, if I understood your testimony prior to that, this

3  was a different video than that to which the indictment

4  refers; is that correct?

5  A.   It's a different video depicting many of the same

6  training iterations.

7  Q.   All right.

8  A.   Some of the footages overlap, but this is a different --

9  different music, different order.

10  Q.   All right.  Let me play for the Court Government's

11  Exhibit 2.

12      (Video recording played)

13  Q.   Who is the individual pictured in Government's Exhibit 2?

14  A.   That's Mr. Maurino.

15  Q.   And can you tell the Court what's happening here?

16  A.   It's basically a -- a -- he's carrying on a conversation

17  with someone that's not there.  It's, like, a -- like, a skit.

18  Q.   A skit?

19      (Video recording played)

20  Q.   And at this point, if you would tell the Court -- I'm

21  going to reduce the sound so that we can hear you testify --

22  what is Mr. Maurino doing at this point in time?

23  A.   He's retrieving a collapsible stock triple rifle from a

24  backpack.  It's concealed in the backpack with hearing

25  protection, eye protection, and a high-capacity magazine.

John Little - Direct

1    Q.   And so that's what he's doing, as we speak now, at about

2    fifty-six seconds into the video?  Excuse me, for the record,

3    it's forty-three.

4         He unfolds the stock and then begins firing?

5    A.   Yes.  He began firing what I describe as indiscriminately

6    into a -- a group of targets.

7    Q.   And that was a short-barrel rifle in your estimation?

8    A.   It appears to be so, yes.

9    Q.   All right.  If I can turn your attention to Government's

10   Exhibit 6 and 7 at this time.  And first, Exhibit 6, what is

11   that?

12   A.   That's another image of Mr. Maurino from the -- the Boise

13   training that was on his cellular phone.

14   Q.   All right.  And how do you know that this is Mr. Maurino?

15   A.   Other images from the day, the -- the hat, shirt, other

16   images without the mask, and then also the rifle.

17   Q.   Do you know if the emblem on his left chest, on his shirt

18   or whatever attire that is, has any meaning?

19   A.   I'm not aware of that -- that image.

20   Q.   All right.  And is the mask Mr. Maurino was wearing in

21   this photo that which is referred as an Atomwaffen-type mask?

22   A.   Correct.

23   Q.   All right.  And Government's Exhibit 7, what is that?

24   A.   That is Mr. Maurino, group member T.C. together again in

25   Boise.  And that is Jordan Duncan's vehicle.

John Little - Direct

1    Q.   All right.  And is Mr. Maurino on the right or the left

2    in that photo?

3    A.   The left, as you look at the photo.

4    Q.   And you were able to identify them in that photo how?

5    A.   As -- as before, the -- the clothes they were wearing in

6    previous pictures from the same day, without the masks on,

7    also their stature, approximate size.  There -- there's

8    between -- Mr. Maurino's advice and others, there's a -- a

9    large volume of -- of imagery from their training in Boise.

10   Q.   All right.  Let's leave the training in Boise, then, and

11   come forward in time.  Mr. Kryscuk sent packages to Mr.

12   Maurino to his home in New Jersey; is that correct?

13   A.   That's correct.

14   Q.   And that address was 164 Colony Lane in Manalapan, New

15   Jersey?

16   A.   Yes, ma'am.

17   Q.   And was law enforcement able to search those packages?

18   A.   Yes.

19   Q.   And what was recovered?

20        I'm sorry, what was discovered?

21   A.   Among other items, there was an upper receiver to a

22   short-barrel rifle.  That upper receiver appears consistent

23   with the short-barrel rifle pictured in the previous exhibits

24   and in the videos.

25   Q.   All right.  And what do you base that upon?

John Little - Direct

1  A.    The accessories on the rifle, the handguards, the

2  foregrip, the optic, and the approximate size of the upper

3  receiver -- the barrel length.

4  Q.   I assume not necessarily unique accessories, but

5  certainly in combination, make it appear that it's the same

6  short-barrel rifle.  Is that accurate?

7  A.    Correct.  The -- the -- the accessories themselves, and

8  then their location on the weapon, or on the -- excuse me --

9  on the upper receiver is what appears unique.

10  Q.   All right.  Now, I changed my question from recovered to

11  discovered because the rifle was not -- or that upper receiver

12  was not seized at that time; is that correct?

13  A.    It was not.  It was searched and then delivered to Mr.

14  Maurino's home.

15  Q.   All right.  And that upper receiver was not itself in

16  violation of law; is that correct -- federal law?

17  A.    Not unless it was assembled with a lower receiver.  So at

18  that time, no.  In that package, it was not.

19  Q.   All right.  Let me turn your attention to Government's

20  Exhibit 8.  What is that?

21  A.    This is a -- these are pictures from a manual review of

22  Mr. Maurino's phone of a Signal chat group.  Signal is the

23  application -- an encrypted messaging application similar

24  to -- to Wire.  And this is a chat group Mr. Maurino

25  participated in from August up until the phone was seized in

John Little - Direct

1    October of 2020.

2    Q.    And was there a name to this particular chat group?

3    A.    I don't -- I believe it's West Virginia.

4    Q.    And are the participants in this chat different than

5    those in the indictment with Mr. Maurino?

6    A.    They are.  They -- they are not any of the ones named in

7    this indictment.  And they appear to live in the New Jersey

8    area or much closer to New Jersey than the others who had co-

9    located to Boise.

10   Q.    What are the time frame of these chats belonging to

11   Government's Exhibit 8?

12   A.    These chats go -- specifically in the printed-out

13   exhibit, go from August through September --

14   Q.    All right.

15   A.    -- of 2020.

16   Q.    And can you put some context to Government's Exhibit 8

17   for the Court?

18   A.    Yes.  The group chat overall appeared similar -- to have

19   similar ideas about minorities and Jewish individuals that

20   the -- what I would call the Boise group does.  They also had

21   similar interests in firearms and conducted -- kind of on the

22   advice of Mr. Maurino, kind of had the same style of OPSEC.

23   Mr. Maurino would direct the group to use Wire for certain

24   things or say, I would talk to you in person about certain

25   things when it came to firearms.

www.escribers.net | 800-257-0885

John Little - Direct

1     Specifically turning to the first page of the exhibit,

2  this is an image from -- again, this is from a manual review

3  of the phone.  Mr. -- they're talking about a trip to West

4  Virginia they're going to make us a group to -- to shoot.  And

5  they're talking about the types of ammo they need to get.  Mr.

6  Maurino states he's got seven MAC-11s, about eight .38s, and

7  nine 9s.  It appears to be he's referring to firearms.  There

8  was -- these types of firearms were never recovered.

9  Q.   In fact, just above that, where Maurino says, I've got

10  seven MAC-11s, the previous text or entry is, I'll need list

11  of ammo to get?

12  A.   Correct.  So these -- the -- these firearms would have

13  different calibers.  And it appears they're -- they're trying

14  to figure out what calibers they -- they need to purchase.

15  Q.   And what is a MAC-11, if you know, sir?

16  A.   It's a small -- what I describe as, like, a submachine

17  gun.  Not that this one would definitely be automatic, but

18  it's a -- a small, like, very short-barreled weapons.

19  Q.   All right.  And a .38?

20  A.    .38 is a caliber.  So there's a lot of pistols, like,

21  revolvers, different weapons shoot .38.  And then nine 9s

22  would likely reference nine 9-millimeter weapons.

23  Q.   All right.  Let me turn you to page 2 of Exhibit 8.  This

24  contains the reference to downloading and using the Wire

25  messaging app; is that correct?

John Little - Direct

1   A.    Correct.

2   Q.    Turn to page 3.  What is relevant for the Court on page 3

3   of Exhibit 8?

4   A.    On this page, the -- the individual in -- typing in

5   the -- in the blue text bubble says, "I was forced to hang out

6   with an annoying Jew against my will."  This is kind of, like,

7   one of the more tame references to Jewish people in -- in the

8   chat.  What's significant here is Mr. Maurino states that

9   everything has a silver lining, social interactions like that,

10   and learning to be likable by people who you don't like and

11   should hate you is an experience-only ability.

12   Q.    Is an experience-only ability.  Did you find other

13   indications of him gaining experience, in this regard, in Mr.

14   Maurino's history?

15   A.    That's why I think this is significant.  It's -- it's

16   talking about the ability to blend in with society while

17   having these types of extreme beliefs.  For instance, while

18   Mr. Maurino was able to be in the National Guard, he stayed

19   very active and participating with this group while they're

20   growing along their trajectory.  For example, while he was

21   deployed he stayed in touch with Mr. Kryscuk and attempted to

22   stay up on what's going on with the group on the Wire app as

23   they continued to -- to progress.

24   Q.    All right.  Turn to the next page of Government's Exhibit

25   8.  And it would be the last two pages of Exhibit 8, that is.

John Little - Direct

1    And what's relevant in regard to these two pages?

2    A.   One of the individuals involved in that chat states they

3    want a GLOCK, which is a handgun manufacturer.  "Someone send

4    me what I should get."  And then they specifically state, Joe,

5    like, asking for Mr. Maurino's input.  Mr. Maurino states,

6    like, from an official brand or more underground company.  The

7    individual says they want a good pew-pew (ph.), which is

8    another -- you know, it's slang for a gun.

9         And then Mr. Maurino advises, "Okay, dummy.  We can talk

10   in person."  So again, similar measures of OPSEC when related

11   to talking about specific firearms purchases and the way the

12   firearm is described, like, more underground company, would be

13   consistent with the types of firearms manufactured by Mr.

14   Kryscuk and others.

15   Q.   And was there evidence specifically of Mr. Maurino

16   involved in Mr. Kryscuk's manufacturer in some fashion or

17   form?

18   A.   Like, physically involved in manufacturing the firearms

19   himself?

20   Q.   Involved in that conspiracy charged in Count I.

21   A.   Yes.

22   Q.   And what is that?

23   A.   There's the instance of him transferring money better, in

24   amounts consistent with other known firearms purchases.

25   Q.   When was the first transfer of money between Kryscuk and

John Little - Direct

1  Maurino, to your knowledge?

2  A.   The first one was in 2018, I believe.  The first one

3  that -- that I'm aware of.

4  Q.   All right.  And there were others, you say?

5  A.   There were others throughout 2018, '19, and '20.

6  Q.   All right.  And then the Court is aware, from the

7  indictment, that in September of '20, specifically Mr. Maurino

8  gathered funds from others and then sent an amount to Kryscuk.

9  Were you able to see that in some record?

10 A.   Yes.  Mr. Maurino had a screenshot of a Wire message from

11 Mr. Kryscuk that contained what appears to be a receipt from a

12 manufacturer that makes these 80 percent lowers.  The receipt

13 was for three lowers for an AR-15-style rifle for the 80

14 percent style that -- that need to be completed, and then a --

15 a jig to complete those.  I believe that was in the

16 approximate amount of 449 dollars, in -- in that range.

17 Q.   All right.  And that was the number of people, from

18 looking at the financial transactions, had contributed to that

19 amount of money, three; is that right?

20 A.   Correct, with Mr. Maurino putting in money himself as

21 well.

22 Q.   All right.  Let me pull you forward, then, to October of

23 2020 and the arrests of the previously charged persons,

24 specifically Mr. Collins, Kryscuk, and Duncan.  What can you

25 tell the Court about what might have been recovered from those

John Little - Direct

1    three individuals?

2    A.   In Boise, Idaho, we recovered multiple short-barrel

3    rifles, pistols that appear to have been manufactured by Mr.

4    Kryscuk, silencers that appear to be manufactured by Mr.

5    Kryscuk.  We recovered fake identity documents for multiple

6    group members in -- in Boise and -- and other locations.  We

7    recovered a lot of electronic evidence in the form of external

8    hard drives and cellular devices and tablets.

9         We also recovered, from the home of Mr. Kryscuk, what the

10   FBI bomb technician described as components consistent with

11   IED schematics we found on Mr. Kryscuk and other individuals'

12   devices.  We also found a handwritten list, in Mr. Kryscuk's

13   home, that contained, on one side of the list, multiple

14   intersections that were consistent with power substations in

15   multiple locations in the -- I believe, Oregon, Washington,

16   California, and Idaho.  There's also a large -- very large

17   fuel depot listed on the handwritten list.  On the other side

18   of that list was a list of individuals that would be more

19   left-leaning local politicians, state representatives, BLM

20   leadership, and other individuals.

21   Q.   Did you get any other information about that list from

22   the interviews that you undertook?

23   A.   I did.  We also -- going back to the -- the -- the list,

24   the list also had -- for instance, Mr. Kryscuk had screenshots

25   of, like, the home address for certain individuals that were

John Little - Direct

1    on the list.  Also in -- from interviews, the locations of the

2    power substations were consistent with what was described as

3    locations the -- the group was interested in conducting

4    attacks and operations.

5        Also from other interviews, when the list of actual

6    people was discussed, it was discussed, as, you know, people

7    that, you know, Mr. Kryscuk would hate.  Also from talking to

8    other group members, the individuals on the list were

9    discussed by the group and specifically how they would be

10   killed, how they could be killed, it -- like, details about

11   where they may live, the best way to conduct a certain attack

12   specific to those -- those individuals.

13   Q.   And specific to Mr. Maurino, did those interviews of

14   persons involved discuss, specifically, Mr. Maurino or

15   Bishop's involvement?

16   A.   Yes.  But overwhelmingly they referred to him as

17   "Bishop".  Some of them did not know his real name, but when

18   they described Bishop, they described him as part -- like, a

19   very integral part of the group, and they described him as

20   being part of the vetting process, like the -- the entry

21   interview I briefly described earlier.  He was even referenced

22   as -- and I remember seeing a screenshot of a conversation

23   between two other group members, where he was referenced as

24   like a -- a founding father of the group, like, an

25   important -- an important member.

John Little - Direct

1    Q.   All right.  Now, I interrupted you.  You were listing the

2    types of things that were recovered on the arrests of the

3    coconspirators.  You mentioned fake identity documents,

4    weapons, explosive components.  Was there anything else of

5    relevance?

6    A.   Military body armor and other military equipment.

7    Q.   Was Mr. Maurino contacted at all on the day of those

8    arrests?

9    A.   Yes.

10   Q.   What can you tell us about that?

11   A.   Mr. Maurino ended up being arrested by the State of New

12   Jersey, after an unserialized lower receiver to an AR-15 and

13   short-barrel upper receiver were turned over by consent.

14   Q.   Did he also have ammunition clips and magazines?

15   A.   Correct.  There was ammunition and magazines that

16   appeared consistent with what would be issued by the National

17   Guard.  And those were also seized.

18   Q.   All right.  And I believe one of his pending charges is

19   the possession of stolen property there in New Jersey; is that

20   right?

21   A.   To my knowledge, yes.

22   Q.   Yes.  It's theft by taking, I think, rather than

23   possession of stolen property, but --

24        THE COURT:  I'm sorry.  What was that clarification?

25        MS. KOCHER:  I'm sorry?

John Little - Direct

1          THE COURT:  What was that clarification?

2          MS. KOCHER:  I was reading off the pre-trial services

3    report that the pending charge is theft by unlawful taking --

4          THE COURT:  Okay.

5          MS. KOCHER:  -- rather than possession of stolen

6    property.

7    BY MS. KOCHER:

8    Q.   So speaking of National Guard, then, do you have any

9    information regarding a plan involving a National Guard

10   armory?

11   A.   I do.

12   Q.   Tell us about that.

13   A.   From an interview of a group member, when discussing

14   group aspirations or the types of attacks the group plan to

15   conduct or wanted to conduct, it was specifically mentioned

16   that Mr. Maurino suggested a raiding a National Guard armory

17   to steal specifically 240 -- M240 machine guns from the

18   armory.

19   Q.   And what is an M240 machine gun?

20   A.   It is what the military would call, like, a crew served

21   weapon.  It's a belt-fed, 7.62mm, fully automatic machine gun

22   that more than one of the group members would have been

23   trained to operate in the military.

24   Q.   And if I can turn your attention to Government Exhibit 9,

25   what is that?

John Little - Direct

1    A.    That is an image from Mr. Maurino's phone of M240 machine

2    guns in what appears to be a military armory.

3    Q.    You have been inside of a National Guard armory?

4    A.    I have, and many other military armories.  It looks --

5    I'll say this looks consistent with what I've seen in military

6    armories, and that this phone -- this picture was from Mr.

7    Maurino's device.

8    Q.    And what type of weapons are there depicted?

9    A.    These are M240 machine guns.

10   Q.    Was there a reference made as to how they would get into

11   the armory?

12   A.    There was reference made that Mr. Maurino would use his

13   military ID and uniform or access to military facilities to

14   get past the first -- to get close enough.  There was also

15   specific discussion that the armory had two guards.  And from

16   the individual from the interview, the individual felt

17   confident that they did not know which specific armory had

18   been selected.  But from the detail from the conversation,

19   that they were confident that there was one specifically

20   selected, but that the group would only talk about that face-

21   to-face, in person.

22   Q.    In the more recent Signal chat, that is with the

23   different group, did the use of Mr. Maurino's military ID come

24   up?

25   A.    It did.  One of the -- in the Signal chat, one of the

John Little - Direct

1    individuals was stating that they wanted to come on base to

2    see a tank or some other weapon as to -- to view it.  And Mr.

3    Maurino told him that he has access to any military facility

4    through his military ID.

5    Q.   I want to turn your attention very briefly to something

6    you mentioned before.  At the recovery of the items in Boise,

7    at the arrest of the coconspirators, you mentioned both

8    explosive components and digital hard drives and things.  Were

9    you able to do any comparison of the digital media, found as a

10   result of the Boise search, and Mr. Maurino's phone?

11   A.   Specifically in the Boise search, there was an external

12   hard drive belonging to Mr. Duncan that had a vast amount of

13   explosive schematics and other how-to manuals regarding --

14   regarding weapons.  Pertaining to the explosive schematics,

15   many of the explosive schematics found on Mr. Duncan's device

16   were also found on other group members' devices, specifically

17   Mr. Kryscuk and group member T.C.  And so those are the

18   schematics that I was previously referencing --

19   Q.   Okay.

20   A.   -- as far as the components.

21   Q.   In addition to those schematics, there was a manual on

22   how to build homemade silencers, where that same manual was

23   also found on Mr. Maurino's phone.  So it appears that Mr.

24   Duncan's hard drive was kind of a source for -- for the entire

25   group.  There was multiple documents from that hard drive

John Little - Direct

1    found on multiple other group members' devices.

2    Q.   All right.  And was there commonality among other items,

3    not just explosive materials and the like, but reading

4    material or material that would indicate the underlying

5    ideology for some of their actions?

6    A.   What's a consistent theme through multiple electronic

7    devices and discussions the group had was the attack conducted

8    in New Zealand by Mr. Tarrant, where approximately fifty

9    individuals were murdered in mosques in Christchurch, New

10   Zealand.  From interviews, the -- the group frequently

11   discussed the attack, how they could conduct it better, and

12   you can see consistent praise for Tarrant, referring to him as

13   a legend, referring to different aspects of the very graphic

14   video that was posted online.

15        And then there's also the manifesto left behind by the

16   New Zealand shooter.  On Mr. Maurino's cellular phone, that

17   manifesto and -- was available for him to read.  And then

18   the -- at least an excerpt or part of the video from Tarrant

19   was also on his device.  That's consistent through other group

20   members' devices as well.

21   Q.   Tarrant there in Christchurch, New Zealand videotaped the

22   entire --

23   A.   He -- he live -- he did a live feed while he murdered

24   approximately fifty people.

25   Q.   And did some of the other members have the entire video

John Little - Cross

1   on their phone?

2   A.   Yes.

3   Q.   All right.  Finally, Agt. Little, the pre-trial services

4   report indicates that -- hang on one second -- that Mr.

5   Maurino was discharged from the army under general honorable

6   conditions.  Can you tell us what that means?

7   A.   That is a general discharge under honorable conditions.

8   Q.   Is that the same thing as an honorable discharge?

9   A.   It is not.

10  Q.   And does it fall above or below, if you would -- if you

11  would rank the ways you get out of the military?

12  A.   It's a nonpunitive discharge, but it is not -- it is

13  below an honorable discharge.  And it's the same discharge

14  that Liam Collins got when he got out.  It's something I --

15  I've seen used multiple times.

16       MS. KOCHER:  All right.  No further questions, Your

17  Honor.

18       THE COURT:  All right.  Mr. Chetson?

19       MR. CHETSON:  Yes, Your Honor.  Thank you.

20                     CROSS-EXAMINATION

21  BY MR. CHETSON:

22  Q.   And Agent, I'm going to ask you a few questions, if you

23  don't mind, and --

24  A.   Yes, sir.

25  Q.   Okay.  First of all, I want to talk to you about on

John Little - Cross

1    October 22nd, that's when my client -- when Joe was arrested

2    by New Jersey State Police or New Jersey police, correct?

3    A.    I'm not -- I was -- I wasn't there.  I'm not aware of it,

4    but that sounds correct.

5    Q.    Okay.  And you're aware that various members of the FBI

6    came and spoke with his family that day, correct?

7    A.    Yes, sir.

8    Q.    And they segregated them in the house, and they chatted

9    with them and spoke with them, and the family talked with

10   them, correct?

11   A.    Yes.

12   Q.    Also you spoke, at one point, about a search of, I

13   believe, the home.  And that was a consent search, correct?

14   A.    I don't know that the whole home was searched.  I'm

15   saying the -- the weapon was turned over by consent.

16   Q.    By consent.  Okay.

17         And that was consent given by either my client or my

18   client's parents, correct?

19   A.    Correct.

20   Q.    Okay.  And so that was willingly turned over to the

21   police on that day, correct?

22   A.    It was.

23   Q.    Okay.  And as far as you're aware, there are no other

24   firearms in that home, correct?

25   A.    I don't know.  The home was not completely searched.

John Little - Cross

1    Q.   Okay.  Now, on October 23rd -- so Joe was arrested -- if

2    I'll just proffer to you on October 22nd -- an interview was

3    conducted of various members of his family on that day.  On

4    October 23rd, the FBI came back again and had another

5    conversation, correct?  It's reflected in a FBI 301 (ph.).

6    A.   Okay.  I wasn't a part of that, but --

7    Q.   But you, as a --

8    A.   -- it's in the report.  I'm aware of the reports.

9    Q.   You're aware of the general nature of the reports because

10   you're one of the lead agents in this case --

11   A.   Yes, sir.

12   Q.   -- correct?  Okay.  And on October 20- -- so on October

13   23rd, Special Agents Franheim (ph.), Manley, Schmidt (ph.),

14   and Yoakum (ph.) --

15        MR. CHETSON:  And I will let the Court know that this

16   is Bates number A004244 in the discovery provided by the

17   government.

18   Q.   -- made contact with Joseph Maurino.  You're aware of

19   that, correct?

20   A.   Yes.

21   Q.   And that is because my client was released from custody

22   after his arrest on the state charge, correct?

23   A.   I was aware he was released on bail.

24   Q.   Okay.  On bail, yeah.

25        And as far as you're aware, there have been no violations

John Little - Cross

1    whatsoever on my client's custody status or bail status on the

2    state charges, correct?

3    A.    Correct.  As far as I'm aware, no.

4    Q.    None.  And that he has not missed a single court date or

5    hearing or whatever procedure they're following in New Jersey

6    state court, correct?

7    A.    Correct.

8    Q.    And you're aware that he has a New Jersey State -- a

9    state attorney, Mr. Ansell, representing him on that case, or

10   are you aware?

11   A.    I'm not aware of his state attorney.

12   Q.    Okay.  And Mr. Maurino answered the door on the 23rd,

13   having gotten out of custody, correct?

14   A.    Correct.

15   Q.    And he had a conversation with the FBI agents and spoke

16   with them, correct?

17   A.    I'm aware --

18   Q.    You're aware of that, correct?

19   A.    I'm aware he spoke with them.  I'm not, you know, up on

20   the details of who answered the door, all those things.  But

21   I'm aware they spoke.

22   Q.    Okay.  And he made various statements about traveling to

23   Boise back in July, correct?  You're aware of the general

24   nature --

25   A.    Yes.

John Little - Cross

1    Q.    -- of that, right?

2    A.    Yes.

3    Q.    And he may have made a statement about -- may have made a

4    statement at some point, in either interview, of potentially

5    being Bishop, correct?

6    A.    Yes.

7    Q.    Okay.  And then it was how long after that were the other

8    individuals in this named federal indictment arrested,

9    Collins, Kryscuk, Duncan, and Hermanson?

10   A.    They were arrested on October 20th.

11   Q.    20th.  Okay.  So they had already been arrested?

12   A.    Correct.

13   Q.    And you're aware that my client became aware -- at least

14   if he had not been aware by that point, he had been -- he was

15   aware, at that point, meaning October 23rd, 2020, that the

16   other individuals had been arrested, correct?

17   A.    Yes.

18   Q.    Because he was informed about that by the FBI, correct?

19   A.    Yes, sir.

20   Q.    So he's been aware, at least generally, of the fact that

21   they've been arrested and they've been detained -- or I

22   believe all of them have been detained, correct?

23   A.    Yes, sir.

24   Q.    Okay.  And yet Mr. Maurino was arrested in -- was it July

25   or June of this year?

John Little - Cross

1    A.    June.

2    Q.    Do you recall the day?

3    A.    I don't recall the exact date.

4    Q.    But you're aware that when he was arrested in late June

5    of 2020, he was arrested at that same home, where he was

6    living with his family, correct?

7    A.    Yes, sir.

8    Q.    The first time he was arrested, meaning by the state

9    police, he was arrested at a fire department of some sort; is

10   that correct?

11   A.    Yes.

12   Q.    And you're aware that that's the fire department where he

13   was a volunteer, correct?

14   A.    Correct.

15   Q.    And in fact, are you aware that the chief of the fire

16   department, who was a special ATF agent or something like

17   that -- some federal agent -- had offered to have that be the

18   location where he get arrested?  Is that fair?

19   A.    I -- I'm not -- I mean, I'm not aware of that detail, but

20   I am aware of the -- the fire station.

21   Q.    And there was no --

22   A.    As far as the planning and, like, how that happened, I

23   was not there.

24   Q.    You were not there.

25         But it's fair to say that he was -- when he was arrested,

John Little - Cross

1    there was no difficulty on October 22nd, if that were the

2    date, effecting his arrest by the New Jersey police, correct?

3    A.   I'm not aware of any difficulty.

4    Q.   No difficulties.  Okay.

5    And then in late June, when he was arrested by federal agents

6    or federal marshals on the federal indictment, there was,

7    again, no difficulty, correct?

8    A.   Not that I'm aware of.

9    Q.   In fact, he emerged from the home.  I don't know if

10   you're aware, but there were -- well, there was a Ring video

11   or Ring --

12   A.   Ring camera.

13   Q.   -- alarm system on the front door, correct?

14   A.   I'm not sure.

15   Q.   Okay.  The FBI report notes, at one point, that his

16   mother was talking to him outside of the Ring by -- via of

17   that Ring --

18   A.   I do recall that.

19   Q.   Okay.  So we'll talk about that later.  But there were no

20   issues -- as far as you're aware, no issues with his arrest in

21   late June, correct?

22   A.   Yes, sir.

23   Q.   And this has been an ongoing investigation by yourself

24   for -- when did you actually initially get involved in this,

25   or initially begin this investigation?

John Little - Cross

1   A.   I initially began the investigation, as it pertains to

2   Liam Collins specifically, in April of 2020.

3   Q.   April of 2020.  Okay.

4   A.   As far as Liam Collins, not Mr. Maurino.

5   Q.   Sure.

6   A.   I was not aware of him at that time.

7   Q.   You became aware of him in in July, around the time of

8   the Boise trip -- or the Idaho trip?

9   A.   Approximately.  Yes, sir.

10  Q.   Okay.  But you have not -- you did not stop your

11  investigation in October, when the others were arrested,

12  correct?

13  A.   Correct.

14  Q.   You've continued your investigation until today?

15  A.   Correct.  It's ongoing.

16  Q.   Ongoing.  You've not testified to any conduct, after

17  October 22nd, by my client, regarding internet chats, Wire

18  chats, Signal chats, any social media chats whatsoever, since

19  October 22nd until today, related to this general theme -- and

20  I'll just call it a general theme at this point -- of white

21  supremacy, or Atomwaffen conduct, or conspiratorial mutterings

22  or ramblings or statements regarding the United States

23  government.  None of that since October -- at least since

24  October 22nd -- or October 20th, whenever that is -- until

25  today, correct?

John Little - Cross

1    A.    That's because the phone that was seized on October 20th,

2    that had a couple years of that kind of information --

3    Q.    Right.

4    A.    -- it was seized on the 20th.  And that's what we have.

5    We don't have current past that time.

6    Q.    Well, the government has the ability to get wiretaps and

7    to get up and do other kinds of surveillance, correct?

8    Doesn't just rely upon seizing, say, my phone to see what I've

9    been saying.  It can listen in, correct?

10   A.    I -- I'm not aware of all the --

11   Q.    You're not aware of federal wiretaps?

12   A.    We did not conduct a federal wiretap.

13   Q.    Right.  But you have that ability, correct?

14   A.    That ability exists, but it was not used here.

15   Q.    Fair enough.  I'm just asking about the ability.  You've

16   used that in another contexts, correct?

17   A.    I have not, no.

18   Q.    You're aware that the FBI can do that, correct?

19   A.    They could.

20   Q.    Okay.  And what I'm asking is you have no evidence or no

21   indication of any -- I'll just use the general word of

22   problematic conduct related to these offenses, from October

23   22nd, 2020, until today, correct -- by my client?

24   A.    We don't have additional evidence at this time.  No, sir.

25   Q.    Okay.  And that's not because you haven't been

John Little - Cross

1    investigating this case, correct?  I mean, you have been going

2    on --

3    A.   We're --

4    Q.   -- you have continued to investigate the case?

5    A.   -- we're continuing to review the information that we

6    have.

7    Q.   Right.  And Joseph Maurino -- Joe Maurino has been either

8    a known potential target or a target of this investigation,

9    since sometime in the summer of 2020, correct?

10   A.   Yes, sir.

11   Q.   Okay.  If you had any indication that Mr. Maurino had

12   been up to -- and again, I'm going to use the general phrase,

13   problematic conduct, meaning white supremacy, weapons-related

14   conduct, anti-government or government -- overthrow the United

15   States government conduct, or conspiracies along that line,

16   from October 2020 -- late October 2020 to today, you would

17   have said it, correct?

18   A.   I would have said it that I had the evidence.

19   Q.   You would have -- if you had any of that evidence, you

20   would have testified to that, correct?

21   A.   Yes.  We would testify -- testify about our evidence.

22   Q.   You talked a little bit about my client being responsible

23   in part for the vetting of membership or of entry into this

24   alleged conspiracy.  Do you recall talking about that?

25   A.   Yes, sir.

John Little - Cross

1    Q.   Okay.  Did you find any documents on my client's phone or

2    in any of his chats listing the criteria that would go into

3    the vetting?

4    A.   That statement was based off of group member

5    interviews --

6    Q.   Okay.

7    A.   -- talking about -- and by vetting, I mean conducted,

8    basically, like, a -- a job interview for the group, not,

9    like, research into the person, but an encrypted voice call

10   where the individual is asked questions by specific members of

11   the group.

12   Q.   Right.  Did you find any documents on my client's phone

13   or in my client's possession indicating what questions he

14   would ask during that vetting process?

15   A.   No.

16   Q.   Did you find out who my client actually vetted?

17   A.   Yes.

18   Q.   Who did my client vet?

19   A.   Justin Hermanson.

20   Q.   Justin Hermanson.  Okay.  Who else did my client vet?

21   A.   I have not had -- been able to interview the other

22   individuals I feel like he would have predated on the group,

23   but I feel like he would have taken part in the vetting for

24   Jordan Duncan as well.

25   Q.   Jordan Duncan.  Any other individuals?

www.escribers.net | 800-257-0885

John Little - Cross

1   A.   Not that I'm aware of at this time.

2   Q.   So two individuals that my client vetted?

3   A.   It would likely have taken place for T.C. as well.

4   Q.   Okay.

5   A.   And he was an administrator for the group communication

6   application that the vetting would have taken place on.

7   Q.   So there were three individuals -- T.C., Justin

8   Hermanson, and Jordan Duncan -- that you've listed as people

9   that he would have vetted?

10  A.   Likely vetted.

11  Q.   Likely vetted.  Are there any indications of anybody he

12  would have vetted and said they're not good?

13  A.   I'm not aware of them.  I don't know.

14  Q.   Okay.  And do you know how that vetting occurred with --

15  let's take Mr. Hermanson, for example.  How was that vetting

16  conducted?

17  A.   I was told that it was conducted as an encrypted voice

18  call, utilizing the Wire application.

19  Q.   When was that conducted?

20  A.   I don't recall the exact date, but it would have been

21  in -- sometime in summer of 2020.

22  Q.   Okay.  And then with respect to Jordan Duncan, when and

23  how was that vetting conducted?

24  A.   I don't know the specific details of that.

25  Q.   Do you know the year?

John Little - Cross

1  A.   That would have been in 2018, probably.  Likely in the

2  fall to winter of 2018.

3  Q.   Okay.  And then with respect to T.C., when would that

4  vetting have occurred, and how?

5  A.   I would suspect that the vetting would have occurred the

6  same way, through the Wire application, or you know, it can --

7  potentially could have occurred in person if it was prior to

8  Mr. Kryscuk's move to Boise.

9  Q.   So when would that have occurred?

10  A.   I don't recall the specific date for T.C.

11  Q.   I mean, as far as you're aware, my client only went to

12  Boise -- as far as the investigation reveals, my client only

13  went to Boise on one occasion, correct?

14       MS. KOCHER:  I'm sorry.  I didn't hear.

15  Q.   My client only went to Boise on one occasion, with

16  respect to this conspiracy?

17  A.   That's all I'm aware of.  Yes, sir.

18  Q.   Correct.  So that would have been 2020?  T.C. would have

19  been in 2020, if it happened in person?

20  A.   I think T.C. would have happened prior to 2020.

21  Q.   So not in person, then?

22  A.   Mr. Kryscuk moved to Boise in early 2020, and that's when

23  the group started to co-locate in -- in Boise, in that -- in

24  that year.  They existed prior to that, and they were all in

25  the northeast.

John Little - Cross

1    Q.   Do you know how many times my client physically met Mr.

2    Kryscuk?

3    A.   I don't know.

4    Q.   And Mr. Kryscuk at that point was living where --

5    A.   At --

6    Q.   -- I'm sorry, in 2020?

7    A.   In 2020, he moved to Boise --

8    Q.   Okay.

9    A.   -- from the northeast, from, like, New York/New Jersey

10   area.

11   Q.   Okay.  And do you know if my client ever met Mr. Kryscuk

12   prior to going to Idaho?

13   A.   I'm -- I'm not positive.  I'm not --

14   Q.   Okay.

15   A.   -- certain.  I believe he stated he met him on a hiking

16   trip.

17   Q.   Okay.  Do you know if that was the same trip that he was

18   talking about in July of 2020?

19   A.   It's a statement from Mr. Maurino.  I don't --

20   Q.   Right.  I'm asking, do you think -- was that the same

21   trip in 2020?

22   A.   I don't believe so.

23   Q.   Okay.  Now, with respect to Jordan Duncan, how many times

24   did my client meet Jordan Duncan?

25   A.   I don't know.  I know there is an image of Mr. Maurino,

John Little - Cross

1    Mr. Collins, Mr. Duncan, and Mr. Kryscuk in somebody's kitchen

2    in late 2018.  They're all together in 2018, and then again at

3    least another time in 2020.

4    Q.    Okay.

5    A.    So from -- he's known him for at least that time period.

6    Q.    Okay.  You talked about potential political figures that

7    were spoken about as potential objects of these folks.  Do you

8    recall testifying about that?

9    A.    Yes, sir.

10   Q.    And who were they?  Who were the -- who was actually --

11   what political figure was actually talked about as a potential

12   target?

13   A.    Specifically -- so Mr. Kryscuk's list had multiple

14   individuals on it.  And then from -- from interviews, we know

15   that the group discussed specific individuals that were also

16   on that list.  And then also Mr. Kryscuk had screenshots of

17   their home address that he sent to other individuals in the

18   group.  One individual I can remember is Scott Wiener.  He's a

19   state representative in San Francisco.

20   Q.    Okay.  And beyond listing the name and -- it was an

21   address provided for Mr. Wiener?

22   A.    Yes.  Mr. Kryscuk screenshotted an address for Mr.

23   Wiener, and then gave that -- I saw that same screenshot on

24   other group members' devices.  I did not see that on Mr.

25   Maurino's device, but I saw it on other group members'

John Little - Cross

1    devices.

2    Q.    Okay.  So Mr. Maurino may never have received that --

3    A.    We don't know --

4    Q.    -- that particular name or address?

5    A.    From the information from the interview, that the entire

6    group discussed that as a group.  But then as far as that

7    specific screenshot, I don't know if he's ever seen that or

8    not.

9    Q.    Well, the group, it sounds like, was fluctuating at

10   various times, where people being added and maybe people not

11   present at certain times, correct?

12   A.    I'm -- I'm not certain.

13   Q.    Well, you're aware that my client was deployed and in

14   Qatar for parts of 2019 and into -- most of 2019.  You're

15   aware of that, correct?

16   A.    And I'm also aware he stayed in contact with Mr. Kryscuk

17   and the group, utilizing the Wire application while he was

18   there.

19   Q.    Okay.  And so are you -- do you know -- do you have any

20   copies of any of those chats?

21   A.    I have -- I recall seeing text messages between Mr.

22   Maurino and Mr. Kryscuk, discussing that -- just that, like,

23   that he's trying to communicate with the group on Wire while

24   he's in Qatar.

25   Q.    And when was that text message sent?

John Little - Cross

1    A.    It was sometime during the deployment.  I don't remember

2    the exact date.

3    Q.    Sometime during that entire year?

4    A.    Sometime during 2019, during Mr. Maurino's deployment.

5    Q.    Okay.  Besides Mr. Wiener, what other politicians were

6    identified or talked about his potential objects, according to

7    your investigation?

8    A.    The others referenced -- and they're not all politicians,

9    but there are individuals like -- another one described by the

10   group member I interviewed would be Les Wexner.  He was a --

11   he was known for owning Victoria's Secret at some point, and

12   that's how --

13   Q.    One of the people that backed Jeffrey Epstein?

14   A.    Right.  That was on the list as well.  He's -- well, it

15   was referenced to me it had to do with him being Jewish.  And

16   from the interview, I recall that they discussed, you know,

17   where he lived and how best to accomplish attacking him.

18   Q.    Okay.  And Mr. Wexner's name came up a bit when Mr.

19   Epstein died in federal custody in 2020, correct?

20   A.    I -- I recall seeing some information about that, but I'm

21   not really overly familiar with that.

22   Q.    Right.  But --

23   A.    Right.

24   Q.    -- his name was in the news at that point for people to

25   think about, or do you remember?

John Little - Cross

1    A.   I -- I just -- I don't remember.

2    Q.   Okay.  Besides Mr. Wexner and Mr. Wiener, any other

3    individuals?

4    A.   There's other individuals on the list --

5    Q.   Um-hum.

6    A.   -- and they're consistent with how they were described.

7    But the individual interviewed could not recall their specific

8    name.  So he knew, like, people associated with BLM, but

9    didn't know the specific name, if that --

10   Q.   And of course, BLM is not an actual organization,

11   correct?  It's a grouping?

12   A.   It's --

13   Q.   There's no president of the BLM, correct?

14   A.   There's, like, establishing members of the BLM.

15   Q.   Black Lives Matter, obviously, was in the news quite a

16   bit last year, correct?

17   A.   Yes, sir.

18   Q.   Okay.  In fact, our then-president would talk often about

19   Black Lives Matter in a very derogatory way, correct?

20   A.   Yes.

21   Q.   This photograph, do you know when this photograph of --

22   I'm sorry; I'm talking about Government's Exhibit 9 -- of the

23   weapons in the armory, do you know where that armory is?

24   A.   I do not.

25   Q.   Do you know when that photograph was taken?

John Little - Cross

1    A.    I don't recall when the photograph was taken.

2    Q.    Do you know even if that armory is -- I mean,

3    theoretically, you don't even know if that armory is in the

4    United States --

5    A.    I --

6    Q.    -- or maybe Qatar?

7    A.    I don't know the location --

8    Q.    Okay.

9    A.    -- of the armory.

10   Q.    Okay.  I want to go through some of these exhibits with

11   you, if that's okay.  Let's turn to Government's Exhibit 3.

12   A.    Okay.

13   Q.    And I don't want to read every single item, but some of

14   the writing is hard to see.  But you said that this was found

15   in about -- or was on a phone and dated about March of 2020,

16   correct?

17   A.    Yes, sir.

18   Q.    That was the start of COVID, correct?  I mean, February

19   into March of 2020 was when the COVID started hitting the

20   United States, correct?

21   A.    Yeah.  I mean, COVID was here in that time.

22   Q.    Right.  And that was when the lockdowns began in the

23   United States, and gas shortages, and concern about how long

24   we were going to be in a lockdown?

25   A.    Yes, sir.

John Little - Cross

1    Q.   Do you remember that?

2    A.   That was going on around that time.

3    Q.   Yeah.  And none of these items -- all of these items are

4    food or batteries or sanitary or disinfectant wipes, latex

5    gloves.  Is that --

6    A.   Yes, sir.

7    Q.   -- fair?

8    A.   Yes, sir.

9    Q.   Fuel.  I don't see any -- there are no armory, no armor,

10   no guns, no ammunition, no repair items for any of those --

11   for weaponry at all on that list, correct?

12   A.   Correct.

13   Q.   So I think you talked about that being kind of consistent

14   with -- I'm going to call it maybe a prepper -- that's

15   consistent with a prepper approach to the world, correct?

16   You're familiar with the term "prepper", right?

17   A.   Yes.  But what I stated was it was consistent with other

18   descriptions of locations that can be described as wanting to

19   stage -- like bug out gear, like to --

20   Q.   Right.

21   A.   -- to flee.

22   Q.   But that's also consistent with what a lot of people put

23   together in terms of being preppers, right?

24   A.   It could be.

25   Q.   Right.  I'm going to talk about Government's Exhibit 4.

John Little - Cross

1    A.    Yes, sir.

2    Q.    Government's Exhibit 4 is a list of slogans, correct --

3    or statements?

4    A.    Correct.

5    Q.    And I mean, quite -- talks right here, it says -- the

6    person says, "It doesn't have to be Nazi shit.  Just do our

7    anarchist style, fuck society taglines."  Do you see that

8    statement there?

9    A.    Yes, sir.

10   Q.    And these were just sort of taglines that can be

11   utilized, correct -- or painted somewhere, or put on a

12   T-shirt?

13   A.    Well, I was -- I was -- as I mentioned previously, this

14   was to specifically replace some BLM fliers, like --

15   Q.    Oh.  I see.

16   A.    -- propaganda to replace ---

17   Q.    The kind of propaganda that -- the kind of propaganda

18   that BLM was using?

19   A.    -- to replace the -- it was, like, a flier.  The picture

20   showed a flier that said BLM --

21   Q.    Okay.

22   A.    -- in large letters.

23   Q.    Oh.  I see.  Was this designed to basically pretend to be

24   BLM?  Or was it saying -- I mean, what was the theory behind

25   this?  Do you know?

John Little - Cross

1    A.    It was to replace what Kryscuk described as BLM fliers --

2    Q.    Okay.

3    A.    -- that were posted in -- or --

4    Q.    So do you know if these were statements that the group

5    was earnest about, or were these statements designed to

6    basically say, pretend to be BLM -- to say, this is the sort

7    of stuff that BLM would say?  Do you know which it was?

8    A.    It was not -- I do not believe it was to pretend to be

9    BLM.

10   Q.    Okay.  But you've seen some of the BLM statements that

11   are posted or spray painted on buildings, correct?

12   A.    Like what?

13   Q.    Well, like, I mean, I don't want to be -- well, I guess

14   we can -- "fuck 12"?

15   A.    I've seen that.

16   Q.    Okay.  Which means what?

17   A.    That means "fuck the police".

18   Q.    Okay.

19   A.    But is that specifically attributed to BLM?

20   Q.    It can be used by a lot of different groups, right?

21   A.    I -- I don't know.  I've never -- I don't know who

22   specifically uses that.

23   Q.    Okay.  You didn't see that painted up in Raleigh around

24   May 31st, 2020, correct?

25   A.    I've seen it spray painted places.

John Little - Cross

1    Q.   Okay.  Government's Exhibit 5, I think you said this came

2    off of one of the individuals' phones, Mr. Collins, maybe?  Is

3    that what you --

4    A.   The first page is from Mr. Collins' phone.

5    Q.   Yeah.

6    A.   And the second page is from Mr. Maurino's phone.

7    Q.   Okay.  Do you know -- do you know if Mr. Collins actually

8    ended up coming to Mr. Maurino's home in Manalapan, New

9    Jersey?

10   A.   When?

11   Q.   Well, it says on June 12th, 2020, there appears to be a

12   message saying, "If you can come to Manalapan, it would be

13   good.  If not, I can meet you halfway"?

14   A.   That is from Mr. Maurino to the individual delivering the

15   body armor.

16   Q.   Okay.  And do you know if that that meeting actually

17   happened?

18   A.   Yes, it did.

19   Q.   Okay.  And where did it happen?

20   A.   At his home.

21   Q.   In Manalapan, New Jersey?

22   A.   Or outside the home.  It happened in that -- in that

23   general vicinity.

24   Q.   Okay.  And what was exchanged there?

25   A.   Body armor.

John Little - Cross

1    Q.    Okay.  How many pieces?

2    A.    I believe a front and back plate.

3            MS. KOCHER:  I'm sorry.  I couldn't hear.

4            THE WITNESS:  I believe it was a front and back

5    plate, so two pieces.

6    BY MR. CHETSON:

7    Q.    And it's your understanding that the body armor -- some

8    of the body armor -- some of the body armor that was being

9    spoke about was apparently in reference to either National

10   Guard or Army National Guard or Army body armor, correct?

11   A.    No.  This was body armor issued by the Marine Corps and

12   stolen off --

13   Q.    Marine Corps.

14   A.    -- Marine Corps unit.

15   Q.    Okay.  Do you know if those particular items were

16   actually taken from Camp Lejeune?  Or were they some of the

17   body armor that you could purchase privately that was similar?

18   A.    This was taken from Camp Lejeune.

19   Q.    Okay.  Have you recovered that?

20   A.    We don't know.

21   Q.    You don't know whether you recovered it?

22   A.    We don't know.  We've recovered body armor, but sometimes

23   they've removed the serial numbers, and it's -- it's not --

24   it's hard to tell specifically who that was issued to or which

25   specific set was sent to Mr. Maurino or someone else.

John Little - Cross

1    Q.   Okay.  So you don't -- so you don't know whether -- you

2    have it on a statement from somebody, saying that they had

3    delivered that body armor in Manalapan.  Is that what you're

4    telling me?

5    A.   Yes, sir.

6    Q.   Okay.  I just want to be clear.  We've talked about an

7    upper and a lower receiver?

8    A.   Yes, sir.

9    Q.   And the firearm, according to your testimony, is only

10   illegal if the upper and the lower are actually put together

11   as a single firearm, correct?

12   A.   Wait.  The lower receiver is the firearm.

13   Q.   Right.

14   A.   And depending on the length of upper receiver you attach

15   to it --

16   Q.   I see.

17   A.   -- depends on if it's --

18   Q.   Legal or not?

19   A.   -- legal or not.

20   Q.   Right.  Okay.  So if the short upper were attached to the

21   lower, then it would be illegal -- it potentially would be

22   illegal, correct?

23   A.   Like, the way it's assembled in Exhibit 6 --

24   Q.   Um-hum.

25   A.   -- would be illegal.

John Little - Cross

1    Q.   Okay.  If that were a real firearm, that was really

2    being -- was this firearm -- was this firearm itself actually

3    recovered?  Do you know?

4    A.   We recovered the upper receiver that is very consistent

5    with that one.  But it's not a serialized item, so we don't

6    have a number to compare it to.  But we recovered the upper

7    receiver that has very similar accessories -- handguard,

8    foregrip, and optic.  To my knowledge, that lower receiver

9    with the folding stock that was in the video with the backpack

10   gun, that was not recovered, to my knowledge.

11   Q.   Okay.

12            MR. CHETSON:  If I could just have a moment, Your

13   Honor, to consult with my client?

14            THE COURT:  Go ahead.

15   BY MR. CHETSON:

16   Q.   I believe you testified, at some point -- that at some

17   point, there was some evidence that my client, back in -- I

18   think it was July of 2020 -- drove by, or cased may be the

19   word, a BLM rally in Idaho.  Did I hear you correctly?

20   A.   No.

21   Q.   Okay.

22   A.   That's -- I didn't -- I don't recall the exact date of

23   the video because I believe that was likely in the New Jersey

24   area.  I didn't say that it was in Idaho.

25   Q.   Okay.

John Little - Cross

1    A.    But that he wrote -- there's two videos of BLM rallies on

2    his device.

3    Q.    So two videos of BLM rallies on my client's device?

4    A.    Correct.

5    Q.    And do you know where those BLM rallies actually were?

6    A.    I don't know.

7    Q.    Okay.  And do you know when the rallies were?

8    A.    I don't recall off -- you know, sitting here, but I mean,

9    I think the information is available on the device, like, as

10   far as the data capture of --

11   Q.    Okay.

12   A.    -- the -- of the video.

13   Q.    And do they depict my client in the video, or my client's

14   voice?

15   A.    It sounds like your client saying -- I don't -- I don't

16   want to try to quote him, but I remember him stating, it's

17   BLM, or BLM's here, or something like that.  I don't know.

18   Q.    Right.  What I'm trying to determine is, is my client's

19   presence in the video apparent from the video?

20   A.    No.  As I --

21   Q.    Do you see what I'm saying?

22   A.    -- stated earlier, I don't see his face in the video.  I

23   can tell that the video was taken with his -- with his device,

24   with that phone, and it's on there, and -- and it --

25   Q.    And how did you determine that it was taken from my

John Little - Cross

1  client's phone, as opposed to emailed to my client or

2  transmitted to my client in some way?

3  A.   It was the information available on the phone extraction.

4  Q.   Okay.

5  A.   And it states that it was taken with the -- the camera on

6  that phone.

7  Q.   And when did you recover my client's phone to do that

8  analysis?

9  A.   I had access to your client's phone -- I don't remember

10  the exact date, but it wasn't until a while after it was

11  seized.  I didn't get access to the phone extraction until a

12  few months ago.

13  Q.   Okay.  But it was seized back in October of 2020?

14  A.   Yes, by the FBI in New Jersey.

15  Q.   Correct.  Okay.

16      (Pause)

17  Q.   Do you think your testimony that the upper of the -- the

18  upper that was recovered from my client was not serialized or

19  it was serialized?

20  A.   The upper receiver -- upper receivers are not serialized

21  firearms.  Like, they're not --

22  Q.   But there's no serial number on the upper or at all?

23  There's no identifying --

24  A.   I don't know if there's, like -- I've -- all the uppers

25  I've seen or not serialized in that -- like, that individual

John Little - Redirect

1    one.  And if they were, we didn't have access to it before he

2    went to Boise.

3    Q.  No.  I understand that.  I'm just asking that there

4    was -- okay.

5        MR. CHETSON:  No further questions, Your Honor.

6    Thank you.

7        THE COURT:  Any redirect?

8        MS. KOCHER:  Yes, sir.

9                REDIRECT EXAMINATION

10   BY MS. KOCHER:

11   Q.  Agt. Little, are you aware if there are other numbers

12   present on firearms besides what would be known as the serial

13   number?

14   A.  Yes.

15   Q.  All right.  And could there be numbers on that upper

16   receiver?

17   A.  Yes.

18   Q.  Okay.  To the extent you were asked about whether an

19   unattached upper and the presence of a lower receiver would be

20   legal or illegal, do you have knowledge to that end?

21   A.  As far as a -- a lower receiver by itself?  I mean, if

22   they're readily accessible and can be readily put together,

23   then it would be the same as it being assembled.

24   Q.  All right.  You were asked about the recovery of the body

25   armor from Mr. Maurino, whether the plate Mr. Guevera took to

John Little - Redirect

1    him were recovered?

2    A.    Correct.

3    Q.    Were they recovered in a search of Mr. Maurino's home?

4    A.    I'm -- not that I'm aware of.

5    Q.    All right.  And is your testimony, then, that we simply

6    don't know if they were given to someone else and were

7    recovered at some other point in the investigation?

8    A.    That's what I was --

9    Q.    Okay.

10   A.    -- that's what I meant, that Mr. Maurino could have given

11   them to another group member, where we recovered it later, but

12   we don't have a way to compare those serial numbers.

13   Q.    All right.  In regard to vetting, you were asked several

14   times about whether there were documents on Mr. Maurino's

15   phone related to that process.  Would you, sir, have expected

16   to find documents related to the vetting process on the phone?

17   A.    Absolutely not.

18   Q.    Why not?

19   A.    The group's OPSEC rules.  That would pretty much violate

20   anything, you know, they would -- they would do, as far as

21   keeping an electronic document of information like that.

22   Q.    All right.  You were asked if you're aware of any

23   problematic conduct occurring after October of 2020.  Do you

24   recall that?

25   A.    Yes.

John Little - Redirect

1    Q.   Was there any problematic conduct prior to October 2020

2    that would cause concerns as to Mr. Maurino being either a

3    risk of flight or a danger to the community?

4         THE COURT:  Did you say before or after 10 --

5         MS. KOCHER:  Before.

6    BY MS. KOCHER:

7    Q.   Are you aware of any problematic conduct occurring before

8    October of 2020 that would raise concerns going forward into

9    the future?

10   A.   Yes.  The -- the conduct described here.

11   Q.   What specifically?

12   A.   The -- the violent tendencies displayed in the -- by

13   participation with this -- with this group.

14   Q.   Anything else?

15   A.   Like -- like, I was -- like, his involvement with the

16   group, being in a leadership role within the group, or a -- I

17   don't know if leadership role is the right word, but like,

18   integral member of the group, information we presented

19   regarding his money transfers to Mr. Kryscuk that appeared

20   consistent with other illegal firearms purchases.

21   Q.   Do you have any reason to believe, Agt. Little, that the

22   upper and lower receivers Mr. Maurino turned over to the New

23   Jersey State Police are the only firearms which he may

24   possess?

25   A.   I believe he may possess others.

eScribers
www.escribers.net | 800-257-0885

John Little - Redirect

1    Q.   And what is that based upon?

2    A.   The fact that, to my knowledge, we haven't recovered the

3    folding stock lower that was in the -- visible in the video

4    that he retrieved from the backpack, the statements made in

5    the Signal chat group stating he's got multiple 9, .38s, and

6    MAC-11s, his ability to purchase unregistered or unserialized

7    weapons, and then his knowledge of what's commonly referred to

8    as ghost guns.

9    Q.   Ghost guns?

10   A.   Ghost guns.  The Polymer80s that you can buy unserialized

11   and quickly -- quickly make fully functional.

12   Q.   And finally, sir, in regard to the National Guard, Mr.

13   Maurino served in the New Jersey National Guard; is that

14   correct?

15   A.   Yes, ma'am.

16   Q.   Do you know, sir, whether or not his unit was activated

17   to respond to Washington, D.C., after the events of January

18   6th?

19   A.   They were.

20   Q.   And was Mr. Maurino involved in that deployment?

21   A.   He was initially slated to be deployed to Washington,

22   D.C. after the events on -- on the 6th.  But due to the

23   information discovered in this investigation, he was pulled

24   off of that deployment by Army CID and kept away from the

25   Capitol.

John Little - Recross

1        MS. KOCHER:  All right.  No further questions, Your

2   Honor.

3        MR. CHETSON:  Just a couple of questions, Your

4   Honor --

5        THE COURT:  Yeah.

6        MR. CHETSON:  -- about what was asked.

7                    RECROSS-EXAMINATION

8   BY MR. CHETSON:

9   Q.  First, you were asked about the money transfer.  You

10  mentioned the money transfer as being of concern.  What was

11  the total amount of money that Mr. Maurino received or sent,

12  related to this?

13  A.  I'm not aware of the total amount.  I'm -- I'm also not

14  aware of money that he received from Mr. Kryscuk.  It was

15  generally payments to Mr. Kryscuk.

16  Q.  How much?

17  A.  I don't recall the total amount.

18  Q.  Under 2,000 dollars?

19  A.  Potentially in that ballpark.  I -- I really -- I don't

20  want to try to say a specific figure.

21  Q.  I'm asking for a rough --

22  A.  I mean, like, 2,000 could be a rough estimate.

23  Q.  Rough estimate of 2,000 dollars?  Okay.

24  A.  Maybe -- maybe less or maybe slightly more.

25  Q.  Sure.  Okay.  You believe he -- well, you know what, you

John Little - Recross

1    cited one of the issues -- the ability to purchase

2    unregistered firearms -- as a concern, right?

3    A.   Because he's mentioned it to individuals by --

4    Q.   Well, you don't have to have a registered -- you can

5    purchase an unregistered firearm in North Carolina.  I mean, I

6    can walk out and purchase an unregistered firearm today.

7    A.   I think unregistered is the wrong time.  I meant

8    unserialized.

9    Q.   Unserialized.  Okay.  So his ability to acquire

10   Unserialized firearms?

11   A.   Correct.

12   Q.   Is that a concern?  Any information to indicate that he

13   has acquired an unserialized firearm, of any sort, since

14   October 2020?

15   A.   The firearm seized on October 20th was -- was

16   unserialized.

17   Q.   Right, that one.  But after that October 2020 arrest?

18   A.   No, we haven't.

19   Q.   It's ten months -- it's ten months after.

20   A.   We haven't searched his home since then.  We haven't -- I

21   mean, I don't know.

22   Q.   You have the ability to get a search warrant and search

23   his home, right?

24   A.   Not necessarily.  I mean, that's not --

25   Q.   You can't get a federal search warrant to search his home

John Little - Recross

1   to find out whether the firearms there related to a federal

2   conspiracy?

3   A.   I can't --

4           MS. KOCHER:  Objection, Your Honor.

5           THE COURT:  Overruled.

6   A.   I can't just decide I want to go see if they have guns in

7   their home.

8   BY MR. CHETSON:

9   Q.   Well, you would apply to a judge like Judge Jones, and go

10  get a search warrant, and then get one, right?

11  A.   Correct.

12  Q.   Okay.  And so you could do that.  If you thought that

13  there was evidence of criminal activity in the home, you could

14  get a search warrant?

15  A.   I guess -- I guess the problem is I don't work -- I -- I

16  don't work in New Jersey.  And that's not --

17  Q.   Well, I guess --

18  A.   -- I --

19  Q.   -- I'm not talking -- and I apologize.  I don't mean

20  to -- but I'm not talking about just you personally.  I'm

21  talking about the United States government in terms of its all

22  of its investigative agencies, the FBI, the ATF, your agency

23  have the capacity to go get a search warrant and search the

24  home?

25  A.   Of course.  Yeah.  We -- we use search warrants.

John Little - Recross

1    Q.   And if you thought that there was anything illegal in

2    that home that related to this conspiracy or other criminal

3    conduct, you -- other criminal conduct related to a federal

4    crime, you could get a federal search warrant and search the

5    home?

6    A.   If we had probable cause, yes, sir.

7    Q.   Okay.  So you don't have any probable cause to believe

8    that there's anything illegal in the home?

9    A.   I -- I -- I personally don't know.  I'm not -- I'm not in

10   New Jersey, right?

11   Q.   Any information from any other agents that there's any

12   probable cause to believe that there's anything illegal in

13   that home?

14   A.   No, sir.

15   Q.   Okay.  Now, the last bit you talked about, there was this

16   issue about the knowledge to buy ghost guns or guns that -- I

17   guess another word for this unserialized guns?

18   A.   Yes, sir.  There's a lot of different -- they're

19   called -- they're called Polymer80s.

20   Q.   Right.

21   A.   By individuals in this case, throughout the

22   investigation, they're called ghost guns, Polymer80s,

23   unserialized GLOCKs, even though they're not actually GLOCK

24   branded.

25   Q.   Yeah.

John Little - Recross

1    A.    They're referred to multiple different ways.

2    Q.    I mean, you're aware you can go on the internet right now

3    and Google how to get a 3D-printed plastic based gun, right

4    this moment, from this courtroom.  You're aware you can find

5    instructions on that right now?  Anyone can in this courtroom.

6    A.    With a -- this is -- I mean, that's a totally

7    different --

8    Q.    I'm just asking.

9    A.    -- topic.  I mean --

10   Q.    Right.  The point is, you said one of the concerns about

11   my client was his knowledge about the ability to buy ghost

12   guns?

13   A.    Just -- not just the knowledge, but the past activity of

14   actually doing it.  That's -- that's what I was referring to.

15   Q.    Okay.

16   A.    That he actually had one and could continue to purchase

17   them in that manner.

18          MR. CHETSON:  Okay.  No further questions.  Thank

19   you.

20          MS. KOCHER:  No, sir.

21          THE COURT:  How did he do that?

22          THE WITNESS:  Excuse me, sir?

23          THE COURT:  When you talk about knowledge and his

24   activity of purchasing ghost guns, how do you purchase a ghost

25   gun?

John Little - Further Redirect

1          THE WITNESS:  Initially, you would purchase a -- you

2    or another individual would purchase a -- what's called an 80

3    percent lower.

4          THE COURT:  Do you go to a store and do that?  How do

5    you do that?

6          THE WITNESS:  You could do it at a store.  You could

7    do it at an online vendor.  There's multiple ways, Your Honor.

8    You can buy it from a private seller.  There's -- there's a

9    lot of different ways, sir.

10          THE COURT:  Okay.  All right.  Thank you.  You can

11   step down.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  All right.  Anything further from the

14   government?

15          MS. KOCHER:  Your Honor, can I just ask the agent one

16   further question?

17          THE COURT:  Yeah.

18                    FURTHER REDIRECT EXAMINATION

19   BY MS. KOCHER:

20   Q.   When you purchase a lower -- an 80 percent that you

21   referenced to the judge's question, does any further machining

22   or modification have to be done in order for that 80 percent

23   lower to actually work as a firearm?

24   A.   Yes, ma'am.

25   Q.   And what is that?

John Little - Further Redirect

1    A.   There's usually -- depending on if it's a pistol or

2    rifle, there's additional drilling that has to take place,

3    utilizing a jig -- generally usually utilizing a jig and a

4    drill press.

5    Q.   And are you familiar, Agt. Little, with any conversation

6    that Mr. Maurino himself may have had about the material or

7    equipment necessary in order to do that?

8    A.   Yes.

9    Q.   And what is that?

10   A.   I recall from the Signal chat we referenced from West

11   Virginia, they discussed getting a drill press that was

12   discussed, which would be a needed component to complete a

13   Polymer or an 80 percent lower.  Also the receipt provided to

14   him for Mr. Kryscuk contained a line for a jig, along with the

15   lowers, that would also be required to use in conjunction with

16   a drill press or something else to -- to complete.

17   Q.   All right.  Thank you, sir.

18        THE COURT:  Was the jig found?

19        THE WITNESS:  It was not recovered.

20        THE COURT:  You've got anything else?

21        MR. CHETSON:  Nothing.

22        THE COURT:  All right.  Thank you, sir.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  You can step down.

25        Anything further from the government?

John Little - Further Redirect

1      MS. KOCHER:  No, sir.

2      THE COURT:  Mr. Chetson, you got witnesses?

3      MR. CHETSON:  Yes, Your Honor.  I would call --

4      THE COURT:  Well, we'll take a --

5      MR. CHETSON:  Okay.

6      THE COURT:  -- we'll take a short break.

7      MR. CHETSON:  Thank you, Your Honor.

8      THE COURT:  We'll take a five-minute recess.

9      THE CLERK:  All rise.  The Honorable Court will be in

10  recess for five minutes.

11      (Recess from 2:47 p.m., until 2:55 p.m.)

12      THE CLERK:  All rise.  The Honorable U.S. District

13  Court for the Eastern District of North Carolina is now back

14  in session.  Please be seated and come to order.

15      THE COURT:  All right.  Mr. Chetson, if you would

16  call --

17      MR. CHETSON:  Yes.

18      THE COURT:  -- your first witness?

19      MR. CHETSON:  Yes, Your Honor.  We call Cynthia

20  Maurino.

21      THE CLERK:  If you would, please place your left hand

22  on the Bible and raise your right hand.

23       DEFENDANT'S WITNESS, CYNTHIA MAURINO, SWORN

24      THE CLERK:  Thank you.  You can take a seat.

25  ///

Cynthia Maurino - Direct

```
 1                      DIRECT EXAMINATION

 2    BY MR. CHETSON:

 3    Q.   Ms. Maurino, would you say and spell your name for the

 4    Court?

 5    A.   My name is Cynthia Maurino, C-Y-N-T-H-I-A M-A-U-R-I-N-O.

 6    Q.   And how were you related to Joseph Maurino?

 7    A.   I am his mother.

 8    Q.   And where do you live?

 9    A.   164 Colony Lane, Manalapan, New Jersey.

10    Q.   And how long have you lived in that residence?

11    A.   Thirty-two years.

12    Q.   And has Joseph always lived with you except when

13    deployed?

14    A.   Yes.

15    Q.   And was he living with you -- has he been living with you

16    since October of 2020?

17    A.   Yes.

18    Q.   Does he have his own room there?

19    A.   Yes.

20    Q.   Who else resides at that residence?

21    A.   My husband, Guido, and his identical twin brother,

22    Matthew.

23    Q.   And was Joseph and -- were Joseph and Matthew -- did they

24    enroll in the U.S. military of some sort?

25    A.   Yes.
```

Cynthia Maurino - Direct

1    Q.   And can you describe that for the Court?

2    A.   Joseph, at seventeen, asked to join the Army National

3    Guard, after meeting with a recruiter at high school.  And we

4    were opposed, and he said he really wanted to join.  And we

5    signed him up, after speaking with the recruiter and knowing

6    this is what he wanted to do.

7    Q.   Did that require your --

8         MS. KOCHER:  Sorry.  I didn't hear the end of that

9    sentence.

10        THE WITNESS:  I said that it is what he wanted to do.

11   He was going to join at eighteen.

12   BY MR. CHETSON:

13   Q.   So you and your husband agreed with that decision?

14   A.   We weren't happy with it, but it was his choice, yes.

15   Q.   And so you consented to allow him to get in -- to enter

16   the Army National Guard?

17   A.   At seventeen, so that he can get training in before he

18   went to boot camp at the age of eighteen.

19   Q.   Okay.  I want to back up a little bit and talk about you

20   and your work history.  Where are you currently employed?

21   A.   I work for Covered Bridge Condominium Association in

22   Manalapan, New Jersey.

23   Q.   And what is Covered Bridge?

24   A.   It is an adult community.

25   Q.   And what do you do for them?

Cynthia Maurino - Direct

1   A.   I am in -- I work in the office as property management

2   and secretary to the Board of Trustees.

3   Q.   And how long have you had that position?

4   A.   Four years.

5   Q.   And is that a full-time position?

6   A.   Yes.

7   Q.   Prior to that position, where did you work?

8   A.   I worked for Stress Care.

9   Q.   And what is Stress Care?

10  A.   Stress Care is a mental health facility -- outpatient.

11  Q.   And what did you do for that?

12  A.   I was a coordinator for appointments.

13  Q.   And where was that located?

14  A.   In Manalapan, New Jersey.

15  Q.   And was that a full-time position?

16  A.   Yes.

17  Q.   And prior to that, where did you work?

18  A.   I worked for Gotta Go (ph.).  It's an online dog sitting

19  service.  I was a coordinator, making appointments.

20  Q.   And how long were you at that position?

21  A.   Approximately two years.

22  Q.   Okay.  If necessary, if the Court were to require -- you

23  currently have a full-time position, I understand?

24  A.   Yes.

25  Q.   And that is a standard 9 to 5 position?

www.escribers.net | 800-257-0885

Cynthia Maurino - Direct

1  A.   7:30 to 3:30.

2  Q.   Okay.  If the Court were to want greater supervision and

3  designate you as a third-party custodian, would you be willing

4  to either resign the position or take a leave of the position

5  in order to remain home with your son?

6  A.   Absolutely.

7  Q.   I want to ask you a little bit about are there any

8  firearms in the home?

9  A.   No.

10 Q.   Is there a landline in the home?

11 A.   No.

12 Q.   Would you be willing to get a landline connection to the

13 home, if the Court were to order it to assist in monitoring?

14 A.   Absolutely.

15 Q.   And which part of New Jersey is Manalapan?

16 A.   We are located in western Monmouth County.

17 Q.   Okay.  And how far is that, just for our reference, to

18 either Philadelphia or New York?

19 A.   It's equidistant, approximately fifty-five minutes.

20 Q.   Okay.  You've heard about some of the allegations that

21 the government has made against your son?

22 A.   Yes.

23 Q.   Were you aware of any of this conduct?

24 A.   No.

25 Q.   When did you first become aware?  Would it have been in

Cynthia Maurino - Direct

1   October?

2   A.   Yes.

3   Q.   And on October 22nd, do you recall anything happening at

4   your home?

5   A.   Yes.

6   Q.   What happened?

7   A.   I was called by my neighbor that there was police

8   activity at my home.  And I left my job, and I went to find

9   multiple agents at my home.

10  Q.   Okay.  Was your son at home at that point?

11  A.   He was in their custody.

12  Q.   Okay.  So he was not at home.  Is that fair?

13  A.   He was in -- he was in the home.

14  Q.   In the home.  Okay.  And when you got home, what did you

15  do?

16  A.   I asked what was going on.

17  Q.   And what did the -- did you conduct an interview or

18  participate in an interview with police?

19  A.   No.  They told me I needed to wait outside my home.

20  Q.   At some point, were you interviewed or were other members

21  of your family interviewed by agents?

22  A.   I was interviewed by the FBI.

23  Q.   Okay.  And was that that day?

24  A.   Yes.

25  Q.   Was your son ultimately taken into custody to some

Cynthia Maurino - Direct

1  location in New Jersey, some police station or court?

2  A.   Yes.

3  Q.   Okay.  And was he released from custody?

4  A.   Yes.

5  Q.   Did you procure an attorney in New Jersey to assist your

6  son with the state charges?

7  A.   Yes.  I hired Mitch Ansell.

8  Q.   Okay.  And your son was released on pre-trial or bail?

9  A.   There was no bail.

10  Q.   No bail.  Okay.  So your son was released out of custody

11  and put back in your home?

12  A.   Yeah.  Yes.

13  Q.   As far as you're aware, have there been any concerns

14  raised by any law enforcement or court officials about your

15  son's conduct while on pre-trial release in New Jersey during

16  the pendency of his New Jersey charges?

17  A.   No.

18  Q.   And as far as you're aware, were the New Jersey charges

19  related to a firearm that had been recovered?

20  A.   Yes.

21  Q.   As far as you're aware, have there been any concerns

22  about your son failing to appear at any court hearings?

23  A.   None.

24  Q.   Has your son been in touch with his attorney up in New

25  York (sic)?

www.escribers.net | 800-257-0885

Cynthia Maurino - Direct

1   A.   Not recently.

2   Q.   But since -- I mean, during the pendency of the case from

3   October, has he been in touch with his attorney?

4   A.   Yes.

5   Q.   Okay.  You understand that you're being offered to the

6   Court as a third-party custodian?

7   A.   Yes.

8   Q.   And you understand that as a third-party custodian, you

9   would essentially be designated by the Court to ensure that

10  your son abides by any conditions that would be imposed upon

11  him if he were to be released?

12  A.   Yes.

13  Q.   And you understand that those conditions would include

14  the requirement that he come to court as required, that he not

15  evade supervision, and that he not violate any other state or

16  criminal laws or local laws.  Do you understand that?

17  A.   Yes, I do.

18  Q.   And you understand that if you saw your son violate any

19  rules imposed by this Court, you would be required to report

20  him to a law enforcement officer or to probation to ensure

21  that he were arrested and detained?

22  A.   Yes.

23  Q.   Would you be willing to do that?

24  A.   Absolutely.

25  Q.   And how can this Court be confident that you would be

Cynthia Maurino - Direct

1   willing to report your own son for potential arrest if he

2   violates any conditions?

3   A.   Because I believe in the law.  I believe in due process.

4   And I do believe that if you did something wrong, you have to

5   be held accountable.  And I would do that for my son.

6   Q.   Your son -- at some point, you've talked a little bit

7   about him being -- him joining the military?

8   A.   Yes.

9   Q.   And at some point, he was deployed?

10  A.   Yes.

11  Q.   Where was he deployed?

12  A.   He was deployed to Camp As Sayliyah, Qatar.

13  Q.   And when he came back -- and how long after he graduated

14  high school did he deploy -- or did he enter the National

15  Guard?

16  A.   He graduated June 26th, I believe, 2017.  And he left

17  July 11th, 2017.

18  Q.   And where did he go?

19  A.   He went to Fort Benning, Georgia, to OSUT, One Station

20  Unit Training.

21  Q.   And is that the sort of equivalent of basic training for

22  the National Guard?

23  A.   It is basic training and AIT, which is infantry training.

24  Q.   And while he was in the National Guard, would he also, at

25  times, work?

Cynthia Maurino - Direct

1    A.   I don't know if he was.  He was working at Wegmans at one

2    point.

3    Q.   Okay.

4    A.   But then he was going to school.

5    Q.   Okay.  And when did he actually -- do you recall when he

6    actually deployed to Qatar?

7    A.   Yes.  He left January 26th of 2019.  They did not get

8    into country until March, I believe, 1st or 2nd.  He left New

9    Jersey, and he went to Fort Bliss, and from Fort Bliss, they

10   then went to Camp McGregor.  And then from there, he went on

11   to Qatar.

12   Q.   When he returned -- after his deployment to Qatar, when

13   he returned to the United States, what did he do, either

14   school-wise or employment-wise?

15   A.   He continued his education.  He had taken online courses

16   in Qatar, and he took classes at Brookdale Community College

17   in person until the pandemic, and then it was online.

18   Q.   Okay.  And was it his intent to either continue working

19   or continue to be employed?

20   A.   Yes.

21   Q.   We have heard some discussion by the agent with respect

22   to Joseph's being sent somewhere in January of 2020 (sic), to

23   Washington, D.C.  What's your understanding about Joseph going

24   to Washington D.C. or not going to Washington D.C.?

25   A.   His unit was sent; however, he, along with his identical

Cynthia Maurino - Direct

1    twin, volunteered back in November of 2020 to do an in-state

2    deployment at Rowan University, where the megasites were being

3    formulated for the vaccine.  And that's where they were

4    deployed in state.  Since they had already accepted that in-

5    state deployment, he was not sent to Washington.

6    Q.   So it's your understanding that he was actually -- he had

7    actually chosen or decided to participate as part of his

8    group, or as part of the National Guard, at the vaccine center

9    at that time?

10   A.   Yes.

11   Q.   Okay.  At some point, Joseph left the -- or was separated

12   from the military under general honorable conditions.  You've

13   heard some testimony about that?

14   A.   Yes.

15   Q.   And is it your understanding that that was related to the

16   state charges?

17   A.   Yes.

18   Q.   And not any other conduct or misconduct in the military?

19   Just the state charges?

20   A.   Correct.

21   Q.   At one point, your sons were both deployed to -- I mean,

22   they were both deployed to Qatar; is that correct?

23   A.   Yes.

24   Q.   And some news articles were published about them?

25   A.   Yes.

Cynthia Maurino - Direct

1    Q.    Okay.  Who is Jackson Bainbridge?

2    A.    One of Joseph's closest friends.

3    Q.    Okay.

4          MR. CHETSON:  One second to consult with my client,

5    Your Honor?

6          THE COURT:  Go ahead.

7          (Pause)

8    BY MR. CHETSON:

9    Q.    There was some testimony about your son having some issue

10   getting a registration or getting some kind of permission to

11   purchase a firearm in New Jersey.  You heard some testimony

12   about that, correct?

13   A.    Yes.

14   Q.    And it's your understanding that that was because his

15   brother --

16         MS. KOCHER:  Objection to leading, Your Honor.

17         THE COURT:  Overruled.

18   BY MR. CHETSON:

19   Q.    It's your understanding that that was because his

20   brother, Matthew, had gotten into trouble at school, correct?

21   A.    Yes.

22   Q.    Okay.  And your son was a volunteer firefighter,

23   beginning in July of 2020, until about October 2021, when he

24   was arrested on the state charges, with the Gordons Corner

25   Fire Company?

Cynthia Maurino - Cross

1    A.    Correct.

2            MR. CHETSON:  No further questions, Your Honor.

3            THE COURT:  Cross?

4            MS. KOCHER:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MS. KOCHER:

7    Q.    Ms. Maurino, how many college credits does Joe have?

8    A.    I honestly don't know.

9    Q.    Do you know how many credits or classes he needs to

10   attain an associate's degree from the community?

11   A.    I think he needs just another semester.

12   Q.    And what would his degree be in?

13   A.    He was taking criminal justice.

14   Q.    So is that what the degree would be in?

15   A.    I can't answer that because I don't know.

16   Q.    You all don't talk about his schooling?

17   A.    We do talk.  He tells me some of the classes he has

18   taken.  I know he took classes when he was deployed.  I don't

19   know which classes they were.  I'm sorry.  I don't have

20   anything further.

21   Q.    Did he tell you what he wants to do?

22   A.    He always wanted to be a state trooper, ma'am.

23   Q.    Were you aware, Ms. Maurino, of the short-barrel rifle in

24   the home that Joe turned over to the State police?

25   A.    I was aware of the upper portion.  And when he got it, I

Cynthia Maurino - Cross

1    questioned its legality and was told that it was legal to just

2    own that.

3    Q.    You were not aware of the lower receiver?

4    A.    No, ma'am.

5    Q.    How about the magazines that were from the National

6    Guard?

7    A.    No, ma'am.

8    Q.    And the ammunition that he had?

9    A.    No, ma'am.

10   Q.    Where were those located in the home?

11   A.    It had to have been in his room, ma'am.

12   Q.    Only because you accessed the rest of the house?

13   A.    Yes, ma'am.

14   Q.    All right.  You didn't see him retrieve them for law

15   enforcement that day?

16   A.    No, ma'am.  That happened prior to my return from work to

17   find what I found.

18   Q.    All right.  You were asked if you were aware of this

19   conduct, presumably the conduct that you've heard about today.

20   And I think you said, not at all?

21   A.    No, I did not.

22   Q.    All right.  Were you aware that within that first year of

23   Joe having gone into the military, that he had sought

24   membership in Identity Evropa?

25   A.    I don't even know what that is, ma'am.

Cynthia Maurino - Cross

1    Q.   All right.  Were you aware of him attempting to join a

2    group that had ideologies consistent with white supremists

3    (sic)?

4    A.   No.

5    Q.   Did Joe ever talk about hating minorities or persons of

6    the Jewish religion?

7    A.   His best friend is Jewish.  My best friend is Jewish.

8    Her parents were Holocaust survivors.  Joseph helped them move

9    into their adult community.  So the answer is no.

10   Q.   It's nothing you ever discussed?

11   A.   It never came up because there was never an issue.

12   Q.   All right.  Did you say [Roe-wahn] University?

13   A.   Rowan.

14   Q.   R-O-W-A-N?

15   A.   Yes, ma'am.

16   Q.   And where is that located?

17   A.   That's located in -- I think it's -- I don't know if it's

18   Glassboro, New Jersey, I'm not sure -- or Gloucester -- excuse

19   me -- Gloucester, New Jersey.

20   Q.   And how far away is that from your home?

21   A.   I think it's a good hour.  I know that they were given

22   access to stay in a hotel close to the campus for work,

23   through the Army National Guard.

24   Q.   All right.  And when did he go stay in that hotel?

25   A.   He didn't.  He -- well, I don't remember.  His brother

Cynthia Maurino - Cross

1    got the access card to go.  He hadn't gotten one yet.  And I

2    believe it was in December.  It was right after Christmas,

3    December 26th, I believe.

4    Q.   All right.  And so Matthew, Joe's twin brother, went on

5    to Rowan?

6    A.   Yes, they both did.

7    Q.   I'm sorry.  I thought that's what I asked.  So when did

8    Joe go?

9    A.   Joe went with his brother simultaneously.  I believe it

10   was December 26th.  I know it was, like, the day after

11   Christmas.

12   Q.   I'm sorry.  I understood you to say that Matthew had

13   gotten the access card, but that Joe didn't.

14   A.   The access card, meaning they were given a credit card by

15   the Army to utilize for the hotel.  Joe's hadn't come yet, so

16   he stayed in the room with his brother.  He didn't have his

17   own private room thus far.

18   Q.   Got it.  So December 26th.  When did they return?

19   A.   Joseph was pulled from the deployment due to his arrest

20   in October.  I don't recall the date.  It was sometime in

21   January.  So he got pulled from the deployment.

22        Matthew continued on until -- I believe it was March.  I

23   think it was supposed to be until March 26th, and they told

24   him he could get off on March 3rd.  So that's when Mark --

25   that's when Matthew ended it.  But Joseph's was prior to them

Cynthia Maurino - Cross

1    pulling him from deployment.  It's in the DD214 that states

2    that he was removed, in his military records.

3    Q.   All right.  And what was the date on the DD214 that he --

4    A.   I don't recall.  I apologize.  I don't remember.

5         MS. KOCHER:  Just a moment, Your Honor.

6    Q.   Did you ever have the opportunity to meet Liam Collins?

7    A.   Yes.

8    Q.   When was that?

9    A.   During the pandemic shutdown.  It was either March or

10   April of 2020.

11   Q.   Are you aware that Mr. Collins went to your home in

12   September of 2020?

13   A.   No.

14   Q.   Did you ever meet Paul Kryscuk?

15   A.   Yes.

16   Q.   And when was that?

17   A.   I don't remember.  A few years back, briefly.

18   Q.   Was that at your home?

19   A.   Yes.

20   Q.   Was that before or after Joseph had entered the National

21   Guard?

22   A.   I'm going to say before.

23   Q.   I'm sorry, before?

24   A.   I think.  I -- forgive me.  I don't know the date in the

25   time line.

Cynthia Maurino - Cross

1          MS. KOCHER:  No further questions, Your Honor.

2          THE COURT:  Any redirect?

3          MR. CHETSON:  No, Your Honor, except that I do have

4    some exhibits that I'll just be proffering to the Court.

5          THE COURT:  Any objection?

6          MS. KOCHER:  No, sir.

7          THE COURT:  All right.  Thank you.  Ma'am.  You can

8    step down.

9          MR. CHETSON:  And no further witnesses, Your Honor.

10   I'll just proffer the exhibits.

11         THE COURT:  Okay.

12         MS. KOCHER:  And I provided a copy of the

13   government -- Defendant's Exhibit 1 is a letter from Mitch

14   Ansell, who is the attorney up in New Jersey, that represents

15   my client on the state charge, simply basically attesting to

16   the fact that there's been no pre-trial issues.

17         Exhibit 2 is a picture of the bedroom that my client

18   would stay in.

19         Exhibit 3 relates to a letter that I'm going to refer

20   as -- another issue, but it's essentially about a bird that my

21   client rescued.

22         And Exhibit 4 is a story about identical twins

23   sharing deployment together.

24         And Exhibit 5 is Manalapan -- I'm hoping I got them

25   all right, Madam Prosecutor -- but Manalapan High School

Cynthia Maurino - Cross

1    diploma.

2           And then I have the DD- -- sorry.

3           Exhibit 6 is the State of New Jersey orders regarding

4    my client's reporting to Fort Bliss and his deployment.

5           And then Exhibit 7 is an exhibit regarding the

6    release from the military, the DD214.

7           And then Exhibit 8 is an army achievement medal that

8    my client received.

9           If I could approach?

10          THE COURT:  Go ahead.

11          MR. CHETSON:  The last -- and he couldn't be here

12   today, so I'll just read a note -- and regarding my client

13   from Jackson Bainbridge, who was -- his mother testified --

14   one of my client's best friends.  He refers to an incident

15   that occurred.  And it's my understanding that the incident

16   occurred in either June or July -- well, it would have been

17   June of this year.  But he talks about Joe being a friend for

18   most of my client's -- a friend of Jackson Bainbridge for most

19   of my client's and their lives together, that my client

20   assisted a gentleman who was collapsed on the street.

21          And I can show this to the government as -- it

22   essentially describes my client helping to rescue this person

23   and turn him using his training that he received in the

24   military and first aid rescue to get this guy positioned in

25   such a way that whatever he was facing, he could now breathe.

Colloquy

1    And then rescue services came and rescued that person who was

2    having some kind of medical or drug-induced condition.

3         And it also talks about my client being somebody who

4    entered the military, which you've heard about, and who

5    assisted -- since the issue of race or ethnic background has

6    come up -- assisted people who are Holocaust survivors,

7    presumably of Jewish extraction. Thank you, Your Honor.

8         THE COURT: All right. Ms. Kocher, you'll lead off

9    in closing arguments?

10         MS. KOCHER: Thank you, Your Honor.

11         THE COURT: Let me ask you directly how it is, if we

12    have a third-party custodian, and that I can flesh out from

13    all the testimony, what Mr. Maurino is alleged to have done,

14    square that with the fact that all his codefendants are in

15    jail, that he's been on bond since October, that since that

16    time, he had some knowledge of the charges before his arrest,

17    that he surrendered the weapons, he has no -- I don't want to

18    say has no criminal history, but he doesn't have the history

19    that would suggest easily that he would -- that he would

20    violate conditions of pre-trial release in this case.

21         Couple that with the many tools this Court can impose

22    upon him in the way of conditions of house arrest, electronic

23    monitoring, warrantless searches. I feel confident that I can

24    keep him off the internet, subjecting him to warrantless

25    searches of his house. How is it that these conditions would

Colloquy

1    not satisfy the Court as required?

2          MS. KOCHER:  Your Honor, I would take you to the word

3    "weapons".  Early in your recitation just then, you said he

4    surrendered weapons.  And that is not accurate; he surrendered

5    one.

6          THE COURT:  Okay.

7          MS. KOCHER:  And the government's evidence would

8    indicate he's got -- and these are his own words --

9          THE COURT:  Where?  Where are they?

10         MS. KOCHER:  They are in -- let me find it here.

11   It's in Government's Exhibit 8, on page one.  "I got seven

12   MAC-11s.  I got .38s.  And I got nine 9s."  That coupled with

13   the inventory -- it's not a list of groceries; it's an

14   inventory.  In this case, I would argue that words are worth a

15   picture, rather than 1,000 words equal a picture.  Inventory

16   is a current list as of that time; that's a counting.  The

17   group and the difference between what's come out in cross and

18   in the defense presentation, and the government's view, is

19   that in isolation, I understand what the cross-examination and

20   the defense's points were about.  In context, with the group,

21   the group was all about provisioning itself --

22         THE COURT:  The group's in jail.

23         MS. KOCHER:  Correct.

24         THE COURT:  The group's in jail.

25         MS. KOCHER:  That's correct.  But the provisions are

Colloquy

1    not.  The guns are outstanding.  This defendant has access to

2    funds.  The pre-trial service report done in New Jersey speaks

3    to a significant amount of funds.

4            THE COURT:  Significant amount of what?

5            MS. KOCHER:  Money.  He's got 90,000 dollars.  He's

6    got 90,000 dollars, Your Honor.

7            THE COURT:  Where is this?

8            The format of the New Jersey report is --

9            MS. KOCHER:  It is unusual.

10           THE COURT:  -- it is different.

11           MS. KOCHER:  It is, but on page 3, it sets out there,

12   he's got 93,000 dollars, between the value his vehicle, and

13   everything else is cash or can be cashed.  Personal checking,

14   personal savings, Robinhood balance of 30,000 dollars in

15   cryptocurrency.

16           THE COURT:  But likelihood -- likelihood -- of the

17   conditions that the Court impose upon him, what --

18           MS. KOCHER:  One of --

19           THE COURT:  -- what's the likelihood of all that

20   being problematic for him?

21           MS. KOCHER:  The government thinks that there is a

22   clear and convincing evidence that the safety of the community

23   is at risk, and a preponderance as to the risk of flight,

24   given this defendant's preparation.  The difference, Your

25   Honor, between this defendant and the fact that I have nothing

Colloquy

1    from October of '20 -- you mentioned the fact that he'd been

2    successfully on release since then.  This defendant wasn't

3    charged.

4            I can't get into his head.  It may very well be that

5    he thought, in terms of federal charges, that he was clear.

6    And in fact, he had been for a while until Agt. Little was

7    able to get access to the phone there in New Jersey and review

8    the content and find Mr. Maurino -- the alleged conduct, Mr.

9    Maurino's involvement in that conspiracy to distribute those

10   unserialized weapons manufactured by Kryscuk.  That's exactly

11   what Collins did.  The government actually purchased two of

12   those weapons, a pistol with a silencer and an SBR.

13           THE COURT:  Why didn't he run in October?

14           MS. KOCHER:  Because he didn't have to.

15           THE COURT:  Why not?

16           MS. KOCHER:  Why would he run at that time and

17   risk -- in Collins' words, this is a long game.  They are --

18           THE COURT:  What's changed?

19           MS. KOCHER:  They --

20           THE COURT:  What's changed since October?

21           MS. KOCHER:  Now he's under federal arrest.

22           THE COURT:  Well, of course, but --

23           MS. KOCHER:  He's facing difficult charges.

24           THE COURT:  -- but I mean, in his mind, if he wants

25   to -- if he wants -- what is different other than the charges

1    are pending in another jurisdiction -- what's going to -- why

2    wouldn't he -- why wouldn't he flee in October?

3         MS. KOCHER:  Because the state -- as the pre-trial

4    services report indicates, Your Honor, those -- nothing has

5    happened on those charges, absolutely nothing.  He was

6    arrested in October 26th.  He was released.  This actually

7    says his first appearance was November 23rd.  My suspicion --

8    again, I can't get in his head -- there wasn't even bail

9    issued.  Apparently, it's like he's on his personal

10   recognizance up there.  I can't speak to that point.  All I

11   can speak to is --

12        THE COURT:  And look what he did.  Nothing.

13        MS. KOCHER:  And I --

14        THE COURT:  So why can't some pretty serious

15   conditions be imposed upon him and expect him to do similarly

16   the same?

17        MS. KOCHER:  Your Honor, the government believes that

18   the risk to the community -- I mean, it is to your

19   determination.

20        THE COURT:  I know.

21        MS. KOCHER:  But it is the government's view that the

22   risk to the community, because of the preparation that the

23   group underwent, because of their operational security, the

24   fact that we don't have the outside edge -- we don't know

25   where these weapons are; we don't know where the provisions

Colloquy

1    are.  Not only that, Your Honor, but following that July live

2    fire training, what we do know is that he came back and got

3    into a second group.

4         Now, I can't -- as counsel correctly brought out on

5    cross-examination, I can't go to whether that group has stayed

6    active or whether he may have opened yet a different group.

7    What I know, Your Honor, is this was all behind the scenes.

8    His mom, presumably his father, had no idea this was going on.

9    It goes to his words.  Yes, so his parent's best friend are

10   Holocaust survivors, presumably Jewish, and specifically in

11   regard to the Jewish religion, at the Government's Exhibit 8,

12   on page 3, when one of his chat members says, "I was forced to

13   hang out with an annoying Jew against my will", how does Mr.

14   Maurino respond?  "Ah, everything has a silver lining.  Social

15   interactions like that are learned, and learning to be likable

16   by people who you don't like and should hate you is an

17   experience-only ability."

18        His entire army career, his entire National Guard

19   career, from the government's perspective, also follows Liam

20   Collins' word.  And that is he went in to get the military

21   experience.  His own exhibit, Your Honor, the certificate in

22   the military, compliments him for his tactical and technical

23   abilities with his military training.  The DD214, which Mom

24   testified that reflects his deployment to Rowan University, is

25   now in evidence before the Court as a defendant's exhibit.

Colloquy

1    And it does not mention that deployment, Your Honor.

2         Now, the mom, I'm not at all --

3         THE COURT:  What are you looking at?

4         MS. KOCHER:  I am looking at one of the defense

5    exhibits, the DD214.  I believe it was number 7 or 8.  My

6    copies don't have numbers.  I apologize.

7         MR. CHETSON:  Sorry.

8         THE COURT:  Yeah.

9         MS. KOCHER:  And again, a mom who would be willing to

10   quit her job to further the son's interest, I cannot speak

11   against.  What I can speak against is that that's not the

12   household this man needs to be in on release.  We've got the

13   twin brother, who gave such a threatening statement in high

14   school that it got him kicked out of the school and

15   prohibited --

16        THE COURT:  I have no idea why that happened.  It's

17   so speculative, I don't know what to think about that.

18        MS. KOCHER:  That is the evidence before the Court,

19   Your Honor.  And the defense did put on a case, and it was not

20   mentioned.  In fact, it was only brought out on cross that

21   that was the understanding from the testimony.  Mom didn't

22   deny that.  That is the evidence before you.  That household

23   where he secreted the lower receiver, even despite her

24   intervention, when she sees the upper -- what are you doing;

25   this is illegal in New Jersey -- and he convinces her it's

Colloquy

1    not.  The mom has done everything she can.

2         The point comes back to his words in Exhibit 8.  He

3    has developed the ability to fool people, experiential

4    ability.  That, Your Honor, is why that home in particular,

5    and the other resources at your disposal for pre-trial release

6    are not sufficient in this case.

7         THE COURT:  All right.  Mr. Chetson?

8         MR. CHETSON:  I don't want to really belabor it too

9    much, Your Honor.  I mean, I guess I would say -- and I don't

10   want to be very dramatic about it, but the kind of -- the kind

11   of argument by the government would require the -- would

12   require the pre-trial detention of anybody in the military.  I

13   mean, where there was some --

14        THE COURT:  He's not a military.

15        MR. CHETSON:  Well, anybody in the military, people

16   with familiar with firearms who are tactically good in the

17   military.  The government's position seems to be, well, he did

18   well in the military, and so therefore he should, at this

19   point, be --

20        THE COURT:  Well, these are serious charges.

21        MR. CHETSON:  They are extreme -- they are very

22   serious charges.  But it's a five-year -- it's a five-year

23   maximum, Your Honor.

24        THE COURT:  Well, let's not -- at detention, let's

25   not minimize the charges.

Colloquy

1     MR. CHETSON:  I'm not minimizing the charges, Your

2     Honor.  But the point being that the detention decision that

3     the government puts forward would apply to large, large

4     numbers of Americans, given that what they're saying -- what

5     the government seems to be saying is that if you do well in

6     the military, and you come out of the military with training,

7     and that you develop a list of goods at the beginning of the

8     COVID -- a list that many Americans were putting together, at

9     that very time, of provisions that they might need, depending

10    on how long the lockdown went forward -- that coupled

11    together, means that my client needs to be, at this point,

12    detained, when, in fact, the proof essentially is in the

13    pudding.

14         And the proof in the pudding is that since October of

15    2020, he has been aware of the fact that every other member of

16    the group has been under federal investigation or federal

17    detention.  They've all been detained.  And there's not a

18    single bit of evidence of any bad conduct after October 20th,

19    2020.  Normally in a federal case, we don't have that kind of

20    track record.

21         But essentially, for ten months now, he has been out.

22    He has spoken with the FBI.  He has an attorney up in New

23    Jersey on the state charges.  He was deployed for about two

24    weeks to attend to the mass vaccination center.  He was

25    removed from the military, presumably because of the state

eScribers
www.escribers.net | 800-257-0885

1    charges.  He was arrested at the location where he should have

2    been, which was his parents' home, in June of 2021.  He was,

3    on both occasions, cooperative with the police or the agents

4    that came.

5         The government has the ability and has had the

6    ability to procure search warrants to search the home.  If the

7    government did not search the home, then that's the government

8    not believing that they had probable cause or any reason to

9    search the home and then now coming to court and saying, there

10   may be firearms about.  All of that tends to suggest that

11   there are -- that my client would -- there are suitable

12   conditions in which my client can be released, in a district

13   with overcrowded detention facilities, that he could be

14   returned to his parents' home, that he could -- there could

15   be -- if there were any concern about his brother -- and I

16   agree; there's no clear definition about what occurred back

17   when they were in high school.  My initial impression from the

18   testimony was that my client was somehow involved, but it

19   became clear that it was his brother Matthew that was involved

20   in that incident and not my client.  And why that should be

21   imputed to my client is beyond me.  My client, at this stage,

22   could be ordered to keep away from his twin brother.  And his

23   twin brother could be advised to get an apartment somewhere,

24   if that's of concern to the Court.

25         But there are plenty of conditions and plenty of

Colloquy

1    tools that this Court has at its disposal to ensure that this

2    individual, this person, Joe, abides by the conditions.  And

3    if there is any issue during pre-trial release, then that

4    would subject him to additional criminal charges,

5    enhancements, obstruction enhancements.  The government's

6    evidence has all been seized at this point, and my client's

7    cell phone has been seized.  And the government has had ample

8    time to do its investigation.  So I would ask you to release

9    him and could suggest provisions that the Court is well aware

10   of that could be imposed upon my client.

11         I will also -- the last bit I'll note is that some of

12   that -- there was a government's exhibit that has a bunch of

13   text messages.  And some of those text messages I recognize as

14   rap lyrics.  Should that rap lyric have been exchanged?  Is it

15   a -- are some of those text messages referring to pop culture

16   issues or things in our pop culture that are offensive?

17   Should that have been said?  No.  Should people harbor hateful

18   views of other cultures, ethnicities, races, and so forth?

19   No.

20         But with respect to the criminal charges here, we can

21   assure that the community remains safe and my client comes to

22   court.  And he has been doing so on the New Jersey charges for

23   ten months.

24         MS. KOCHER:  Your Honor, in rebuttal, I would just

25   simply point to Government's Exhibit 2.  That is the second

Colloquy

1    video that we showed.  It is this defendant, not only live

2    firing, or appearing to live fire a weapon, but scripted and

3    not to a, hey, leave my mom alone, or hey, get off of my front

4    porch, or get out of my house, or whatever.  It was scripted

5    to, I'd like to ask this girl out.  She rebuffs him.  Well,

6    I've got something for you, and turns her back -- turns his

7    back, and unloads the weapon then, once he pulls it out of the

8    backpack.

9         That is the crux of the government's case.  He's got

10   the training.  He's got the skills.  He's got the weaponry.

11   And he put it together in a practice scenario.  It remains the

12   government's position that the risk of safety in particular,

13   but also the risk of flight, is not overcome by releasing this

14   man, particularly back to that home, in that area.

15        I would note, I don't think the Court would consider

16   it, but I would not believe that this Court has jurisdiction

17   over a brother such that he could be ordered to leave his

18   home.  Just to note that.

19        MR. CHETSON:  The Court could order that my client

20   not reside with his brother.  And so he couldn't order the

21   brother leave, but could order that my client not reside with

22   him, and that therefore, effectively, the brother could get

23   some other -- find some other living arrangement with another

24   friend or something like that.

25        And then the other issue about this video is that,

Colloquy

1    yes, it's -- I don't know how to regard the video.

2            THE COURT:  You don't know how what?

3            MR. CHETSON:  How to regard the video.  It's

4    obviously an unpleasant video.  But the substantial evidence

5    indicates that he can comply with court instructions and has

6    done so for ten months.

7            THE COURT:  What were the instructions of the New

8    Jersey court?

9            MR. CHETSON:  I don't know what they were, but the

10   letter from the New Jersey attorney indicates that he has been

11   in compliance.  So this Court could impose even stronger

12   instructions.

13           THE COURT:  If they're conditions we don't know

14   about, I don't know --

15           MR. CHETSON:  Well, we could presume that there are

16   very few conditions, and you could impose very significant

17   conditions if you wanted to, Your Honor.  But the other issue

18   is that this investigation has been ongoing since October

19   2020.  And had there been any indication that my client was

20   continuing to or advancing these supposed plots or

21   conspiracies at all, that would have been presented to this

22   Court.

23           THE COURT:  What is the danger?  What is the danger

24   that he represents?

25           MS. KOCHER:  I believe the danger is represented by

Colloquy

1    his participation in a group that had this long range plan.

2          THE COURT:  They're all in jail.

3          MS. KOCHER:  The others are in jail.

4          THE COURT:  The West Virginia --

5          MS. KOCHER:  The other from the Boise group.  So I

6    can't even speak to the West Virginia group.

7          THE COURT:  So --

8          MS. KOCHER:  So yes, presumably they are out and

9    running around, wherever they are.  But in reference to the

10   Boise group, it may appear to this defendant he is the last

11   sole survivor.  This may be the opportunity that has not been

12   required of him in the past, and that would be to take action,

13   to create the chaos, to begin the killing on the list, the

14   preparation through the fact that he said he had the firearms.

15   The whole focus of that group was that preparation, Your

16   Honor.  They discussed this in context.  It is significant.

17         THE COURT:  The list --

18         MS. KOCHER:  That -- I'm sorry.

19         THE COURT:  The list was on someone else's phone.

20         MS. KOCHER:  The list is on Liam Collins' phone.

21         THE COURT:  Right.

22         MS. KOCHER:  But that is a screenshot that -- if you

23   see at the top of that list, it's Bishop.  It came from Mr.

24   Maurino and sent to Liam Collins.

25         THE COURT:  Is that one of the exhibits?

eScribers
www.escribers.net | 800-257-0885

Colloquy

1          MS. KOCHER:  Yes, sir.  That's Government's Exhibit

2     3.

3          THE COURT:  I'm sorry.  I'm thinking the list of

4     people.

5          MS. KOCHER:  Oh.  The list of people is not an

6     exhibit, Your Honor.

7          THE COURT:  But that was on someone else's phone.  It

8     was on --

9          MS. KOCHER:  That was a --

10         THE COURT:  -- Mr. Kryscuk's phone.

11         MS. KOCHER:  -- that was a piece of paper, the

12    government would argue, consistent with the operational

13    security.  Something at that level would never have been put

14    on the electronics.  The agent testified in regard to other

15    types of items.  That was actually a hand-recovered --

16    literally a piece of paper recovered from Mr. Kryscuk's home

17    that had the list of people on one side and the list of

18    intersections that correspond to the locations of

19    transformer -- large power substations and a fuel depot and

20    those things.  But that is why this client is dangerous, Your

21    Honor.

22         THE COURT:  All right.  We'll take a short recess.

23         THE CLERK:  All rise.  This Honorable Court will be

24    in recess.

25         (Recess from 3:42 p.m., until 4:03 p.m.)

Colloquy

1      THE CLERK:  This Honorable Court is now back in

2  session.  Please be seated and come to order.

3      THE COURT:  The issue this afternoon is whether there

4  is a condition or a combination of conditions that will

5  reasonably assure the appearance of Mr. Maurino and the safety

6  of any other person in the community.  The factors the Court

7  considers include the nature and circumstances of the offense

8  charged, including whether the offense is a crime of violence

9  or involves a narcotic drug; secondly, the weight of the

10  evidence against the defendant; three, the history and

11  characteristics of the person, including employment, family

12  and community ties, financial resources, past conduct, history

13  relating to drug and alcohol abuse, a defendant's criminal

14  history, including convictions and prior arrests, the

15  defendant's record concerning appearances at court proceedings

16  in the past, whether at the time of the alleged offense the

17  defendant was on probation.  The fourth factor is the nature

18  and the seriousness of the danger to any person or to the

19  community that would pose if the defendant were released.

20      These factors given a broad meaning in a way that is

21  not limited to the potential for physical violence.

22  Obviously, all cases are different.  Some of these factors are

23  evident in other cases; sometimes they're not evident at all.

24  Here, I think the first two factors, the nature and

25  circumstances of the offense charged and the weight of the

Case 7:20-cr-00167-M   Document 400   Filed 12/20/24   Page 110 of 113
eScribers
www.escribers.net | 800-257-0885

Colloquy

1   evidence, weigh in favor of detention in this matter.  What
2   we've really been talking about here is the third and fourth
3   factor, specifically my pointed question to the government of
4   what kind of danger Mr. Maurino presents.

5        So I've considered all of the evidence that the
6   parties have presented to the Court, watched the video, taken
7   notes, heard testimony.  I believe that considering the
8   government's allegations of Mr. Maurino -- and the evidence to
9   support that -- considering Mr. Maurino's leadership role in
10  this alleged conspiracy, his apparent devotion to a violent
11  disruption of society, it appears that he trained for this.
12  All this suggests it's beyond his mere beliefs.

13       The government presented evidence that he
14  participated in membership recruitment in this organization by
15  vetting.  The government also presented evidence that he drove
16  by BLM rallies.  The government says that there are others
17  associated with this group that are not in custody.  And there
18  was a second group that was identified.  This falls into the
19  third and fourth elements that I've described.

20       I have weighed this evidence against the third-party
21  custodian, Mr. Maurino's mother, who has testified here, as
22  well as what has been described by Mr. Chetson as Mr.
23  Maurino's cooperation and his behavior since being arrested on
24  the related state charges.  And I've got to agree with the
25  government that this is -- this evidence is outweighed by the

Ruling

1  secretive nature of this organization, the concern that this

2  Court has regarding these offenses, and the behavior alleged

3  of members of this organization.  I'm also concerned of the

4  missing guns that are apparently out there, according to the

5  government's description and the defendant's own words.  I'm

6  concerned that the third-party custodian was not alleged (sic)

7  of this alleged conduct.

8       For all of these reasons, I'll sign an order to

9  detain Mr. Maurino, pending trial in this case.

10       This is a closed case.  Mr. Maurino, you have very

11  good counsel in this case in Mr. Chetson.  If you wish to take

12  an appeal of this order, you certainly have the right to do

13  that.  I will issue a written order this afternoon.  Just know

14  that you have fourteen days to take an appeal of this order to

15  the District Court.

16       Is there anything further regarding Mr. Maurino's

17  case?

18       MS. KOCHER:  Not for the government, Your Honor.

19       MR. CHETSON:  Not for the defense.

20       THE COURT:  All right.  We'll take a short recess

21  until the next case.

22       THE CLERK:  All rise.

23            (Court is adjourned)

24                 *  *  *  *  *

25

1                    CERTIFICATE OF TRANSCRIBER

2

3          I, Sara Bernstein, court-approved transcriber, in and

4   for the United States District Court for the Eastern District

5   of North Carolina, do hereby certify that pursuant to Section

6   753, Title 28, United States Code, that the foregoing is a

7   true and correct transcript from the official electronic sound

8   recording of the proceedings held in the above-entitled matter

9   and that the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12                   Dated this 5th day of February, 2024.

13

14

15

16          /s/  _____

17          SARA BERNSTEIN, CDLT-127

18          COURT-APPROVED TRANSCRIBER

19

20

21

22

23

24

25